# UNITED STATES COURT OF INTERNATIONAL TRADE

CAMBRIA COMPANY LLC,

     Plaintiff,

ANTIQUE MARBONITE PRIVATE
LIMITED; PRISM JOHNSON
LIMITED; and SHIVAM
ENTERPRISES,

     Consolidated-Plaintiffs,

v.

UNITED STATES,

     Defendant,

APB TRADING, LLC; ARIZONA TILE
LLC; COSMOS GRANITE (SOUTH
EAST) LLC; COSMOS GRANITE
(SOUTH WEST) LLC; COSMOS
GRANITE (WEST) LLC; CURAVA
CORPORATION; DIVYASHAKTI
GRANITES LIMITED; DIVYASHAKTI
LIMITED; FEDERATION OF INDIAN
QUARTZ SURFACE INDUSTRY; M S
INTERNATIONAL, INC.; MARUDHAR
ROCKS INTERNATIONAL PVT LTD.;
OVERSEAS MANUFACTURING AND
SUPPLY INC.; PNS CLEARANCE
LLC; QUARTZKRAFT LLP; and
STRATUS SURFACES LLC,

     Defendant-Intervenors.

Before: Mark A. Barnett, Chief Judge
Court No. 23-00007

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

     Pursuant to Rule 56.2 of the Rules of the Court, Plaintiff Cambria Company

LLC ("Plaintiff") hereby moves for judgment on the agency record with respect to its

complaint challenging the final results of the antidumping duty administrative review issued by the U.S. Department of Commerce ("Commerce") in *Certain Quartz Surface Products from India: Final Results of Antidumping Duty Administrative Review; 2019-2021*, 88 Fed. Reg. 1,188 (Dep't Commerce Jan. 9, 2023) ("*Final Results*").

For the reasons explained in the accompanying memorandum in support of its motion for judgment on the agency record, Plaintiff respectfully moves for the Court to hold that the contested portions of the *Final Results* are not supported by substantial evidence or are otherwise not in accordance with law. Plaintiff further moves for the Court to remand this matter to Commerce for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

*/s/ Luke A. Meisner*
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Cambria Company LLC*

Dated: June 30, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

CAMBRIA COMPANY LLC,

      Plaintiff,

ANTIQUE MARBONITE PRIVATE
LIMITED, *et al.*,

      Consolidated-Plaintiffs,

v.

UNITED STATES,

      Defendant,

APB TRADING, LLC, *et al.*,

      Defendant-Intervenors.

**PUBLIC VERSION**

Before: Mark A. Barnett, Chief Judge
Court No. 23-00007

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION
### FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite
500
Washington, DC 20001
(202) 223-1700

*Counsel for Cambria Company
LLC*

Dated: June 30, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................ii

STATEMENT PURSUANT TO RULE 56.2(c)(1) .........................................................1

I.   Administrative Determination Under Review........................................................1

II.  Issues Presented for Review ................................................................................2

STANDARD OF REVIEW .............................................................................................2

STATEMENT OF FACTS ..............................................................................................3

SUMMARY OF ARGUMENT .....................................................................................10

ARGUMENT ................................................................................................................13

I.   Commerce's Departure from the Expected Method for Calculating the AD
Rate for the  Non-Selected Respondents Should Be Reversed...........................13

  A.  Legal Standard..............................................................................................13

  B.  Commerce Correctly Applied the Expected Method in the Preliminary
Results ..........................................................................................................16

  C.  Substantial Evidence Does Not Support Commerce's Decision to Depart
from the Expected Method.............................................................................17

      1.  The Historical Rates Calculated Under the Order Are Insufficient
Evidence to Depart from the Expected Method .........................................18

      2.  Commerce Ignored the Probative Value of Antique's AFA Rate During
the Current Review ...................................................................................21

      3.  Commerce Ignored Evidence Regarding the AUVs of the Respondents ...24

      4.  Commerce Contradicted Its Own Findings on Representativeness
During Respondent Selection....................................................................25

  D.  Commerce's Decision Is Inconsistent with Agency Practice ...........................28

II.  Commerce's Decision to Pull Forward the All-Others Rate from the Original
Investigation Was Not Supported by Substantial Evidence or in Accordance
with Law.............................................................................................................31

  A.  Neither of the Two Circumstances Outlined in *Albemarle* Apply ..................31

  B.  Commerce's Decision to Pull Forward the Old Rate Was Not Supported by
Substantial Evidence ....................................................................................35

III. CONCLUSION.................................................................................................37

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) .................... passim

*Allegheny Ludlum Corp. v. United States*, 112 F.Supp.2d 1141 (Ct. Int'l Trade 2000) ........................................................................................................ 3, 25

*Bosun Tools Co. v. United States*, No. 2021-1930, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) ..................................................................................................... 14

*Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017) .... 16

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) .................. 3, 30

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........................................................ 2

*Dupont Teijin Films USA v. United* States, 407 F.3d 1211 (Fed. Cir. 2005) .............. 2

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) .......................... 2

*Mid Continent Steel & Wire, Inc. v. United States,* 321 F.Supp.3d 1313 (Ct. Int'l Trade 2018) .......................................................................................... 19, 20, 32

*Nakornthai Strip Mill Pub. Co. v. United States*, 33 C.I.T. 326 (2009) .................... 27

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ......................... 3

*Primesource Building Products, Inc. v. United States*, 581 F.Supp.3d 1331 (Ct. Int'l Trade 2022) ................................................................................... passim

*Pro-Team Coil Nail Enter., Inc. v. United States,* No. 18-00027, 2022 WL 2783885 (Ct. Int'l Trade July 15, 2022) ........................................................ 18, 28

*Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185  (Fed. Cir. 1990) .................... 23

*Shandong Huarong Mach. Co. v. United States*, 29 CIT 484 (2005) ......................... 19

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ............................... 30

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018) ................. 25

*Universal Camera Corp. v. NLRB*, 340 U.S. 474(1951) ............................................... 3

*US Magnesium LLC v. United States*, 37 C.I.T. 100 (2013) ...................................... 25

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ............................................................................................................ 24

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................................... 2

19 U.S.C. § 3512(d) .................................................................................................. 13

19 U.S.C. § 1637d(c)(1)(B)(i)(II) .................................................................. 13, 14, 34

**Other Authorities**

*1-Hydroxyethylidene-1, 1-Diphosphonic Acid from China*, 74 Fed. Reg. 10,545 (Dep't Commerce March 11, 2009) (final results) ................................................ 14

*Certain Frozen Fish Fillets from Vietnam*, 83 Fed. Reg. 12,717 (Dep't Commerce Mar. 23, 2018) (final results) .......................................................................... 22, 33

*Certain Quartz Surface Products From India and Turkey: Antidumping Duty Orders*, 85 Fed. Reg. 37,422 (Dep't Commerce June 22, 2022) ............................... 3

*Certain Quartz Surface Products from India,* 87 Fed. Reg. 40,786 (Dep't Commerce July 8, 2022) ("prelim. results") ...................................................................... 7

*Certain Quartz Surface Products from India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 Fed. Reg. 25,391 (Dep't Commerce May 1, 2020) ..................................................... 6

*Certain Quartz Surface Products from India: Final Results of Antidumping Duty Administrative Review; 2019-2021*, 88 Fed. Reg. 1,188 (Dep't Commerce Jan. 9, 2023) ......................................................................................................................... 2

*Initiation of Antidumping Duty and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 41,821 (Dep't Commerce Aug. 3, 2021) ................................................. 4

*Laminated Woven Sacks From China*, 76 Fed. Reg. 14,906 (Dep't Commerce Mar. 18, 2011) (final results) ........................................................................................... 23

*Large Power Transformers from Korea,* 83 Fed. Reg. 11,679 (Dep't Commerce Mar. 16, 2018) (final results) ........................................................................................... 22

*Narrow Woven Ribbons With Woven Selvedge From China*, 75 Fed. Reg. 41,808 (Dep't Commerce July 19, 2010) (final results) ...................................................... 14

*Steel Concrete Reinforcing Bar from Mexico*, 87 Fed. Reg. 34,848 (Dep't Commerce Jun. 8, 2022) (final results of 2019–2020 review) ...................................... 28, 31, 32

*Steel Nails from Oman,* 87 Fed. Reg. 43,240 (July 20, 2022) (Dep't Commerce prelim. results) ................................................................................ 34

*Steel Nails from Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) (final results) ................................................................................................ 34

*Steel Nails from Taiwan*, 85 Fed. Reg. 76,014 (Dep't Commerce Nov. 27, 2020) (final results of 2018-2019 review) ......................................................... passim

*Wooden Cabinet and Vanities and Components Thereof from China*, 87 Fed. Reg. 67,674 (Dep't Commerce Nov. 9, 2022) (final results of 2019-2021 review) ................................................................................................... 29, 30, 31

*Wooden Cabinets and Vanities and Components Thereof from China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (Dep't Commerce Apr. 21, 2020) ....................... 30

## Regulations

19 C.F.R. § 351.213(d)(1) ............................................................................. 7

## UNITED STATES COURT OF INTERNATIONAL TRADE

CAMBRIA COMPANY LLC,

     Plaintiff,

ANTIQUE MARBONITE PRIVATE
LIMITED, *et al.*,

     Consolidated-Plaintiffs,

v.

UNITED STATES,

     Defendant,

APB TRADING, LLC, *et al.*,

     Defendant-Intervenors.

Before: Mark A. Barnett, Chief Judge
Court No. 23-00007

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

     Plaintiff Cambria Company LLC ("Cambria") hereby submits the following memorandum in support of its motion for judgment on the agency record in the above-captioned action.

### STATEMENT PURSUANT TO RULE 56.2(c)(1)

## I.    Administrative Determination Under Review

     Cambria seeks judicial review of the final results issued by the U.S. Department of Commerce ("Commerce") for the first administrative review of the antidumping duty ("AD") order on quartz surface products ("QSP") from India. *Certain Quartz Surface Products from India: Final Results of Antidumping Duty Administrative Review; 2019-2021*, 88 Fed. Reg. 1,188 (Dep't Commerce Jan. 9,

2023) ("*Final Results*") (P.R. 355). The challenged determination, findings, and conclusions are set out in Commerce's Issues and Decision Memorandum ("IDM") for the Final Results of Antidumping Duty Administrative Review (Dec. 30, 2022) ("*Final IDM*") (P.R. 346).

## II.    Issues Presented for Review

(1) Was Commerce's decision to depart from the "expected method" for calculating the AD rate for the non-selected respondents supported by substantial evidence or otherwise in accordance with law?

(2) Was Commerce's decision to "pull forward" the rate calculated for the non-selected respondents from the original investigation as the rate for the non-selected respondents in the first administrative review supported by substantial evidence or otherwise in accordance with law?

## <u>STANDARD OF REVIEW</u>

This Court must hold unlawful any determination by Commerce in an antidumping proceeding that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence requires more than the mere assertion of "evidence which in and of itself justified {the determination} without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). Rather, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v.*

*NLRB*, 340 U.S. 474, 488 (1951). Ultimately, the substantial evidence standard asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Moreover, "Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F.Supp.2d 1141, 1165 (Ct. Int'l Trade 2000) (collecting cases).

The courts have held that Commerce's decision is not in accordance with law when the agency deviates from an established practice followed in similar circumstances and does not provide a reasonable explanation for the deviation. *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). Such an arbitrary departure from practice must be overturned. *See id.*

## STATEMENT OF FACTS

Commerce issued the AD order on QSP from India on June 22, 2020. *Certain Quartz Surface Products From India and Turkey: Antidumping Duty Orders*, 85 Fed. Reg. 37,422 (Dep't Commerce June 22, 2022). In its original AD investigation on QSP from India, Commerce calculated an AD rate of 2.67% for Pokarna Engineered Stone Limited ("Pokarna") and 5.15% for Antique Marbonite Private Limited and its affiliates ("Antique"). *Id.* Commerce also calculated an all-others rate of 3.19% for the smaller Indian QSP exporters that had not been selected for individual examination. *Id.*

On June 30, 2021, Cambria filed a request that Commerce conduct the first administrative review of the AD order on QSP from India for 50 Indian exporters because Cambria had reason to believe that the dumping margins of these companies had increased and that the AD rates calculated for the mandatory respondents during the original investigation did not reflect the dumping behavior of these companies during the period of review ("POR"). *See* Cambria Request for Review (June 30, 2021) (P.R. 11). Cambria's request did not include a request for the large exporters from the original investigation, including Pokarna, because Cambria did not believe Pokarna's dumping margin reflected the dumping behavior of the smaller Indian exporters. *See id.* Commerce also received requests for reviews from other interested parties, who were U.S. importers and Indian exporters, for a review of the AD order on QSP from India. *Initiation of Antidumping Duty and Countervailing Duty Administrative Review*s, 86 Fed. Reg. 41,821 (Dep't Commerce Aug. 3, 2021) (P.R. 22). Some of these interested parties specifically requested that Pokarna and Antique be reviewed. *See id.* On August 3, 2021, Commerce published the notice of initiation for the underlying administrative review. *Id.*

On August 13, 2021, Commerce released data from U.S. Customs and Border Protection ("CBP") regarding entries of QSP from India that entered during the POR for the purpose of selecting the mandatory respondents that would be individually examined. *See* Commerce Memo re: CBP Data (Aug. 13, 2021) (P.R. 30). On August 20, 2021, Cambria filed comments regarding the CBP data. *See* Cambria Comments on CBP Data (Aug. 20, 2021) (P.R. 37). In its comments, Cambria argued

that Commerce should not select the mandatory respondents representing the largest volume of shipments during the POR but should instead use its sampling methodology to select the mandatory respondents. *Id.* at 3-11. Cambria demonstrated in its comments that the Indian QSP industry is divided in a way that the sampling methodology was warranted. *Id.* On one side of the divide, there were a few established Indian producers, such as Pokarna, which has been operating in India for many years and has exclusive rights to expensive Italian Bretonstone technology. *Id.* On the other side of the industry, there were a large number of newer Indian producers that appeared only after Commerce imposed AD/CVD duties on QSP from China in late 2018. *Id.* These smaller Indian producers were using cheaper Chinese equipment, technology, and expertise to produce QSP. *Id.* Cambria demonstrated that this division results in differences within the industry in cost structures, pricing practices, and dumping margins. *Id.* Cambria argued that if Commerce selected the larger and more established Indian exporters as the mandatory respondents, it would fail to capture these differences, and the dumping margins it calculated would not be reflective of the majority of the Indian QSP industry. *Id.*

In its comments, Cambria specifically pointed to the dumping margins from the original investigation to argue that Pokarna's low dumping margin of 2.67% may differ significantly from the dumping margins for the other Indian exporters –

[

].

*Id.* (citing *Certain Quartz Surface Products from India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 Fed. Reg. 25,391 (May 1, 2020)) (C.R. 5).[1]

In response to Cambria's comments, the respondents uniformly insisted that the dumping rates of the two largest producers, Pokarna and Antique, were representative of the non-selected respondents' dumping rates. For example, one large group of U.S. importers asserted that "*there is no evidence of differences in margins among exporters due to their size or, indeed, any other factor.*" U.S. Importers CBP Rebuttal (Aug. 30, 2021) (P.R. 42) at 2 (emphasis added). Similarly, the Federation of Indian exporters asserted that there is "*no evidence to suggest the AD rates of smaller companies would be any different from the AD rates of larger exporters,*" because "*the pricing behavior of smaller companies reflects that of the larger companies.*" Federation CBP Rebuttal (Aug. 30, 2021) (P.R. 40) at 12 (emphasis added).

On September 28, 2021, Commerce selected Pokarna and Antique as the mandatory respondents for the review based on the fact that they accounted for the largest volume of subject merchandise that could be reasonably examined.

---

[1] Cambria notes that in its request for Commerce to use sampling to select the mandatory respondents, it did not assert that [

]. *See* Cambria Comments on CBP Data (Aug. 20, 2021) (P.R. 37, C.R. 5) at 10-11. Rather, Cambria argued that an analysis of the AUVs and dumping margins of the Indian exporters showed that [

], and, as a result, that [          ] dumping margin was not representative of the remaining smaller Indian exporters. *Id.*

Commerce Respondent Selection Memo (Sept. 28, 2021) (P.R. 53) at 6. Commerce rejected Cambria's request to use its sampling methodology to select the mandatory respondents because it found that the history of the proceeding was too short to make any conclusions as to differences in the dumping margins between the large mandatory respondents and the smaller non-selected respondents. *Id.*

After Commerce selected Pokarna and Antique as the mandatory respondents, the other respondents had a right to withdraw their review requests in whole or in part. *See* 19 C.F.R. § 351.213(d)(1) (providing opportunity to withdraw review request within 90 days of publication of the notice of initiation). The respondents were apparently unconcerned that the margins calculated for Pokarna and Antique would be unrepresentative of the smaller non-selected companies, because they did not withdraw their review request for these two companies after they were selected as the two mandatory respondents. *See, e.g.,* MSI Withdrawal of Review Request (Oct. 29, 2021) (P.R. 68) (withdrawing request for numerous Indian exporters but not for Pokarna and Antique).

On July 8, 2022, Commerce published the preliminary results of the administrative review in the Federal Register. *Certain Quartz Surface Products from India,* 87 Fed. Reg. 40,786 (Dep't Commerce July 8, 2022) ("prelim. results"), and accompanying Preliminary Decision Memorandum ("PDM") (P.R. 243). In the preliminary results, Commerce calculated a dumping margin of 0.00% for Pokarna and assigned a rate of 323.12% to Antique based on total adverse facts available ("AFA") due to the company's failure to cooperate to the best of its ability. PDM at 1,

10. Commerce calculated the rate for the 53 non-selected respondents by averaging the rates assigned to Pokarna and Antique. *Id.* at 11-12. Commerce explained that this was the "expected method" outlined by Congress under the Statement of Administrative Action Accompanying the Uruguay Round Agreements ("SAA") when the weighted-average dumping margins established for all individually investigated respondents are zero, *de minimis*, or based entirely on facts available. *Id.* This resulted in an all-others rate of 161.56%. *Id.*

Between August 17 and 24, 2022, Commerce received case briefs and rebuttal briefs on behalf of Cambria and the respondents. *Final IDM* at 2 (P.R. 346). Many respondents argued that the rate assigned to the mandatory respondents should not be assigned to the non-selected companies in the final results because, in a complete about face from what they had said earlier, the dumping margins of these larger Indian companies did not reflect the dumping behavior of the smaller non-selected companies. *Id.* at Comment 5. Cambria argued that Commerce should continue to apply the "expected method" outlined by Congress in the SAA to calculate the all-others rate for the 53 non-selected respondents in the review. *Id.*

Commerce held a public hearing on August 30, 2022. *Id.* at 2. Within weeks of the public hearing, the respondents unleashed an unprecedented public relations and lobbying campaign to pressure Commerce to change course in the *Final Results*. They arranged for numerous *ex parte* meetings between high level company officials and Commerce. *See* Memo re: *Ex-Parte* Meeting with MSI President (Sept. 8, 2022) (P.R. 327); Memo re: Ex-Parte Meeting with Architectural Surface Group (Sept. 27,

2022) (P.R. 329). They arranged for prominent media publications to publish editorials comparing Commerce officials and analysts to college students drunk on spring break. *See* Complaint (Feb. 10. 2023) at para. 20 (citing Wall Street Journal, *Trade Bureaucrats Gone Wild* (Sept. 12, 2022)). They arranged for Members of Congress to apply pressure to Commerce through telephone calls and written correspondence. *See, e.g.,* Memo re: Correspondence with Rep. Frank Pallone's Office (Oct. 14, 2022) (P.R. 331); Memo re: Call with Rep. Dave Joyce's Office (Nov. 1, 2022) (P.R. 334); Memo re: Call with Sen. Cory Booker's Office (Nov. 3, 2022) (P.R. 335). They arranged for consumer groups to apply pressure to Commerce. *See* Letter to Leading Builders of America (Nov. 14, 2022) (P.R. 336).[2]

Commerce's final results were due no later than December 6, 2022. On November 25, 2022, Commerce placed on the record a letter from 10 additional Members of Congress to Secretary Raimondo urging a reversal of the preliminary results to ease "inflationary pressures" resulting from the higher AD rate that had been calculated. *See* Commerce Memo Placing Congressional Correspondence on the Record (Nov. 25, 2022) (P.R. 337). Soon thereafter, on November 30, 2022, near the eve of the deadline for the final results – and more than three months after the

---

[2] To mitigate the influence of the respondent's pressure campaign on Commerce's decision-making process, Cambria worked with its Congressional delegation and others to request that Commerce apply the law as written when calculating the non-selected rate for the *Final Results*. *See, e.g.,* Commerce Memo to File (Dec. 20, 2022) (P.R. 344) (transmitting a letter from the Minnesota Congressional Delegation to Secretary Raimondo expressing concern that the respondents' "only defense" to Commerce's straightforward application of the law "has been to fault required adherence to filing deadlines and unfairly criticize Commerce employees as overzealous bureaucrats").

review had been fully briefed and argued – Commerce extended the final results to January 4, 2023. Memo re: Extension of Final Results (Nov. 30, 2022) (P.R. 338).

Commerce published the *Final Results* of review on January 9, 2023. In the *Final Results*, Commerce assigned a rate to the 53 non-selected companies by pulling forward the all-others rate calculated in the underlying investigation. *Final IDM* at Comment 5 (P.R. 346). This resulted in a rate for the non-selected companies of 3.19%. *Id.* Commerce explained that after reviewing the history of the rates calculated under the AD order on QSP from India, the rate resulting from the application of the expected method was "not reasonably reflective of the non-selected companies' potential dumping margins during the POR." *Id.*

## SUMMARY OF ARGUMENT

The "expected method" to calculate the rate for the non-selected respondents was to average Pokarna's and Antique's dumping margins. Commerce's decision in the *Final Results* to depart from the expected method is not supported by substantial evidence. As demonstrated below, the Federal Circuit's decision in *Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) makes it clear that the burden of proof lay with Commerce, if it chose to make a departure from the expected method, to show with data contemporaneous to the POR that the dumping margins of the mandatory respondents did not reflect the dumping margins of the non-selected companies. Commerce failed to point to any such contemporaneous data. Instead, it examined the "historical rates" under the order to make a finding of unrepresentativeness. These historical rates cannot, on their own, constitute substantial evidence to warrant a departure from the expected method.

10

Even if reliance on historical rates to depart from the expected method is ever permissible under *Albemarle*, it was still error to do so in this case. Commerce failed to consider that the historical rates had no probative value because: (1) the history of the order was so short; (2) the rates fluctuated significantly across the two different segments of the AD proceeding, even for the same respondent, Antique, which saw a dramatic increase in its rate; and (3) none of the historical rates pertained to the non-selected companies in the current review. In addition, when considering the historical rates, Commerce ignored the probative value of Antique's AFA rate, which was inconsistent with the SAA, contrary to Commerce's own practice, and against the holding of prior cases decided by the Court of International Trade ("CIT"). Commerce also ignored the record evidence showing that the AUVs of the non-selected respondents [

], which showed that the expected method did, in fact, reasonably reflect their dumping behavior. Finally, in reaching its *Final Results*, Commerce ignored its own finding that the history of dumping margins under the order was insufficient to show that the margins calculated for the two largest Indian exporters are not representative of the remaining non-selected respondents.

In addition to being unsupported by substantial evidence, Commerce's decision to depart from the expected method based on the historical rates was also not in accordance with law because it is inconsistent with agency practice. Indeed, in numerous prior cases, Commerce has declined to depart from the expected

method under circumstances similar to those present in the underlying review in this case. Commerce's failure to provide a reasonable explanation for deviating from this established practice provides yet another reason to reverse and remand the *Final Results*.

But even assuming for the sake of argument that there was substantial evidence on the record warranting a departure from the expected method, and that the departure did not conflict with established agency practice, Commerce still erred in the *Final Results* when it pulled forward the all-others rate from the original investigation and applied it to the non-selected respondents in the first review. The Federal Circuit in *Albemarle* outlined two limited circumstances in which Commerce may carry forward a prior rate, and neither of those circumstances applies here. Namely, there were no contemporaneous data to establish that the market and margins relevant to the subject merchandise had not changed such that the prior rates could be considered reflective of current rates. Nor was this a situation where Commerce was applying a prior AFA rate against a non-cooperating respondent. In addition to being inconsistent with *Albemarle* and its progeny, Commerce's decision to pull forward the all-others rate from the original investigation was also not supported by substantial evidence because all the available evidence showed that the expected method more reasonably reflected the dumping behavior of the non-selected respondents. But at a minimum, Commerce ignored the possibility of other reasonable methods for calculating the rate assigned to the non-selected respondents.

For all these reasons, which are set forth in greater detail below, Commerce's *Final Results* should be reversed.

<div align="center">

**ARGUMENT**
</div>

I.    **Commerce's Departure from the Expected Method for Calculating the AD Rate for the Non-Selected Respondents Should Be Reversed**

    **A. Legal Standard**

For non-selected respondents in an administrative review, Commerce calculates an "all others" rate, usually by taking the weighted average of all mandatory respondents' rates, excluding any zero or *de minimis* rates and rates based entirely on AFA. 19 U.S.C. § 1637d(c)(1)(B)(i)(II). However, when all dumping margins established are either *de minimis* or AFA rates, Commerce applies the exception found in the statute where it "may use any reasonable method to establish the estimated all others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1637d(c)(5)(B). The SAA, recognized by Congress as an authoritative expression concerning the interpretation and application of the Tariff Act under 19 U.S.C. § 3512(d), provides guidance on the methodology Commerce should apply under the exception to the general rule:

> In such situations, Commerce may use any reasonable method to calculate the all-others rate. The expected method in such cases will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available. However, if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporter or producers, Commerce may use other reasonable methods.

<div align="center">13</div>

SAA, H.R. Doc. No. 103–316, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4200.

Consistent with this guidance from Congress, Commerce has stated that, when faced with the circumstances presented here—where one respondent receives a zero rate and the second respondent receives an AFA rate—it has an "established practice" of using the average of the two rates as the rate for all non-selected respondents. *See Narrow Woven Ribbons With Woven Selvedge From China*, 75 Fed. Reg. 41,808 (Dep't Commerce July 19, 2010) (final results) and accompanying IDM at Comment 9 (citing *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from China*, 74 Fed. Reg. 10,545 (Dep't Commerce March 11, 2009) (final results) and accompanying IDM at Comment 6).

The courts have repeatedly upheld this practice. For example, in the seventh administrative review of *Diamond Sawblades and Parts Thereof from China*, Commerce selected two mandatory respondents. *Bosun Tools Co. v. United States*, No. 2021-1930, 2022 WL 94172, at *1 (Fed. Cir. Jan. 10, 2022). The first exporter received an AFA rate of 82.05%, and, after a remand, the second exporter received a rate of 0.00%. Commerce calculated the separate rate for the non-selected respondents pursuant to the exception in § 1637d(c)(5)(B) by averaging these two rates, resulting in a separate rate of 41.025%. The CIT upheld this rate, and one of the respondents appealed to the Federal Circuit. The Federal Circuit found that Commerce was authorized by statute to rely on the AFA rate when calculating the

rate for the non-selected respondents and that Commerce's 41.025% rate was not unreasonable and was supported by substantial evidence.

Similarly, in *Primesource Building Products, Inc. v. United States*, the CIT upheld Commerce's practice of averaging AFA rates to calculate the rate for non-selected respondents. 581 F.Supp.3d 1331 (Ct. Int'l Trade 2022). In that case, Commerce had on remand assigned an AFA rate of 78.17% to both mandatory respondents. Commerce then assigned this same rate to the non-selected respondents based on the expected method. After conducting an exhaustive analysis of the Federal Circuit's jurisprudence regarding the "expected method," the CIT upheld Commerce's remand redetermination. In so doing, it rejected the respondents' argument that the expected-method rate was not representative of the non-selected respondents' dumping behavior. The CIT explained that prior cases on this issue "all recognize an important assumption that is built into Commerce's statutory authority to engage in respondent selection: that *the largest exporters by volume are assumed to be representative of the non-selected respondents.*" *Id.* at 1340 (emphasis added). The CIT further explained that, "{c}onsistent with this assumption, the cases also stand for the proposition that *Commerce is expected to use the mandatory respondents' rates to determine the antidumping duty rate to be assigned to the non-selected respondents.*" *Id.* (emphasis added). Indeed, the entire statutory framework for respondent selection dictates this outcome:

> These concepts, representativeness and expectedness, are connected. Representativeness allows Commerce to select certain respondents for individual examination and, in so doing, decline to individually examine other respondents. By allowing Commerce to focus its

> resources on certain respondents, the statute necessarily creates the assumption of representativeness because Commerce often will lack further information about the non-selected respondents. ... Commerce is not otherwise required to collect information about the non-selected respondents because Commerce is permitted, in fact, expected, to treat the mandatory respondents as representative of the non-selected respondents when it determines the non-selected respondents' rate.

*Id.* (citations omitted). Based on this statutory framework and the Federal Circuit's binding precedents interpreting the statute, "the expected method is the default method and … the burden of proof lies with the party seeking to depart from the expected method (or with Commerce as the case may be)." *Id.* at 1338 (citing *Albemarle,* 821 F.3d at 1345; *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017)).

### B. Commerce Correctly Applied the Expected Method in the Preliminary Results

Based on the foregoing discussion, it is clear that Commerce correctly applied the expected method in the preliminary results of the underlying review here. First, the SAA, which is the authoritative interpretation of the relevant statute, provides that the "expected," or default, method for determining the non-selected rate when all the margins for the examined respondents are zero, *de minimis*, or based entirely on facts available, is to weight-average those margins. SAA at 873. Second, no authority forbids Commerce from including an AFA rate assigned to a mandatory respondent when utilizing the expected method; indeed, the SAA expressly contemplates such inclusion. Third, the rates of the largest respondents (*i.e.*, the mandatory respondents) are presumed to be representative of the non-selected respondents. Fourth, Commerce found when selecting the mandatory

respondents that there was no evidence that the rates of the largest exporters of QSP during the POR would not be reflective of the non-selected respondents' dumping margins. Fifth, neither Commerce nor the respondents ever submitted or cited evidence on the record that was *contemporaneous with the POR* purporting to show that the rates of the mandatory respondents would not be reflective of the non-selected respondents' dumping margins.

For all these reasons, Commerce correctly applied the expected method in the preliminary results. The only new "evidence" placed on the record between the preliminary results and the final results was the blitz of media and political pressure orchestrated by the respondents. Commerce's decision to reverse course in the final results should thus not be sustained.

### C. Substantial Evidence Does Not Support Commerce's Decision to Depart from the Expected Method

As noted above, the burden of proof lay with the parties seeking to depart from the expected method and with Commerce if it chooses to make such a departure. *Primesource*, 581 F.Supp.3d at 1338. Put another way, "Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different." *Albemarle,* 821 F.3d at 1353. As demonstrated below, substantial evidence did not support such a finding in the *Final Results*.

### 1. The Historical Rates Calculated Under the Order Are Insufficient Evidence to Depart from the Expected Method

In the *Final Results*, Commerce's sole basis for departing from the expected method was a review of the "history of rates in this *Order*" where Commerce found that "all of the rates in this *Order* are significantly lower than the rate of 161.53 percent assigned to the non-selected companies in the *Preliminary Results*." *Final IDM* at Comment 5 (P.R. 346). The historical rates of the *Order* did not constitute substantial evidence that the mandatory respondents' rates were different from the non-selected respondents.

This Court has specifically held that to depart from the expected method, Commerce needs "contemporaneous data" to establish that the rates from the mandatory respondents are not reflective of the current rates of the non-selected companies. *Primesource*, 581 F.Supp.3d at 1338. Rates that are "historical" are by definition not "contemporaneous" with the POR and thus cannot satisfy Commerce's burden to depart from the expected method. Indeed, Commerce and the courts have recognized that rates from prior time periods have little probative value for purposes of determining whether the "expected method" results in aberrational dumping rates. For example, the CIT has recognized that the fact that rates from a prior period differ from the rates in a current review does not, "on its face, demonstrate that the rates in {the current} review are not reasonably reflective of the potential dumping margins for the companies not individually examined." *Pro-Team Coil Nail Enter., Inc. v. United States,* No. 18-00027, 2022 WL 2783885, at *7 (Ct. Int'l Trade July 15, 2022) (quoting Commerce). The Federal Circuit has

been more emphatic: "There is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period. '{I}f the facts remained the same from period to period, there would be no need for administrative reviews.'" *Albemarle*, 821 F.3d at 1356 (quoting *Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 490–91 (2005).

To the extent historical rates are ever relevant, this Court recognized in *Primesource* that where rates fluctuate significantly across different segments of an AD proceeding, and even for a single respondent from review to review, turning to past segments for evidence "lacks a logical foundation." *Primesource*, 581 F.Supp.3d at 1343. *See also Mid Continent Steel & Wire, Inc. v. United States,* 321 F.Supp.3d 1313, 1323-24 (Ct. Int'l Trade 2018) (finding that it was not reasonable to use information from prior segments as evidence to depart from the expected method due to "the fluctuation in margins over the last several segments"). Here, while Pokarna's rate remained relatively low in the original investigation and the first review, Antique's rate fluctuated from 5.15% in the original investigation to 323.12% in the first review. Thus, Commerce's reliance on historical rates despite this fluctuation lacks a logical foundation.

Both Commerce and this Court have also recognized that historical rates have no probative value when analyzing whether to depart from the expected method if the historical rates do not pertain to the non-selected companies in the current review. In the underlying proceeding in *Primesource*, when reviewing the rates assigned in prior segments, Commerce observed that "as 73 of 75 of the

non-examined companies have never been examined in any segment of the proceeding, there is no evidence on this record or any other record that the {expected method} rate does not reflect their commercial reality." *Steel Nails from Taiwan*, 85 Fed. Reg. 76,014 (Dep't Commerce Nov. 27, 2020) (final results of 2018-2019 review), and accompanying IDM ("*Taiwan Nails 2018-2019 IDM*") at Comment 1. On appeal, the Court noted this meant that "the relevant data from past reviews was severely limited" and there was "no compelling argument for why such limited, non-contemporaneous data would be more representative than margins determined in the present review." *Primesource*, 581 F.Supp.3d at 1343. Similarly, in *Mid Continent*, the CIT found it "difficult to see" how the rates calculated for the mandatory respondents in the prior seven reviews could be probative when only two of the prior respondents were among the 17 non-selected respondents in the current review. *Mid Continent*, 321 F.Supp.3d at 1323-24. Here, all 53 non-selected respondents had never been examined in any prior segment of the antidumping proceeding on QSP from India, which was limited to the original investigation. All the historical rates pertained to two different companies – *i.e.*, Pokarna and Antique. Thus, the historical rates from the original investigation have zero probative value as to the non-selected respondents' dumping behavior.

In sum, Commerce's sole basis for departing from the expected method, which was an examination of historical rates calculated under the order, does not constitute substantial evidence for the agency's departure.

2. *Commerce Ignored the Probative Value of Antique's AFA Rate During the Current Review*

In analyzing whether to depart from the expected method, Commerce stated that it "reviewed the history of rates in this Order." *Final IDM* at Comment 5 (P.R. 346). However, in doing so, it compared the expected-method rate to all historical rates "other than the AFA rate we applied to Antique Group in the Preliminary Results." *Id.* At the same time, Commerce gave significant weight to the fact that "the one fully calculated weighted-average dumping margin, for {Pokarna}, in this instant review is zero percent." *Id.* In other words, Commerce specifically ignored the Antique's AFA rate of 323.12% when analyzing whether the expected method resulted in a rate that reflected the dumping behavior of the non-selected companies. This was the only way it could find that "*all* of the rates in this *Order* are significantly lower than the rate of 161.53 percent assigned to the non-selected companies in the *Preliminary Results*." *Id.* (emphasis added). As discussed below, this is yet another basis to overturn Commerce's decision.

First, Commerce's failure to give any weight to Antique's AFA rate was contrary to Congressional intent and guidance. The SAA specifically states that, when calculating the rate for the non-selected companies, Commerce is to give equal weight to both zero rates and rates based on AFA. *See* SAA at 873 ("The expected method … will be to weight average the zero and *de minimis* margins and margins determined pursuant to the facts available…"). In fact, if Antique had been the sole mandatory respondent in this review, then the expected rate would have been 323.12%. Because Pokarna received a zero rate, the expected rate decreased to

161.56%. But, in the *Final Results*, Commerce appeared to give weight only to Pokarna's zero rate when it assigned a rate of 3.19% to the non-selected companies. Commerce thus ignored the SAA's directive to give equal weight to both zero rates and AFA rates when calculating the rate for non-selected respondents.

Commerce's refusal to consider Antique's AFA rate is also inconsistent with its established practice of giving weight to AFA rates in this context. *See, e.g.*, *Taiwan Nails 2018-2019 IDM* at Comment 1; *Large Power Transformers from Korea,* 83 Fed. Reg. 11,679 (Dep't Commerce Mar. 16, 2018) (final results), and accompanying IDM at Comment 5A (averaging two AFA margins to calculate the rate for the non-selected respondents); *Certain Frozen Fish Fillets from Vietnam*, 83 Fed. Reg. 12,717 (Dep't Commerce Mar. 23, 2018) (final results) and accompanying IDM at Comment 2 ("The logic of the CAFC is in no way distinguished just because it had before it two *de minimis* rates rather than two rates based on facts available."). Indeed, in the underlying proceeding in *Primesource*, the respondents claimed that when examining the history of the proceeding, Commerce should only give weight to the "calculated margins," which showed a history of "low" rates. *Primesource*, 581 F.Supp.3d at 1342. Commerce rejected this claim because the respondents "omitted any mention of the rates assigned in the history of the proceeding that were based on the 78.17 percent AFA rate," despite the fact that more than half of the reviews contained a determination based on AFA. *Id.* (citations omitted). The CIT agreed with Commerce, finding that "examining only the calculated margins and *excluding from consideration the AFA-based margins*

*would not have yielded a full picture of the historical trends.*" *Id.* (emphasis added).

Given this agency practice, as upheld by the CIT, it is inexplicable that Commerce excluded from consideration Antique's AFA rate in this review.

Commerce's practice of giving weight to AFA rates when deciding whether to depart from the expected method is well founded. As Commerce and the Courts have long recognized, application of AFA is based on the premise that, if company had cooperated, it may have received a rate higher than the applicable AFA rate. *Laminated Woven Sacks From China*, 76 Fed. Reg. 14,906, 14,910 (Dep't Commerce Mar. 18, 2011) (final results) (citing *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190–92 (Fed. Cir. 1990)). Indeed, this presumption "reflects a common-sense inference" that the applicable AFA rate "*is the most probative evidence of current margins* because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less." *Rhone Poulenc,* 899 F.2d at 1190 (emphasis added).

In the *Final Results*, Commerce did not give any weight to Antique's AFA rate when analyzing whether to depart from the expected method. However, Antique's AFA rate is just as much a part of the history of the rates assigned in the proceeding as the three calculated margins and, in fact, is "the most probative evidence" of the current dumping behavior of Antique, who was one of the two mandatory respondents that had been individually examined as part of the history of the proceeding. Therefore, in considering whether to depart from the expected method, Commerce erred when it failed to take into account Antique's AFA rate.

### 3. *Commerce Ignored Evidence Regarding the AUVs of the Respondents*

Commerce also ignored evidence in the form of the AUVs of the respondents. The Federal Circuit has recognized that "'all things being equal,' a low estimated AUV could indicate the existence of a larger dumping margin, while a high estimated AUV could 'indicate the reverse to be true.'" *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1376 (Fed. Cir. 2013) (quotation and citation omitted). Below is a calculation of the AUVs of the respondents, as calculated by the respondents themselves, based on the CBP data on the record:

| Company | AUV (USD/SM) |
|---|---|
| Pokarna | [          ] |
| Antique | [          ] |
| Non-Selected Companies | [          ] |

Importers' Case Brief (Aug. 17, 2022) (P.R. 306, CR. 249) at Exhibit 3.

Pokarna's AUV for its U.S. sales during the POR was [          ], and Antique's AUV for its U.S. sales during the POR was [              ] – *i.e.* [

]. The non-selected respondents' aggregated AUV was [          ], which is [

]. Thus, the AUV data show that the

[


]. Thus, if anything, the AUV data show that applying the expected method would [            ] the dumping margins of the non-selected respondents. But at a minimum, the AUV data support the reasonableness of the rate calculated using the expected method.

Cambria raised this evidence regarding the AUVs in its rebuttal brief in the underlying proceeding. *See* Cambria Rebuttal Brief (Aug. 25, 2022) (P.R. 321, C.R. 251) at 50-51. Commerce failed to even mention this highly relevant evidence that directly contradicts its conclusion in the *Final Results*. *See Final IDM* at Comment 5 (P.R. 346). When reviewing Commerce's findings of fact for substantial evidence, the courts "look to the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018) (internal quotation marks and citation omitted). Any determination that totally ignores evidence that detracts from Commerce's findings is not supported by substantial evidence and must be reversed. *Allegheny*, 112 F.Supp.2d at 1165 ("Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence."); *US Magnesium LLC v. United States*, 37 C.I.T. 100, 109 (2013) ("Commerce erred in failing to support its selection of Infobanc rates with substantial evidence and in ignoring contradictory evidence on the record."). As that is the case here, Commerce's *Final Results* should be reversed.

### 4. Commerce Contradicted Its Own Findings on Representativeness During Respondent Selection

In the underlying decision in *Primesource*, Commerce found it significant when deciding not to depart from the expected method that "{n}o party argued that Commerce should select respondents for limited examination … based on sampling." *Taiwan Nails 2019-2019 IDM* at Comment 1. Here, the facts are even

stronger. As discussed previously, Cambria did argue that Commerce should select respondents based on sampling because the larger Indian exporters' operations, costs, and prices – and those of Pokarna in particular – rendered their dumping margins unrepresentative of the smaller Indian exporters. *See* Cambria Comments on CBP Data (Aug. 20, 2021) (P.R. 37) at 3-22. Cambria specifically pointed to the historical rates to argue that Pokarna's low rate differed significantly from the dumping margins for the other Indian exporters – [

]. *Id.* (C.R. 5).

Commerce rejected Cambria's request because it found that the history of the proceeding was too short to make any conclusions as to differences in the dumping margins between the respondents:

> At this time, there is *limited evidence* to provide Commerce with a reasonable basis to believe or suspect that the average export prices and/or dumping margins for the largest exporters differ from those of smaller exporters. In the rare cases where Commerce relies on sampling to select respondents, it is typically where there are multiple, and often numerous, prior reviews to draw upon for evidence of margin differentials attributable to size.

Commerce Respondent Selection Memo (Sept. 28, 2021) (P.R. 53) at 6 (emphasis added). In other words, Commerce expressly recognized that the history of dumping margins was insufficient to show that the margins calculated for the two largest Indian exporters were not representative of the remaining non-selected respondents.

In making this finding, Commerce was agreeing with the respondents' comments during the respondent selection process, where they disavowed any

possibility that the historical rates showed that the dumping margins of the largest exporters were not reflective of the dumping behavior of the smaller non-selected companies. One group of U.S. importers asserted that "*there is no evidence of differences in margins among exporters due to their size or, indeed, any other factor.*" U.S. Importers CBP Rebuttal (Aug. 30, 2021) (P.R. 42) at 2 (emphasis added). Similarly, the Federation of Indian exporters asserted that there is "*no evidence to suggest the AD rates of smaller companies would be any different from the AD rates of larger exporters,*" because "*the pricing behavior of smaller companies reflects that of the larger companies.*" Federation CBP Rebuttal (Aug. 30, 2021) (P.R. 40) at 12 (emphasis added).

It is remarkable that Commerce found the historical rates under the order were insufficient to show unrepresentativeness at the outset of the review but somehow found these same historical rates sufficient to show unrepresentativeness for the purpose of departing from the expected method. Equally as remarkable, Commerce did nothing to explain this complete reversal in its reasoning in the *Final Results*. The CIT has not hesitated to overturn Commerce decisions that are internally contradictory in this manner. *Nakornthai Strip Mill Pub. Co. v. United States*, 33 C.I.T. 326, 335 (2009) ("Because of this inconsistency, Commerce has, with regard to this issue, again failed to provide a non-arbitrary, reasoned basis for its conclusion."). The CIT should once more not hesitate to overturn Commerce's decision in this case.

## D. Commerce's Decision Is Inconsistent with Agency Practice

In addition to being unsupported by substantial evidence, Commerce's decision to depart from the expected method based on an examination of historical rates is also not in accordance with law because it is not consistent with agency practice. Indeed, in numerous prior cases, Commerce has declined to depart from the expected method under circumstances similar to those present in the underlying review in this case. *See, e.g., Taiwan Nails 2018-2019 IDM* at Comment 1; *Pro-Team*, 2022 WL 2783885, at *7 (upholding Commerce where it explained that the fact that rates from the investigation and other administrative reviews differed from the rate in this administrative review did not, "on its face, demonstrate that the rates in this review are not reasonably reflective of the potential dumping margins for the companies not individually examined.").

In addition to Commerce's underlying decisions at issue in *Prosource* and *Pro-Team* discussed exhaustively above, consider Commerce's final results in *Steel Concrete Reinforcing Bar from Mexico*, 87 Fed. Reg. 34,848 (Dep't Commerce Jun. 8, 2022) (final results of 2019–2020 review) and accompanying IDM at Comment 7 ("*Steel Rebar from Mexico*"). In that review, Commerce calculated a rate of zero percent for one mandatory respondent and a rate of 66.70% for the second mandatory respondent based on total AFA. *Id.* In the preliminary results, Commerce applied the expected method to calculate a rate of 33.35% for the non-selected respondents. *Id.* In their case briefs, the respondents argued that this rate was not reflective of the non-selected respondents' dumping behavior. *Id.* They

claimed that an examination of historical rates showed that the rate was more than

four times any rate calculated in prior reviews and more than six times any

all-others rate applied in the prior five reviews. *Id.* In the final results, Commerce

rejected this argument:

> {W}e take the non-examined respondents' assertion to be (at most) that
> their claim is the rate assigned to them is not reasonably reflective of
> their potential dumping margins during the POR, in reference to
> language in the SAA. However, there is no record evidence to support
> this assertion. The only analysis that the non-examined respondents
> provide relates to margins assigned in various administrative review
> segments under the Order, and *not to their experience during the POR.*

*Id.* (emphasis added). In other words, Commerce adhered to its practice of not

giving weight to historical rates as evidence that the rates calculated in a current

review are not reflective of the non-selected respondents' current dumping behavior.

Commerce adhered to this same practice in the first administrative review of

*Wooden Cabinet and Vanities and Components Thereof from China*, 87 Fed. Reg.

67,674 (Dep't Commerce Nov. 9, 2022) (final results of 2019-2021 review) and

accompanying IDM at Comment 5 ("*WCV from China*"). Commerce calculated a

dumping rate of zero for the lone mandatory respondent under review – *i.e.*, Qufu

Xinyu.[3] In the preliminary results, Commerce followed the expected method and

---

[3] The second mandatory respondent failed to cooperate and was thus ultimately
considered to be part of the China-wide entity. According to Commerce, this made the
second mandatory respondent's margin ineligible for use in calculating the rate for the
non-selected separate rate companies, because no party had requested a review of the
China-wide entity. *WCV from China* and accompanying IDM at Comment 5. Cambria
notes in this regard that it vehemently objects to Commerce's policy of ignoring the
China-wide rate assigned to noncooperating respondents in NME proceedings when
applying the expected method to calculate the rate for non-selected respondents.

assigned a zero rate to the non-selected companies. In its case brief, the petitioner

argued that Commerce should not assign the zero rate to the non-selected

companies because it was not reflective of the dumping behavior of the non-selected

companies. Significantly, in the original investigation leading to the order on *WCV*

*from China*, Commerce had calculated rates that were all significantly above zero:

| Company | Rate |
|---|---|
| The Ancientree | 4.37% |
| Dalian Meisen | 262.18% |
| Rizhao Foremost Companies | 101.46% |
| China-Wide Entity | 262.18% |
| Separate Rate Companies | 48.50% |

*Wooden Cabinets and Vanities and Components Thereof from China: Antidumping*

*Duty Order*, 85 Fed. Reg. 22,126 (Dep't Commerce Apr. 21, 2020). Despite the fact

that the history of the order showed high rates almost across the board, Commerce

found that "there is no record evidence which demonstrates that Qufu Xinyu's

individually calculated margin {of zero percent} assigned to the separate rate

companies is not reasonably reflective of the separate rate companies' dumping

behavior during the POR." *WCV from China* and accompanying IDM at Comment 5.

It is simply impossible to square Commerce's decision in the first administrative

review of *WCV from China* with its decision in the first administrative review of

QSP from India.

An agency's decision is arbitrary when it deviates from an established

practice followed in similar circumstances and does not provide a reasonable

explanation for the deviation. *See Consol. Bearings*, 348 F.3d at 1007; *see also SKF*

*USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). Here, Commerce's

decision to depart from the expected method based on the historical rates under the order – as reflected in a single prior segment of the proceeding – deviated from the established practice it has followed in similar circumstances, including in *Nails from Taiwan*, *Steel Rebar from Mexico*, and *WCV from China*. Commerce provided no explanation for this deviation. The *Final Results* are thus arbitrary and should also be overturned on this basis.

## II. Commerce's Decision to Pull Forward the All-Others Rate from the Original Investigation Was Not Supported by Substantial Evidence or in Accordance with Law

Even assuming for the sake of argument that there was substantial evidence to depart from the expected method and that it did not conflict with prior agency practice, Commerce still erred in the *Final Results* when it pulled forward the all-others rate from the original investigation and applied it to the non-selected respondents in the first review. Its decision to do so was directly contrary to binding Federal Circuit precedent and was unsupported by the record evidence in the underlying review.

### A. Neither of the Two Circumstances Outlined in *Albemarle* Apply

As this Court has recognized, the Federal Circuit in *Albemarle* outlined two circumstances under which Commerce may depart from the expected methodology and carry forward a prior rate for any particular respondent. *Primesource*, 581 F.Supp.3d at 1338 (citing *Albemarle*, 821 F.3 at 1357). Under the first circumstance, "Commerce needed some *contemporaneous data* to establish that the market and margins relevant to the subject merchandise had not changed such that the prior rates could be considered reflective of current rates." *Id*. This is because "{t}here is

31

no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period." *Albemarle*, 821 F.3d at 1356. Indeed, "if the facts remained the same from period to period, there would be no need for administrative reviews." *Id.* (quotation and citation omitted). Here, there is not a single shred of "contemporaneous data" on the record to show that the market and margins had not changed between the original investigation and the first review. The only evidence pointed to by respondents, and the only evidence upon which Commerce relied in the *Final Results*, involves historical rates calculated under the order. Thus, the first circumstance does not apply.

Significantly, Commerce and the CIT have both recognized that the rule in *Albemarle* regarding the need for contemporaneous data to pull forward a prior rate must be strictly followed. In *Mid Continent*, for example, the Court explained that:

> {P}art of the idea behind periodic reviews is to test if respondents that previously dumped have mended their ways. While the Federal Circuit has identified circumstances where it may, nonetheless, be reasonable to use information from prior segments, those circumstances are not present here. For example, Mid Continent makes no argument that "the overall market and the dumping margins have not changed from period to period."

*Mid Continent*, 321 F. Supp. 3d at 1322–23 (quoting *Albemarle*, 821 F.3d at 1357). Similarly, in *Taiwan Nails*, Commerce explicitly recognized that when there is no contemporaneous data on the record showing that margins have not changed, "{t}he act of 'pulling forward' a company-specific rate or a calculated review-specific rate for non-examined companies from a 'temporally proximate' review contravenes the Federal Circuit's explicit opinion in *Albemarle*." *Taiwan Nails 2018-2019 IDM* at

Comment 5. *See also Steel Rebar from Mexico* and accompanying IDM at Comment 7 (recognizing that "Commerce is not permitted to pull forward rates from prior segments except under two limited circumstances"); *Certain Frozen Fish Fillets from Vietnam*, 83 Fed. Reg. 12,717 (Dep't Commerce March 23, 2018) (final results) and accompanying IDM at Comment 2 ("With respect to the separate rate respondents' proposal to 'pull forward' a margin from a prior segment of the same proceeding, they point to no convincing evidence that the 'underlying facts or calculated dumping margins' have remained the same throughout prior proceedings, or that there is 'consistency' from prior reviews with respect to the margins of the individually examined exporters. This proceeding likewise does not implicate any of the exemptions that the CAFC carved out from the prohibition on 'pulling forward.'")

The second circumstance outlined in *Albemarle* occurs in the AFA context, "where Commerce is allowed to consider deterrence as a factor," and Commerce "may presume that 'a prior dumping margin imposed against an exporter in an earlier administrative review continues to be valid if the exporter fails to cooperate in a subsequent review.'" *Primesource*, 581 F.Supp.3d at 1338 (citing *Albemarle*, 821 F.3d at 1357-58) (internal citations and quotations marks omitted). That circumstance does not apply here because Commerce was not pulling forward an AFA rate from a prior segment to apply to the non-selected companies.

Commerce stated in the *Final Results* that it was following its approach in *Steel Nails from Oman* when it applied the all-others rate calculated in the original

investigation to the non-selected companies. *Final Results IDM* at Comment 5

(citing *Steel Nails from Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022)

(final results)). As an initial matter, that review appears to be wrongly decided

because Commerce cited no "contemporaneous data to establish that the market

and margins relevant to the subject merchandise had not changed such that the

prior rates could be considered reflective of current rates."

In addition, the review in *Steel Nails from Oman* is distinguishable on the

facts from the review at issue in this case. In *Steel Nails from Oman*, there was only

one mandatory respondent whose margin was based entirely on AFA rather than

two mandatory respondents whose margins were zero percent and based on AFA.

*Steel Nails from Oman,* 87 Fed. Reg. 43,240 (July 20, 2022) (prelim. results) and

accompanying Preliminary Decision Memorandum (unchanged in final results). In

addition, in the four most recent administrative reviews of the order in *Steel Nails*

*from Oman*, Commerce had calculated margins ranging from zero to 1.65%, and the

all-others rate in those reviews continued to be the 9.10% rate calculated in the

investigation. *Id.* This is in stark contrast to the review at issue in this case, which

was the first review of the order on QSP from India that had ever been conducted,

meaning the history of the order was much more limited.

The bottom line is that neither of the two circumstances outlined in

*Albemarle* and its progeny warrant Commerce's pulling forward the all-others rate

from the original investigation and applying it to the non-selected respondents in

this review. If Commerce believed that the expected-method rate did not reasonably

reflect the dumping behavior of the non-selected respondents, it could have devised another "reasonable method" to estimate their dumping rate. 19 U.S.C. § 1637d(c)(5)(B). For example, Commerce could have averaged the four rates calculated over the entire history of the proceeding (2.67%, 5.15%, 0.00%, and 323.12%) to calculate a rate of 82.74%. Alternatively, Commerce could have started with the expected method and then adjusted each non-selected respondent's rate based on that respondent's AUV data on the record. Instead, however, Commerce simply pulled forward the old all-others rate with no evidence that it was still relevant in the current review. For this reason alone, Commerce's decision to pull forward the rate must be overturned.

### B. Commerce's Decision to Pull Forward the Old Rate Was Not Supported by Substantial Evidence

In addition to being inconsistent with *Albemarle* and its progeny, Commerce's decision to pull forward the all-others rate from the original investigation was also not supported by substantial evidence. This is the case for many of the same reasons that Commerce's finding that the expected-method rate was unrepresentative and is not supported by substantial evidence. In pulling forward the all-other rate, Commerce completely ignored Antique's AFA rate and the fact that its assigned rate had significantly increased between the original investigation and the first review. Commerce relied entirely on rates calculated from the original investigation when there was no evidence that the market conditions and dumping behavior of the non-selected respondents remained unchanged between the original investigation and the first review. Commerce ignored evidence regarding the AUVs

of the non-selected respondents showing that their U.S. prices [

] during the POR.

Finally, Commerce ignored the possibility of other reasonable methods for calculating the rate assigned to the non-selected respondents. For example, as mentioned above, Commerce could have averaged the four rates calculated over the entire history of the proceeding to estimate a rate of 82.74%. This would have resulted in a rate that more accurately reflected the dumping behavior of the respondents in the current review instead of focusing solely on the dumping behavior from a prior segment of the order.

*       *       *

In sum, the historical rates did not warrant a departure from the expected method. The history of the order was extremely limited. There was no contemporaneous data supporting a departure from the expected method. The historical rates were not consistent from segment to segment (with Antique's rate increasing dramatically during the current review). The AUVs of the non-selected respondents supported the reasonableness of the expected method. And Commerce itself had found at the outset of the review that the historical rates did not show that the largest exporters' rates would be unrepresentative of the smaller exporters' rates. But even if a departure from the expected method was warranted, Commerce's decision to pull forward the all-others investigation should still be overturned for being inconsistent with *Albemarle* and for being unsupported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, Cambria requests that this Court: (i) hold that Commerce's decision to depart from the expected method and instead pull forward the all-others rate from the original investigation to calculate the AD rate for the non-selected respondents in the first administrative review of the AD order is not supported by substantial evidence or in accordance with law; and (ii) and remand Commerce's *Final Results* with instructions to issue a new determination consistent with the Court's decision.

<div style="margin-left:45%">

Respectfully submitted,

*/s/ Luke A. Meisner*
Luke A. Meisner, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Cambria Company LLC*

</div>

Dated: June 30, 2023

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response brief contains 9,453 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures.


Dated: June 30, 2023                                   /s/ Luke A. Meisner
                                                       Luke A. Meisner