UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

———————————————————————————
|                                                      | ) |                          |
| CAMBRIA COMPANY LLC,                                 | ) |                          |
|                                                      | ) |                          |
|                    Plaintiff,                        | ) |                          |
|                                                      | ) |                          |
|          and                                         | ) |                          |
|                                                      | ) |                          |
| ANTIQUE MARBONITE PRIVATE LIMITED,                   | ) |                          |
| SHIVAM ENTERPRISES, PRISM JOHNSON                    | ) |                          |
| LIMITED, *et al.*,                                   | ) |                          |
|                                                      | ) |                          |
|                    Consolidated Plaintiffs,          | ) |                          |
|                                                      | ) |                          |
|          v.                                          | ) | Consol. Court No. 23-00007 |
|                                                      | ) |                          |
| UNITED STATES,                                       | ) |                          |
|                                                      | ) |                          |
|                    Defendant,                        | ) |                          |
|                                                      | ) |                          |
|          and                                         | ) |                          |
|                                                      | ) |                          |
| ABP TRADING, LLC; COSMOS GRANITE                     | ) |                          |
| (WEST) LLC; COSMOS GRANITE (SOUTH                    | ) |                          |
| EAST) LLC; COSMOS GRANITE (SOUTH                     | ) |                          |
| WEST) LLC; CURAVA CORPORATION;                       | ) |                          |
| DIVYASHAKTI GRANITES LIMITED;                        | ) |                          |
| DIVYASHAKTI LIMITED; MARUDHAR                        | ) |                          |
| ROCKS INTERNATIONAL PVT LTD;                         | ) |                          |
| OVERSEAS MANUFACTURING AND SUPPLY                    | ) |                          |
| INC. D/B/A MERRIMACK STONE                           | ) |                          |
| INDUSTRIES; QUARTZKRAFT LLP; and                     | ) |                          |
| STRATUS SURFACES LLC, *et al.*,                      | ) |                          |
|                                                      | ) |                          |
|                    Defendant-Intervenors.            | ) |                          |
———————————————————————————

## <u>ORDER</u>

Upon consideration of the motions for judgment upon the administrative record filed by

plaintiff and consolidated plaintiffs, the responses thereto, and other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's determination is affirmed in all respects; and it is further

ORDERED that judgment is entered in favor of the United States.

_____
CHIEF JUDGE

Dated: _____, 2024
       New York, NY

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| CAMBRIA COMPANY LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| ANTIQUE MARBONITE PRIVATE LIMITED, ) | |
| SHIVAM ENTERPRISES, PRISM JOHNSON ) | |
| LIMITED, *et al.*, ) | |
| ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| v. ) | Consol. Court No. 23-00007 |
| ) | |
| UNITED STATES, ) | **PUBLIC VERSION** |
| ) | Business Proprietary Information |
| Defendant, ) | Denoted By Brackets [ ] on Pg. 43 |
| ) | |
| and ) | |
| ) | |
| ABP TRADING, LLC; COSMOS GRANITE ) | |
| (WEST) LLC; COSMOS GRANITE (SOUTH ) | |
| EAST) LLC; COSMOS GRANITE (SOUTH ) | |
| WEST) LLC; CURAVA CORPORATION; ) | |
| DIVYASHAKTI GRANITES LIMITED; ) | |
| DIVYASHAKTI LIMITED; MARUDHAR ) | |
| ROCKS INTERNATIONAL PVT LTD; ) | |
| OVERSEAS MANUFACTURING AND SUPPLY ) | |
| INC. D/B/A MERRIMACK STONE ) | |
| INDUSTRIES; QUARTZKRAFT LLP; and ) | |
| STRATUS SURFACES LLC, *et al.*, ) | |
| ) | |
| Defendant-Intervenors. ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:                          JOSHUA E. KURLAND
VANIA WANG                           Senior Trial Counsel
Senior Attorney                      U.S. Department of Justice
JOSEPH GROSSMAN                      Civil Division
Attorney                             Commercial Litigation Branch
Office of the Chief Counsel          P.O. Box 480, Ben Franklin Station
for Trade Enforcement & Compliance   Washington, D.C. 20044
U.S. Department of Commerce          Telephone: (202) 616-0477
                                     Email: Joshua E. Kurland@usdoj.gov

November 20, 2023                    *Attorneys for Defendant United States*

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ............................................................2

I.     Administrative Determination Under Review ...............................................2

II.    Issues Presented For Review ........................................................................2

STATEMENT OF FACTS ...............................................................................3

SUMMARY OF THE ARGUMENT ................................................................8

ARGUMENT .....................................................................................................9

I.     Standard Of Review ....................................................................................9

II.    Commerce's Rejection Of Antique Group's Untimely Filings Is Supported By
       Substantial Evidence, Lawful, And Not An Abuse Of Discretion ..............11

       A.  Legal Framework ..............................................................................11

       B.  Commerce Lawfully Rejected Antique Group's Untimely Questionnaire
           Response And Extension Requests Under 19 C.F.R. § 351.302(c) ......13

       C.  Commerce Did Not Abuse Its Discretion In Rejecting Antique Group's
           Untimely Second Supplemental Questionnaire Response ....................20

       D.  Section 351.302(c) Is Lawful And Not An Abuse Of Discretion ..........24

       E.  Commerce's Regulations At 19 C.F.R. § 351.302(c) Govern The Acceptance
           Of Untimely Filed Extension Requests, Not A "Second Chance" Practice ..........27

III.   Commerce's Application Of AFA To Antique Group Is Supported By
       Substantial Evidence And Otherwise Lawful ..............................................31

       A.  Legal Framework ..............................................................................31

       B.  Antique Group Did Not Cooperate To The Best Of Its Ability..............32

       C.  Commerce Lawfully Selected The AFA Rate For Antique Group..........35

IV.    Commerce's Determination To Use The All Others Rate From The Investigation
       As The Non-Selected Rate Is Supported By Substantial Evidence And Lawful..........39

       A.  Legal Framework ..............................................................................39

B.  Commerce's Determination To Depart From The Expected Method Is Supported By Substantial Evidence..................................................................40

V.  Commerce's Determination That The Importers' Allegation Regarding The Export Subsidy Offset Does Not Reflect A Ministerial Error Is Lawful......................48

A.  Legal Framework .....................................................................................48

B.  The Importers' Allegation Regarding The Export Subsidy Offset Does Not Reflect A Ministerial Error .......................................................................49

C.  Because The Importers Failed To Exhaust Their Administrative Remedies With Respect To Their Export Subsidy Offset Allegation, The Court Should Not Consider The Merits Of That Allegation...............................51

CONCLUSION...................................................................................................54

## **TABLE OF AUTHORITIES**

**Case(s)**                                                                 **Page(s)**

*Albemarle Corp. v. United States,*
  821 F.3d 1345 (Fed. Cir. 2016) ............................................................................ 46

*Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*,
  334 F.3d 1284 (Fed. Cir. 2003) ..................................................................... 48, 51

*Artisan Mfg. Corp. v. United States*,
  978 F. Supp. 2d 1334 (Ct. Int'l Trade 2014) .............................................. 21, 22

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) .............................................................................. 9

*Axiom Res. Mgmt., Inc. v. United States*,
  564 F.3d 1374 (Fed. Cir. 2009) ..................................................................... 17, 29

*Bebitz Flanges Works Priv. Ltd. v. United States*,
  433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) .............................................. 24, 27

*BMW of N. Am. LLC v. United States*,
  926 F.3d 1291 (Fed. Cir. 2019) ............................................................................ 38

*Boomerang Tube LLC v. United States*,
  856 F.3d 908 (Fed. Cir. 2017) ............................................................... 47, 48, 53

*Bosun Tools Co. v. United States*,
  No. 2021-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) ..................... 41

*Catfish Farmers of Am. v. United States*,
  No. 21-00380, 2023 WL 4560815 (Ct. Int'l Trade July 7, 2023) ............. 51

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007) ............................................................................ 10

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ................................................................................................. 9

*Corus Staal BV v. United States*,
  502 F.3d 1370, 1379 (Fed. Cir. 2007) ............................................................... 52

*Dillinger France S.A. v. United States*,
  350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) .................................................... 54

*Dongtai Peak Honey Indus. Co. v. United States*,
   971 F. Supp. 2d 1234 (Ct. Int'l Trade 2014),
   *aff'd*, 777 F.3d 1343 (Fed. Cir. 2015) ............................................. 11

*Dongtai Peak Honey Indus. Co. v. United States*,
   777 F.3d 1343 (Fed. Cir. 2015) ......................................... 23, 24, 25

*Downhole Pipe & Equip., L.P. v. United States*,
   776 F.3d 1369 (Fed. Cir. 2015) ........................................................ 43

*Dupont Teijin Films USA, LP v. United States*,
   273 F. Supp. 2d 1347 (Ct. Int'l Trade 2003) ................................... 53

*Fischer S.A. Comercio, Industria & Agricultura v. United States*,
   885 F. Supp. 2d 1366 (Ct. Int'l Trade 2012) ........................ 49, 51, 52

*FPC v. Transcon. Gas Pipe Line Corp.*,
   423 U.S. 326 (1976) ......................................................................... 10

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ............................................................ 9

*Gov't of Argentina v. United States*,
   542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ................................... 16

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
   815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) .............................. 21, 22

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
   335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ................................... 16

*Husteel Co. v. United States*,
   77 F. Supp. 3d 1286 (Ct. Int'l Trade 2015) ................................ 49, 51

*Hyundai Steel Co. v. United States*,
   279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) ................................... 17

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992) ......................................................................... 10

*KYD, Inc. v. United States*,
   607 F.3d 760 (Fed. Cir. 2010) .......................................................... 37

*Maverick Tube Corp. v. United States*,
   107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ........................ 10, 11, 25

*Medtronic, Inc. v. Daig Corp.*,
   789 F.2d 903 (Fed. Cir. 1986) ................................................................ 16

*Mittal Steel Point Lisas Ltd. v. United States*,
   548 F.3d 1375 (Fed. Cir. 2008) .......................................................... 47, 52

*Neo Solar Power Corp. v. United States*,
   190 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ...................................... 11, 24

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003) .......................................................... 31, 34

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ............................................................. 10

*Oman Fasteners, LLC v. United States*,
   No. 22-00348, 2023 WL 2233642 (Ct. Int'l Trade Feb. 15, 2023),
   *appeal pending* Fed. Cir. No. 23-1661 .............................................. 28, 30

*Papierfabrik Aug. Koehler SE v. United States*,
   843 F.3d 1373 (Fed. Cir. 2016) ............................................................. 36

*POSCO v. United States*,
   296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) .......................................... 38

*PrimeSource Bldg. Prods. v. United States*,
   581 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) ................................ 41, 42, 43

*Pro-Team Coil Nail Enterprise v. United States*,
   419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) .......................................... 19

*Pro-Team Coil Nail Enter., Inc. v. United States*,
   483 F. Supp. 3d 1242 (Ct. Int'l Trade 2020) .......................................... 38

*Pro-Team Coil Nail Enter. v. United States*,
   532 F. Supp. 3d 1281 (Ct. Int'l Trade 2021) .......................................... 40

*Pro-Team Coil Nail Enter., Inc. v. United States*,
   587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022),
   *appeal pending*, Fed. Cir. No. 2022-2241 ........................................ 41, 45

*PSC VSMPO-Avisma Corp. v. United States*,
   688 F.3d 751 (Fed. Cir. 2012) ............................................................ 10, 22

*Qingdao Sea-Line Trading Co. v. United States*,
   766 F.3d 1378 (Fed. Cir. 2014) ............................................................. 16

*QVD Food Co., Ltd. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ................................................................ 49, 51

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ..................................................................... 47

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ..................................................................................... 10

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ............................................... 10

*Stanley Works (Langfang) Fastening Sys., Co. v. United States*,
    279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ............................................... 47

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ...................................................................... 10

*Tau-Ken Temir LLP v. United States*,
    587 F. Supp. 3d 1346 (Ct. Int'l Trade 2022),
    *appeal pending*, Fed. Cir. No. 2022-2204 ................................................. 30

*Tianjin Magnesium Int'l Co. v. United States*,
    844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ............................................... 31

*Trinity Manufacturing, Inc. v. United States*,
    549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021) ................................... 20, 21, 27

*U.S. Steel Corp. v. United States*,
    637 F. Supp. 2d 1199 (Ct. Int'l Trade 2009) ............................................... 16

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ....................................................................................... 9

*United States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952) ........................................................................... 47, 49, 52

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ............................................................................... 10, 25

*Woodford v. Ngo*,
    548 U.S. 81 (2006) ....................................................................................... 47

*Yantai Timken Co. v. United States*,
    521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007),
    *aff'd*, 300 F. App'x 934 (Fed. Cir. 2008) ............................................. *passim*

## Statutes

19 U.S.C. § 1516a(b) ................................................................... 9, 17, 29

19 U.S.C. § 1673d(c) ........................................................................ 39, 50

19 U.S.C. § 1675(h) ...................................................................... 48, 49, 51

19 U.S.C. § 1677a(c) ........................................................................ 49, 50

19 U.S.C. § 1677e(a) .................................................................... 31, 32, 33

19 U.S.C. § 1677e(b) .......................................................................... *passim*

19 U.S.C. § 1677e(c) ........................................................................ 8, 32, 36

19 U.S.C. § 1677e(d) ........................................................................ 32, 37

19 U.S.C. § 1677m(e) ............................................................................. 19

28 U.S.C. § 2637(d) ........................................................................... 46, 52

## Regulations

19 C.F.R. § 351.224(e)............................................................................. 51

19 C.F.R. § 351.224(f) ....................................................................... 49, 51

19 C.F.R. 351.301(c)................................................................................. 5

19 C.F.R. § 351.302 ......................................................................... *passim*

19 C.F.R. § 351.302 (2012) ...................................................................... 21

19 C.F.R. 351.304(a)................................................................................. 5

19 C.F.R. § 351.308(c)............................................................................. 31

## Administrative Determinations

*Antidumping Proceedings: Announcement of Change in Department Practice for Respondent
Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket
Economy Entity in NME Antidumping Proceedings*,
78 Fed. Reg. 65,963 (Dep't of Commerce Nov. 4, 2013)........................................ 44

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*,
83 Fed. Reg. 12,717 (Dep't of Commerce Mar. 23, 2018)*2*................................... 43

*Certain Quartz Surface Products From India and Turkey*,
  85 Fed. Reg. 37,422 (Dep't of Commerce June 22, 2020) ...................................... 53

*Certain Quartz Surface Products From India*,
  87 Fed. Reg. 40,786 (Dep't of Commerce July 8, 2022) ...................................... 3, 7

*Certain Quartz Surface Products From India*,
  88 Fed. Reg. 1,188 (Dep't of Commerce Jan. 9, 2023) ...................................... 2, 7

*Certain Steel Nails From Taiwan*,
  83 Fed. Reg. 6,163 (Dep't of Commerce Feb. 13, 2018) ...................................... 45

*Certain Steel Nails from the Sultanate of Oman*,
  87 Fed. Reg. 43,240 (Dep't of Commerce July 20, 2022) ...................................... 42

*Certain Steel Nails from the Sultanate of Oman*,
  87 Fed. Reg. 78,639 (Dep't of Commerce Dec. 22, 2022) ...................................... 42

*Extension of Time Limits*,
  78 Fed. Reg. 57,790 (Dep't of Commerce Sept. 20, 2013)................................*passim*

*Initiation of Antidumping Duty and Countervailing Duty Administrative Reviews*,
  86 Fed. Reg. 41,821 (Dep't of Commerce Aug. 3, 2021)...................................... 3

*Modification of Regulation Regarding the Extension of Time Limits*,
  78 Fed. Reg. 3,367 (Dep't of Commerce Jan. 16, 2013) ................................*passim*

*Large Power Transformers from the Republic of Korea*,
  83 Fed. Reg. 11,679 (Dep't  of Commerce Mar. 16, 2018) ...................................... 43

*Silicon Metal from Kazakhstan*,
  83 Fed. Reg. 9,831 (Dep't of Commerce Mar. 8, 2018) ................................*passim*

*Steel Concrete Reinforcing Bar from Mexico*,
  87 Fed. Reg. 34,848 (Dep't of Commerce Jun. 8, 2022) ...................................... 45

*Utility Scale Wind Towers from the Socialist Republic of Vietnam*,
  85 Fed. Reg. 40,226 (Dep't of Commerce July 6, 2020)...................................... 28, 29

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
  87 Fed. Reg. 67,674 (Dep't of Commerce Nov. 9, 2022)................................... 44, 46

**Other Authorities**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R.
  Rep. No. 103-316, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ................... 32, 38, 39

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

_____

|  |  |  |
|---|---|---|
| CAMBRIA COMPANY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ANTIQUE MARBONITE PRIVATE LIMITED, | ) | |
| SHIVAM ENTERPRISES, PRISM JOHNSON | ) | |
| LIMITED, *et al.*, | ) | |
| | ) | |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| v. | ) | Consol. Court No. 23-00007 |
| | ) | |
| UNITED STATES, | ) | **PUBLIC VERSION** |
| | ) | Business Proprietary Information |
| Defendant, | ) | Denoted By Brackets [ ] on Pg. 43 |
| | ) | |
| and | ) | |
| | ) | |
| ABP TRADING, LLC; COSMOS GRANITE | ) | |
| (WEST) LLC; COSMOS GRANITE (SOUTH | ) | |
| EAST) LLC; COSMOS GRANITE (SOUTH | ) | |
| WEST) LLC; CURAVA CORPORATION; | ) | |
| DIVYASHAKTI GRANITES LIMITED; | ) | |
| DIVYASHAKTI LIMITED; MARUDHAR | ) | |
| ROCKS INTERNATIONAL PVT LTD; | ) | |
| OVERSEAS MANUFACTURING AND SUPPLY | ) | |
| INC. D/B/A MERRIMACK STONE | ) | |
| INDUSTRIES; QUARTZKRAFT LLP; and | ) | |
| STRATUS SURFACES LLC, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response to the motions for judgment upon the agency record filed by

Cambria Company LLC (Cambria), Antique Marbonite Private Limited, Prism Johnson Limited, and Shivam Enterprises (collectively, Antique Group), and Arizona Tile, LLC, M S International, Inc., and PNS Clearance LLC (collectively, Importers). Because the Department of Commerce's (Commerce's) determination in the first administrative review of its antidumping duty order covering certain quartz surface products (QSPs) from India is supported by substantial evidence and otherwise lawful, the Court should sustain Commerce's determination.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The determination before the Court is Commerce's first administrative review of its antidumping duty order covering QSPs from India. *Certain Quartz Surface Products From India,* 88 Fed. Reg. 1,188 (Dep't of Commerce Jan. 9, 2023) (P.R. 355) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM) (P.R. 346). The review period is December 13, 2019, through May 31, 2021.

### II.   Issues Presented For Review

1.      Whether Commerce abused its discretion in rejecting Antique Group's untimely filed second supplemental questionnaire response and untimely extension requests.

2.      Whether Commerce's application of facts available with an adverse inference (AFA) to Antique Group is supported by substantial evidence and otherwise lawful.

3.      Whether Commerce's selection and corroboration of the AFA rate is lawful.

4.      Whether Commerce's determination to depart from the "expected method" to calculate the rate for non-selected respondents by relying on the "all others" rate from the QSPs investigation is supported by substantial evidence and otherwise lawful.

5.      Whether Commerce's determination that the Importers' error allegation relating

to an export subsidy offset was not a ministerial error is reasonable and otherwise lawful.

## STATEMENT OF FACTS

In August 2021, Commerce initiated an administrative review of its antidumping duty

order covering QSPs from India.  *Initiation of Antidumping Duty and Countervailing Duty*

*Administrative Reviews*, 86 Fed. Reg. 41,821 (Dep't of Commerce Aug. 3, 2021) (P.R. 22).

Subsequently, in September 2021, Commerce selected Antique Group and Pokarna Engineered

Stone Limited (PESL) as the mandatory respondents for the review.  Respondent Selection

Memorandum (Sept. 28, 2021) (P.R. 53; C.R. 13).

In October 2021, Commerce issued initial questionnaires to Antique Group and to PESL.

Antique Group Questionnaire (Oct. 7, 2021) (P.R. 55); PESL Questionnaire (Oct. 7, 2021) (P.R.

56).  Antique Group submitted its response to Section A of Commerce's questionnaire in

November 2021, and its Section B, C, and D responses in December 2021.  *Certain Quartz*

*Surface Products From India*, 87 Fed. Reg. 40,786 (Dep't of Commerce July 8, 2022), and

accompanying Preliminary Decision Memorandum at 3 (PDM) (P.R. 243) (*Preliminary Results*).

Upon reviewing the responses, Commerce determined that it required further information, and in

March 2022 issued its first supplemental questionnaire to Antique Group.  First Supplemental

Questionnaire (Mar. 18, 2022) (P.R. 173; C.R. 195).  Antique Group filed a timely response to

the first supplemental questionnaire.  PDM at 4.  In April 2022, Commerce issued a second

supplemental questionnaire to Antique Group with a deadline of May 4, 2022.  Second

Supplemental Questionnaire (April 20, 2022) (P.R. 197; C.R. 216).  The questionnaire stated:

> Commerce must conduct this proceeding in accordance with
> statutory and regulatory deadlines.  If you are unable to respond
> completely to the attachment by the established deadline or are
> unable to provide all requested supporting documentation by the

> same date, you must notify the official in charge and submit a
> request for an extension of the deadline for all or part of the
> questionnaire response . . . Section 351.302(c) of Commerce's
> regulations requires that all extension requests be in writing and
> state the reasons for the request.  Any factual statements made in
> support of such reasons must be accompanied by the certifications
> required under section 351.303(g) of the regulations.  An extension
> request submitted without a proper certification for any factual
> information contained therein will be considered improperly filed
> and, as with any other improperly filed document, will not be
> accepted.  Any extension granted in response to your request will
> be in writing; otherwise the original deadline will apply.

*Id.* at Cvr. Ltr. 1-2.  Commerce further stated that:

> Commerce will not accept any requested information submitted
> after the deadline.  As required by section 351.302(d) of
> Commerce's regulations, we will reject such submissions as
> untimely.  Therefore, failure to properly request extensions for all
> or part of a questionnaire response may result in the application of
> partial or total facts available, pursuant to section 776(a) of the
> Tariff Act of 1930, as amended (the Act), which may include
> adverse inferences pursuant to section 776(b) of the Act.

*Id*.  On April 30, 2022, Antique Group requested a two-week extension to submit its response.

Antique Group First Extension Request (April 30, 2022) (P.R. 198).  Commerce partially granted

the request, extending the deadline for Antique Group to submit its response by one week to May

11, 2022.  Antique Group First Extension (May 2, 2022) (P.R. 199).  On May 7, 2022, Antique

Group requested a second extension of time to submit its response.  Antique Group Second

Extension Request (May 7, 2022) (P.R. 200).  On May 9, 2022, Commerce again partially

granted Antique Group's request, extending the deadline to Monday, May 16, 2022, at 10:00am.

Antique Group Second Extension (May 9, 2022) (P.R. 201).  In doing so, Commerce stated:

> We have evaluated your request and are granting the extension in-
> part.  Accordingly, the deadline for Antique Group to submit its
> response to the Second Supplemental Questionnaire is now **10:00
> a.m. Eastern Time, May 16, 2022.**

*Id.* (emphasis in original).  As in its prior communications, Commerce again noted that:

> Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations,
> any information submitted after the applicable deadline will be
> considered untimely filed and may be rejected.  In such a case, we
> may have to resort to the use of facts available, as required by
> section 776(a)(2)(B) of the Tariff Act of 1930, as amended.

*Id*.  Antique Group failed to file its second supplemental questionnaire response by the

established deadline.  Rejection of Second Supplemental Questionnaire Response (May 18,

2022) (P.R. 203).  Accordingly, Commerce rejected Antique Group's untimely filed response,

explaining that:

> As {Commerce} established in its May 9, 2022, extension letter,
> the deadline for the submission of the supplemental questionnaire
> responses was 10:00 am Eastern Time (ET) on May 16, 2022.
> However, your submissions were timestamped between 2:56 pm
> and 3:45pm ET on May 16, 2022. . . . We note that while the
> supplemental questionnaire was issued on April 20, 2022, and
> originally due on May 4, 2022, Antique Group twice requested and
> received extensions to the deadline to submit the responses and
> thus, was aware of the requirements for requesting additional time,
> should it have been necessary.  However, Antique Group did not
> submit any additional requests for extensions, nor did it indicate to
> Commerce that it was having difficulties submitting the
> information in the form or manner requested within the established
> timeframe.  Accordingly, we find that Antique Group's
> supplemental questionnaire response was untimely filed.  As a
> result, pursuant to 19 CFR 351.301(c)(1), 351.302(d), and
> 351.104(a)(2)(iii), Commerce hereby rejects this untimely
> submission and removes it from the official record{.}

*Id*. at 1-2 (footnote omitted).

Antique Group requested that Commerce grant it the opportunity to refile its response

due to its "clerical oversight" and "mistaken" presumption that the deadline for filing was May

16 at 5:00pm.  Antique Group First Request for Opportunity to Refile at 2 (May 19, 2022) (P.R.

205).  Commerce rejected Antique Group's request to re-submit its untimely response, finding

that Antique Group did not identify an extraordinary circumstance that warranted retroactively

extending the questionnaire response deadline and accepting the untimely submission.  Rejection

PUBLIC VERSION

of Request to Refile (May 20, 2022) (P.R. 207).  Commerce explained that "{w}hen considering

whether to accept untimely-filed information, 19 CFR 351.302(c) establishes that it may accept

untimely extension requests when a party demonstrates that extraordinary circumstances exist."

*Id*. at 1.  It further explained that "19 CFR 351.302(c)(2) defines extraordinary circumstances as

an unexpected event that could not have been prevented if reasonable measures had been taken

and that precludes a party or its representative from timely filing an extension request through all

reasonable means."  *Id*.  Commerce elaborated that:

> As noted in the Request to Refile Letter, the reason that the
> submission was filed after the established deadline is because of
> internal communication that did not properly monitor the
> established time that the response was due on May 16, 2022.  As
> such, Commerce finds that this could have been prevented through
> reasonable measures.  Antique Group states there were difficulties
> in completing the supplemental questionnaire response and
> Commerce only granted a partial extension of time, but Commerce
> granted two partial extensions and there is no indication that a
> situation existed such that Antique Group or its representatives
> were precluded from filing an extension request ahead of the 10:00
> am ET deadline on May 16, 2022.  Accordingly, Commerce finds
> that Antique Group has not demonstrated an extraordinary
> circumstance to extend the deadline and to accept the untimely-
> filed second supplemental questionnaire{.}

*Id*. at 1-2 (footnotes omitted).  Commerce also explained that "Antique Group has not pointed to

any other authorities or reasons why Commerce must reconsider the rejection of the submission"

such that "Commerce has no basis within its regulatory and statutory framework to accept the

untimely-filed supplemental questionnaire response and, as such, is unable to provide Antique

Group an opportunity to re-file the information."  *Id.* at 2.

Antique Group filed a second request for Commerce to accept the untimely questionnaire

response, arguing that extraordinary circumstances did exist.  Antique Group Second Request for

Opportunity to Refile (May 24, 2022) (P.R. 208).  Commerce denied the second request,

explaining that "{a} clerical error or oversight is not an extraordinary circumstance under Commerce's regulations."  Second Rejection of Request to Refile at 3 (June 3, 2022) (P.R. 216).

On June 30, 2022, Commerce published its preliminary results.  *Preliminary Results*, 87 Fed. Reg. 40,786, and PDM.  Commerce preliminarily determined that necessary information was absent from the record and that Antique Group withheld requested information, failed to provide information by the specified deadlines, and significantly impeded the proceeding by failing to respond to the supplemental questionnaire.  PDM at 8.  Commerce also preliminarily determined that Antique Group did not cooperate to the best of its ability.  PDM at 9.  As a result, Commerce used an adverse inference when selecting among the facts otherwise available. PDM at 9.  Commerce preliminarily selected the highest dumping margin alleged in the petition, 323.12 percent, and corroborated that rate using PESL's calculated individual dumping margins. PDM at 10-11.  Commerce also preliminarily calculated the rate for respondents not selected for individual review using the closest public approximation of the "expected method" listed in the Statement of Administrative Action, resulting in a 161.56 percent rate.  PDM at 11-12; Prelim. Non-Selected Companies Rate Memorandum (June 30, 2022) (P.R. 244; C.R. 229).

After considering interested party comments on the preliminary results, Commerce issued its determination in January 2023.  *Final Results*, 88 Fed. Reg. 1,188.  Commerce continued to apply AFA to Antique Group and assigned it the highest margin in the petition on that basis. IDM at 40.  For the rate applied to non-selected respondents, Commerce reviewed the history of rates in the proceeding and found that the results of the best proxy for the expected method were not reasonably reflective of the potential dumping margins for non-selected respondents.  IDM at 53-54.  Commerce thus relied on the "all others" rate from the investigation of 3.19 percent as a reasonable method to calculate the rate for non-selected respondents.  IDM at 55.

PUBLIC VERSION

On January 9 and 10, 2023, Commerce received ministerial error allegations that the non-selected rate must be reduced by an export subsidy offset.  Importers Ministerial Error Allegation (Jan. 9, 2023) (P.R. 354); DivyaShakti Ministerial Error Allegation (Jan. 10, 2023) (P.R. 356).  On January 11, 2023, Cambria submitted rebuttal comments to the ministerial error allegations.  Cambria Ministerial Error Rebuttal (Jan. 11, 2023) (P.R. 357).  On January 24, 2023, Commerce determined that the export subsidy offset allegations pertained to methodological decisions and did not reflect a ministerial error.  Ministerial Error Memorandum (Jan. 24, 2023) (P.R. 362).

## SUMMARY OF THE ARGUMENT

Commerce's determination is reasonable and should be sustained.

First, Commerce did not abuse its discretion in rejecting Antique Group's untimely filed second supplemental questionnaire response and denying Antique Group's untimely extension requests under 19 C.F.R. § 351.302 because Antique Group failed to submit its filings by the established deadline and failed to demonstrate that an extraordinary circumstance existed.  Section 351.302(c) of Commerce's regulation is lawful, is not an abuse of discretion, and governs whether Commerce will grant an untimely filed extension request.  The regulation is neither displaced by plaintiffs' allegations of a second chance "practice," nor by their allegations about the alleged immateriality of the delay caused by the untimely filing.

Second, Commerce's application of AFA to Antique Group is supported by substantial evidence and otherwise lawful because necessary information was not available on the record and because Antique Group did not cooperate to the best of its ability.  Likewise, Commerce's selection of the AFA rate is lawful because Commerce selected and corroborated the rate pursuant to 19 U.S.C. § 1677e(b)(2) and (c).  Commerce's selection of the rate is not punitive.

PUBLIC VERSION

Third, Commerce's departure from the expected method for calculating the dumping margin for non-selected companies was supported by substantial evidence and lawful. The history of rates in this proceeding demonstrated that the result of the expected method was not reasonably reflective of the potential dumping margins of non-selected respondents. Thus, Commerce reasonably relied on the "all others" rate of 3.19 percent from the investigation.

Finally, Commerce's determination that the Importers' error allegation regarding the export subsidy offset was not a ministerial error is reasonable because the alleged error was methodological in nature. The exhaustion doctrine also bars consideration of this claim.

## <u>ARGUMENT</u>

## I.   <u>Standard Of Review</u>

The Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."). Substantial evidence connotes "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and quotation marks omitted). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing "tremendous" deference to Commerce factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).  A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Moreover, "{a}bsent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543-44 (1978)).  Courts will thus "defer to the judgment of an agency regarding the development of the agency record." *Id.*  "To do otherwise would run the risk of propelling the courts into the domain which Congress has set aside exclusively for the administrative agency." *Id.* (quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (cleaned up)); *see also Stupp Corp. v. United States*, 5 F.4th 1341, 1350 (Fed. Cir. 2021).

Consequently, this Court reviews Commerce's determinations regarding the agency's deadlines for abuse of discretion. *See Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1331 (Ct. Int'l Trade 2015).  Specifically, "{Commerce} has broad discretion to establish

its own rules governing administrative procedures, including the establishment and enforcement of time limits." *Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1370 (Ct. Int'l Trade 2007), *aff'd*, 300 F. App'x 934 (Fed. Cir. 2008); *Dongtai Peak Honey Indus. Co. v. United States*, 971 F. Supp. 2d 1234, 1239 (Ct. Int'l Trade 2014), *aff'd*, 777 F.3d 1343 (Fed. Cir. 2015). "Strict enforcement of time limits and other requirements is neither arbitrary nor an abuse of discretion when Commerce provides a reasoned explanation for its decision." *Maverick Tube*, 107 F. Supp. 3d at 1331; *Neo Solar Power Corp. v. United States*, 190 F. Supp. 3d 1255, 1261 (Ct. Int'l Trade 2016) (quoting *Maverick Tube*).

## II.   Commerce's Rejection Of Antique Group's Untimely Filings Is Supported By Substantial Evidence, Lawful, And Not An Abuse Of Discretion

Commerce appropriately rejected Antique Group's untimely filing and its subsequent untimely extension requests in accordance with 19 C.F.R. § 351.302.  Antique Group and the Importers argue that Commerce abused its discretion by not granting Antique Group's untimely extension request, and that Commerce's application of 19 C.F.R. § 351.302 was unlawful.  These arguments lack merit because we demonstrate below that Commerce's determination is supported by substantial evidence, otherwise lawful, and not an abuse of discretion.

### A.   Legal Framework

In proceedings before Commerce, parties are permitted to file timely extension requests. For timely extension requests, the party must state the reasons for the request, and Commerce may grant the request for good cause shown.  *See* 19 C.F.R. § 351.302(b)-(c).  Commerce's regulations also permit parties to file untimely extension requests.  *See id*.  In promulgating its regulations, however, Commerce concluded that it "would be counterproductive to set the same standard for untimely extension requests" as for timely requests, because "parties would have no incentive for filing timely extension requests."  *Extension of Time Limits*, 78 Fed. Reg. 57,790,

11

57,793 (Dep't of Commerce Sept. 20, 2013); *see also Modification of Regulation Regarding the Extension of Time Limits*, 78 Fed. Reg. 3,367, 3,370 (Dep't of Commerce Jan. 16, 2013) (explaining that adopting "good cause" standard for untimely requests "will perpetuate the undue expenditure of Departmental resources in addressing extension requests"). Thus, Commerce does not review untimely extension requests under a good cause standard, but under an extraordinary circumstances standard. 19 C.F.R. § 351.302(c).

Specifically, pursuant to 19 C.F.R. § 351.302(c), adopted in 2013, "{a}n extension request will be considered untimely if it is received after the applicable time limit expires or as otherwise specified by the Secretary" and "{a}n untimely filed extension request will not be considered *unless the party demonstrates that an extraordinary circumstance exists*." (emphasis added). An "extraordinary circumstance" is defined as "an unexpected event" that (i) could not have been prevented if reasonable measures had been taken; and (ii) precludes a party or its representative from timely filing an extension request through all reasonable means. 19 C.F.R. § 351.302(c)(2). Consistent with the regulation's text, Commerce stated in the 2013 preamble to its regulation that "it is the party's responsibility to demonstrate that extraordinary circumstances exist." *Extension of Time Limits*, 78 Fed. Reg. at 57,793.

Commerce will "make a determination whether extraordinary circumstances exist based on the specific facts, taking into account whether reasonable means could have been used to file a timely request or if reasonable measures could have been taken to prevent the unexpected event from occurring." *Id.* Additionally, Commerce explained in the preamble that "{e}xamples of extraordinary circumstances include a natural disaster, riot, war, force majeure, or medical emergency." *Id.* In contrast, "{e}xamples that are unlikely to be considered extraordinary

circumstances include insufficient resources, inattentiveness, or the inability of a party's representative to access the Internet on the day on which the submission was due." *Id.*

## B. Commerce Lawfully Rejected Antique Group's Untimely Questionnaire Response And Extension Requests Under 19 C.F.R. § 351.302(c)

Commerce lawfully rejected Antique Group's untimely filed second supplemental questionnaire response and denied Antique Group's untimely extension requests because Antique Group did not meet the regulatory requirements for Commerce to accept the untimely filings requests under 19 C.F.R. § 351.302(c). *See* IDM at 16-21; Rejection of Request to Refile at 1-2 (P.R. 207); Second Rejection of Request to Refile at 3 (P.R. 216).

In particular, Commerce found that Antique Group's oversight in calendaring the applicable questionnaire response deadline did not constitute an "extraordinary circumstance," and consequently, that Antique Group's untimely filed extension request did not meet the section 351.302(c) regulatory requirement to grant an extension. *See* IDM at 18-19; Rejection of Request to Refile at 1-2 (P.R. 207). By its own admission, Antique Group's untimely filing was due to a "clerical oversight" and "mistaken" presumption that the deadline for its questionnaire response was May 16, 2022 at 5:00pm. Antique Group First Request for Opportunity to Refile at 2 (P.R. 205); *see also* Antique Group Br. 7, 8, 12 (acknowledging same).

In its second extension request, Antique Group changed its position, arguing instead that extraordinary circumstances do exist in this case based on three factors allowing Commerce to accept the untimely questionnaire response and extension request. *See* Antique Group Second Request for Opportunity to Refile at 1-11 (P.R. 208). Specifically, Antique Group claimed that its untimely filing resulted from extraordinary circumstances because (1) a key executive was diagnosed with COVID-19 and ordered to remain at home in quarantine without the ability to work remotely; (2) the 10:00am deadline was "unanticipated"; and (3) Antique Group's

13

executive team and counsel had to travel to Morbi, India to complete the response.  *Id*.

Commerce, however, considered these arguments and reasonably found that they lacked merit.

*See* IDM at 11-21; Second Rejection of Request to Refile at 2-3 (P.R. 216).

With respect to the first and third factors that Antique Group identified in its request,

Commerce disagreed that a member of Antique Group's team being diagnosed with COVID-19

and the resultant need to mobilize other staff to assist with the response constituted an

extraordinary circumstance.  Commerce explained that:

> Despite the fact that Antique knew of this official's inability to
> assist with the preparation of the response approximately a week
> ahead of the new deadline, Commerce was never notified of this
> development, and Antique never requested additional time to file
> prior to the extended due date.  This leads Commerce to determine
> that while this official's absence made filing a response much more
> difficult on the team preparing the response (and required the team
> to travel to Morbi, India), neither the company nor counsel
> determined that they needed additional time{.}

Second Rejection of Request to Refile at 2 (P.R. 216).  Commerce further observed that Antique

Group became aware of this situation approximately one week before the deadline and "to the

extent COVID-19 affected the respondent's ability to submit information on time, the company

had sufficient notice of the COVID-19 challenges to submit an extension request to Commerce

ahead of the deadline."  IDM at 19.

With respect to the second factor Antique Group identified, Commerce explained that,

although the 10:00am deadline may not be routine, it was stated clearly in Commerce's second

extension of time notifying Antique Group of the extended deadline one week in advance.  *See*

IDM at 18; Second Rejection of Request to Refile at 3 (P.R. 216).  As a result, the 10:00am

deadline "does not amount to an extraordinary circumstance that 'could not have been prevented

if reasonable measures had been taken and that precludes a party or its representative from

timely filing an extension request through all reasonable means,' as required by 19 C.F.R. 351.302(c)(2)."  Second Rejection of Request to Refile at 3 (P.R. 216).  Commerce further explained that "while 10 a.m. is not the routine deadline time, as demonstrated in the attachment to this letter, Commerce has set a 10 a.m. deadline more than ten times (in addition to this instance) in the first five months of 2022 across various Enforcement and Compliance offices." *Id*.  Hence, this was "not an isolated instance of Commerce setting such a deadline." *Id*.  Further, Antique Group was notified of the 10:00am deadline a week in advance, and thus the fact that the deadline was set at 10:00am cannot itself constitute an unexpected event that could not have been prevented if reasonable measures had been taken.  *See* IDM at 18.

After examining and rejecting each of the three bases Antique Group set forth to demonstrate extraordinary circumstances, Commerce concluded:

> Antique Group even admits that "{s}imply put, we would have filed before the deadline if Antique Group and undersigned counsel had assessed that the response was due before 5 PM." Antique Group has been forthright since it missed the filing deadline that it was a result of an oversight and not that it was unable to meet the 10 a.m. deadline set by Commerce.  A clerical error or oversight is not an extraordinary circumstance under Commerce's regulations.

Second Rejection of Request to Refile at 3 (P.R. 216).  Given that Commerce's preamble identifies "inattentiveness" as unlikely to be an extraordinary circumstance, Antique Group's reason for the late filing is one that Commerce explicitly excluded from the "extraordinary circumstances" standard.  *Extension of Time Limits*, 78 Fed. Reg. at 57,793.

Thus, Commerce properly rejected Antique Group's untimely filing and extension requests pursuant to the extraordinary circumstances regulatory requirement.  Antique Group's mere disagreement with Commerce's evaluation of its extraordinary circumstances claim is not a valid basis to overturn Commerce's determination.  *See Haixing Jingmei Chem. Prod. Sales Co.*

*v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) ("mere disagreement" with Commerce's weighing of evidence is insufficient basis for challenge); *Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021) (same).

Likewise, the Importers are incorrect to claim that Commerce failed to consider the combination of the three factors asserted by Antique Group, which they argue collectively constitute extraordinary circumstances. *See* Importers Br. 25-26. Indeed, Commerce explained that "{u}ltimately, all of the explanations for why Antique Group overlooked the deadline point to inattentiveness, carelessness and/or inadequate recordkeeping, not a lack of clarity on the part of Commerce or an inability to comply with the deadline." IDM at 17. It is thus clear that Commerce considered the full scope of Antique Group's arguments. In any event, the Court will "presume that a fact finder reviews all the evidence presented unless {it} explicitly expresses otherwise." *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed. Cir. 1986).

Next, Antique Group and the Importers argue that Commerce has granted untimely extension requests in other proceedings and thus abused its discretion by not granting Antique Group's request. Antique Group Br. 24-27; Importers Br. 26-28. This claim is meritless because Commerce's prior decisions are not binding on Commerce in this proceeding, the purportedly similar proceedings are factually distinguishable from the record before the Court here, and Commerce sufficiently explained its reasoning for its rejection in this case.

As an initial matter, Commerce is not bound by its prior decisions regarding the agency's deadlines. *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."); *see also U.S. Steel Corp. v. United States,* 637 F. Supp. 2d 1199, 1218 (Ct. Int'l Trade 2009) ("Even assuming that

Commerce's other Section 129 proceedings are factually identical to the case here, as a matter of

law, each agency determination is *sui generis*, involving a unique combination and interaction of

many variables, and therefore a prior administrative determination is not legally binding on other

reviews before this court." (citation omitted)); *Hyundai Steel Co. v. United States*, 279 F. Supp.

3d 1349, 1372 (Ct. Int'l Trade 2017) ("Commerce is not bound by decisions made in different

segments of a proceeding, let alone decisions made in different proceedings." (citation omitted)).

      Moreover, Commerce did not act contrary to an established practice.  Antique Group and

the Importers argue that Commerce has permitted untimely submissions in other proceedings in

which Commerce granted a party's extension request.  Antique Group Br. 24-25; Importers Br.

26-28.[1]  Those proceedings are distinguishable from this case.  As discussed below, several of

the proceedings that Antique Group and the Importers cite involve a "second chance" rationale

that is inconsistent with Commerce's current practice.  For example, Antique Group points to

Commerce letters in *Narrow Woven Ribbons with Woven Selvedge from Taiwan* (Feb. 27, 2015)

and *Carbon and Certain Alloy Steel Wire Rod from the United Kingdom* (July 10, 2017).  *See*

Antique Group Br. 24-25; Antique Group Request for Reconsideration at 5-6 (June 10, 2022)

---

[1] Two of the sources that the Importers cite—consisting of an October 2017 letter
concerning *Polyethylene Terephthalate Film, Sheet and Strip from Brazil*, and a September 2014
letter concerning *Aluminum Extrusions from the People's Republic of China*—are not part of the
administrative record in this proceeding.  *See* Importers Br. 27.  By statute, Commerce bases its
determinations on the record of the administrative proceeding.  19 U.S.C. 1516a(b)(1)-(2).
Letters from other proceedings are new factual information that should be filed on the record for
Commerce to consider.  *See Silicon Metal from Kazakhstan*, 83 Fed. Reg. 9,831 (Dep't of
Commerce Mar. 8, 2018), at IDM Cmt. 4.  Because these letters were not on the record before
Commerce, this Court should not consider them either.  *See Axiom Res. Mgmt., Inc. v. United
States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) ("the focal point for judicial review should be the
administrative record already in existence, not some new record made initially in the reviewing
court" (citation omitted)).  Further, the letters are not persuasive because they reflect instances in
which Commerce found that medical emergencies that prevented parties from making filings, in
circumstances unlike those in this case, *did* constitute extraordinary circumstances.

(P.R. 225).  In addition to being outside the record, and thus inappropriate to consider, both

letters hinge on a "second chance" rationale rather than application of 19 C.F.R. § 351.302(c).

Antique Group and the Importers also argue that Commerce's decision to accept an

untimely petition supplement in *Titanium Sponge from Kazakhstan* supports their position that

Commerce has accepted untimely submissions in other proceedings involving clerical errors.

Antique Group Br. 25; Importers Br. 26-27.  However, the plaintiffs are actually citing a footnote

in *Silicon Metal from Kazakhstan*, in which Commerce applied AFA to the Government of

Kazakhstan (GOK) for failing to timely file a supplemental questionnaire response.  83 Fed. Reg.

9,831, at IDM Cmt. 1 n.64.  The footnote distinguishes *Titanium Sponge from Kazakhstan* from

situations like this one:

> Although {the respondent} seeks to rely on Commerce's
> acceptance of a petition supplement filed 27 minutes late . . .  in
> the CVD investigation of *Titanium Sponge from Kazakhstan* for
> "good cause," that decision is not instructive because it arose in the
> separate context of pre-initiation questionnaires to the petitioner, a
> context in which section 776 of the Act does not apply. . . . As
> Commerce noted in its letter accepting that filing, Commerce
> continued to issue supplemental questionnaires, and receive
> responses from the petitioner, through September 11, 2017, and
> thus it was logical under those circumstances to accept the
> minutes-late filing of similar information on September 1, 2017.

*Id*.  Thus, *Silicon Metal from Kazakhstan* supports Commerce's position because it distinguishes

the specific facts of *Titanium Sponge from Kazakhstan*, while making clear that "each record

stands alone and is dependent on the specific facts before Commerce."  *Id.* at Cmt. 1.  As

Commerce explained in that determination, Commerce considers a myriad of factors, such as the

specific information sought and Commerce's competing deadlines, when determining whether to

grant an extension for a questionnaire response.  *Id.*

The Importers also cite proceedings concerning *Carbon and Certain Alloy Steel Wire Rod from Mexico* and this Court's decision in *Pro-Team Coil Nail Enterprise v. United States*, 419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019), but neither is on point. *See* Importers Br. 28-30 & n.5. The facts in *Carbon and Certain Alloy Steel Wire Rod from Mexico*—which are not part of the record—concern an instance in which a party's counsel's printers broke down as it was in the process of completing the filing and counsel timely sought to contact Commerce to report the issue and request an extension. *See* Importers Br. 28 n.5 & Att. K. *Pro-Team* involved a situation in which the Court found that Commerce had abused its discretion by refusing to accept *corrective* information inadvertently omitted from a previous submission, in line with jurisprudence on Commerce's obligation to accept corrective information. *See* 419 F. Supp. 3d at 1332. That is a different circumstance than the situation here, in which Antique Group wants Commerce to accept an altogether untimely questionnaire response. *See* IDM at 18-19 (rejecting notion that Commerce denied Antique Group opportunity to correct deficiencies); *cf.* 19 U.S.C. § 1677m(e) (only requiring Commerce to consider information that is submitted timely).

Additionally, Commerce sufficiently explained its reasoning for rejecting Antique Group's extension requests in this case. Similar to *Silicon Metal from Kazakhstan*, Commerce stated in this case that it "evaluates each individual situation when making a determination of whether accepting a late submission is warranted, basing this decision on the specific facts of each proceeding." IDM at 19. In addition to explaining why extraordinary circumstances were not present, Commerce conducted the required case-specific assessment and found that "the deadline for the rejected supplemental questionnaire response was less than two months before the previously fully extended preliminary results deadline." *Id*. at 20. Further, "{g}iven the breadth of the questions covered by the Antique Group Second Supplemental Questionnaire, and

the possibility that yet additional information would need to be collected once the responses were reviewed, as well as the fact that preparation of determinations in administrative reviews requires significant time and effort on the part of Commerce, we note that any time that Commerce lost because the submission was untimely did, in fact, make our ability to conduct our preliminary analysis that much more difficult." *Id*.  Commerce additionally stressed that "Antique Group is a complex group of companies with intertwined operations" and Commerce would have expended significant resources to evaluate its responses prior to making a preliminary decision.  *Id*.

Under similar circumstances in *Trinity Manufacturing, Inc. v. United States*, this Court rejected the plaintiffs' argument "that the Department's decision 'is at odds with prior decisions accepting untimely submissions in other proceedings under less severe or, at least analogous circumstances'" because Commerce had provided a reasonable explanation for its decision to reject the late extension requests and the plaintiffs had "not demonstrated that Commerce granted an untimely extension request under facts analogous to those of this case."  549 F. Supp. 3d 1370, 1379 (Ct. Int'l Trade 2021).  As in *Trinity*, Antique Group and the Importers fail to demonstrate that Commerce's decision to deny Antique Group's untimely extension requests conflicts with prior analogous decisions and that Commerce failed to reasonably explain its determination in this case.  This Court should thus sustain Commerce's finding that Antique Group failed to demonstrate that extraordinary circumstances exist under 19 C.F.R. § 351.302(c) and its consequent denial of Antique Group's untimely extension requests.

### C.     Commerce Did Not Abuse Its Discretion In Rejecting Antique Group's Untimely Second Supplemental Questionnaire Response

Antique Group also argues that Commerce abused its discretion in rejecting the untimely filed questionnaire response because the delay resulting from the untimely filing was immaterial to the conduct of the administrative review.  Antique Group Br. 13-19.  In particular, Antique

Group contends that Commerce failed to establish how the five-hour delay "filed on the due date and within business hours" burdened Commerce and prevented Commerce from calculating an antidumping duty margin for Antique Group.  *Id*. at 14; *see also* Importers Br. 29-30 (making similar argument based on *Pro-Team*).  These arguments equally lack merit.

Antique Group relies on the outdated framework set forth in *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade 2012), and *Artisan Mfg. Corp. v. United States*, 978 F. Supp. 2d 1334 (Ct. Int'l Trade 2014), to assert that Commerce abuses its discretion when it rejects untimely filed documents if the burden on Commerce is low and the timeliness of an investigation is not threatened.  *See* Antique Group Br. 13-17.  As this Court recently explained in *Trinity*:

> *Artisan* and *Grobest* involved the prior version of the Department's regulation, 19 C.F.R. § 351.302 (2012), which did not impose the current "extraordinary circumstance" requirement. . . . The current regulation defines how Commerce will exercise its discretion when it receives an untimely extension request. . . . The factors {derived from *Artisan* and *Grobest*} plaintiffs would have the court apply to resolve the current dispute do not mention the Department's interest in the orderly administration of the antidumping duty law and, specifically, its interest in deterring late filings for which extension requests are not made prior to the expiration of the filing period.  These interests are served by a rule confining the granting of such requests to extraordinary circumstances.

549 F. Supp. 3d at 1378-79; *see Extension of Time Limits*, 78 Fed. Reg. at 57,790 (modifying regulations to include extraordinary circumstances standard for all segments initiated on or after October 21, 2013).  When Commerce added the extraordinary circumstance requirement to its regulations, it stated that "{o}nly if the Department determines that the party has demonstrated that extraordinary circumstances exist will the Department then consider whether the party has demonstrated that good cause exists for allowing an extension of the time limit pursuant to section 351.302(b)."  *Extension of Time Limits*, 78 Fed. Reg. at 57,791.  Here, as Commerce

explained in the final results, Antique Group's error and its other reasons for missing the established deadline do not constitute extraordinary circumstances. *See* IDM at 18-19. Thus, Commerce properly applied its procedural framework by refusing to accept Antique Group's untimely filing, regardless of whether admitting the filing would have been burdensome to Commerce. "A court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered." *PSC VSMPO-Avisma*, 688 F.3d at 761.

Further, both *Grobest* and *Artisan* are factually dissimilar to this case. *Grobest* involved an untimely separate rate certification submitted by separate rate respondent, not a questionnaire response from a mandatory respondent; a separate rate respondent files far less information than a mandatory respondent and is subject to different deadlines. *Grobest*, 815 F. Supp. 2d at 1366. Antique Group is a mandatory respondent for which "evaluating the supplemental responses would have required significant time and effort on the part of Commerce prior to being able to make preliminary decisions in the case." IDM at 20. Similarly, in *Artisan*, this Court found that Commerce was ambiguous in stating its policy on extensions of deadlines. 978 F. Supp. 2d at 1347-48. Here, by contrast, "both the date and time of the deadline were made clear to Antique Group" because they were stated in bold in Commerce's decision granting the second extension, and unlike the ambiguity in *Artisan*, "all of the explanations for why Antique Group overlooked the deadline point to inattentiveness, carelessness and/or inadequate recordkeeping, not a lack of clarity on the part of Commerce or an inability to comply with the deadline." IDM at 16-17; *see also* Antique Group Second Extension (P.R. 201).

Moreover, Commerce explained why its acceptance of Antique Group's late filing would prejudice the proceeding. *See* IDM at 20. Antique Group is a complex group of companies with

intertwined operations, and the second supplemental questionnaire sought a wide breadth of necessary information and carried the possibility that Commerce would need to collect additional information upon reviewing the responses. *Id*. Analogously, in *Dongtai Peak*, the Court of Appeals for the Federal Circuit rejected similar arguments that the delay resulting from an untimely questionnaire response and extension request did not prejudice the proceeding because there were four months until the deadline for Commerce's preliminary results. *See Id.* (citing *Dongtai Peak*, 777 F.3d at 1352-53). In this case, the deadline for Antique Group's response was less than two months before the deadline for the preliminary results. *Id*. Given the time remaining until that fully extended deadline and the significant time and effort Commerce expends to prepare its determinations, Commerce explained that the delay was prejudicial. *Id*.

Additionally, Commerce reasonably considered the aggregate impact of accepting untimely filings. Commerce "establishes deadlines so that it can conduct this administrative review (and its numerous other trade remedy proceedings) in an efficient manner within its statutory and regulatory deadlines." *Id*. "Therefore, it is critical that parties file documents by the established deadline or timely request an extension of such a deadline." *Id*. "Untimely filings and untimely extension requests hinder the efficient and timely conduct of {Commerce's} proceedings and lead Commerce to spend additional time and resources to address such untimely filings and requests." *Id*. "Although the burden associated with a single late-filed questionnaire response may be perceived as minimal, that burden is not minimal when aggregated across all proceedings." *Id*.; *see Extension of Time Limits*, 78 Fed. Reg. at 57,791 ("These modifications will diminish the cumulative impact of last-minute extension requests on the parties and the Department."); *Modification of Regulation Regarding the Extension of Time Limits*, 78 Fed. Reg. at 3,370 (explaining that adopting a "good cause" standard for untimely requests "will perpetuate

the undue expenditure of Departmental resources in addressing extension requests"); *Neo Solar*, 190 F. Supp. 3d at 1262-63 ("Commerce does not allege any prejudice specific to this case, but it does allege the general prejudice stemming from late filings because of the strict statutory deadlines governing its determinations.").

Antique Group does not identify evidence that detracts from Commerce's findings regarding burden.  Instead, Antique Group claims that Commerce failed to support these findings with "record evidence showing that the submission delay actually hindered its ability" to investigate Antique Group and complete the review in a timely manner.  Antique Group Br. 17. But it is unclear how Antique Group expects Commerce to prove a counterfactual scenario regarding how burdensome it *would* have been to accept and consider Antique Group's untimely questionnaire response.  *Cf. Bebitz Flanges Works Priv. Ltd. v. United States*, 433 F. Supp. 3d 1297, 1305 (Ct. Int'l Trade 2020) ("It is not for {the respondent} 'to establish Commerce's deadlines or dictate to Commerce whether and when Commerce actually needs the requested information.'" (quoting *Dongtai Peak*, 777 F.3d at 1352)).  Commerce's determination was reasonable under the circumstances and within the agency's broad discretion in enforcing its deadlines.  Moreover, as discussed above, Commerce's actions are governed by 19 C.F.R. § 351.302(c)—which neither contemplates nor requires that Commerce demonstrate actual burden prior to rejecting an untimely filing.

### D.  Section 351.302(c) Is Lawful And Not An Abuse Of Discretion

The Importers argue that, if 19 C.F.R. § 351.302 does not permit allowing Antique Group the opportunity to refile its untimely response, the regulation is an unlawful abuse of discretion. Importers Br. 31-34.  Contrary to this claim, "Commerce has broad discretion to set and manage its deadlines."  IDM at 19 (citing *Yantai Timken*, 521 F. Supp. 2d at 1372).  "Commerce sets the

PUBLIC VERSION

deadlines based on the situation when the deadline is determined and, when determining whether

to extend a deadline, Commerce considers the justifications provided by the requesting party, as

well as the statutory and regulatory deadlines and Commerce's need for the requested

information." *Id.* Further, as we highlighted above, "{s}trict enforcement of time limits and

other requirements is neither arbitrary nor an abuse of discretion" when Commerce provides a

reasoned explanation for its decision. *Id.* (citing *Maverick Tube*, 107 F. Supp. 3d at 1331).

In *Dongtai Peak*, for example, the Federal Circuit reaffirmed the Supreme Court's

holding in *Vermont Yankee* that agencies should be free to fashion their own rules of procedure,

and held that Commerce reasonably rejected a respondent's untimely submission because the

respondent failed to show "good cause" under the previous version of 19 C.F.R. § 351.302(b).

777 F.3d at 1351 (citing *Vermont Yankee*, 435 U.S. at 543). The Federal Circuit also held that a

respondent's due process rights are not violated when Commerce rejects an untimely submission

for which the respondent had notice of the deadline and an opportunity to reply and request an

extension in advance of the deadline. *Id.* Here, Antique Group was notified of the deadline

ahead of time and had sufficient time to request an extension—as it had done twice previously—

had it believed it needed one. *See* IDM at 20. Commerce explained that, as in *Dongtai Peak*,

Antique Group failed to present any arguments justifying why Commerce should grant an

*untimely* extension request. *Id.*

Moreover, in promulgating its regulation, Commerce addressed the comments it received

and considered potential alternatives. *See Modification of Regulation Regarding the Extension

of Time Limits*, 78 Fed. Reg. a 3,369-70 (analyzing potential alternatives); *Extension of Time

Limits*, 78 Fed. Reg. at 57,792-93 (declining proposal to adopt "good cause" rather than

"extraordinary circumstances" standard for untimely extension of time requests). Commerce

also articulated a rational connection between the issues caused by untimely requests for an

extension of time and its adoption of an extraordinary circumstances standard, explaining that

such requests pose difficulties for the agency, cause undue expenditure of resources, and impede

Commerce's ability to conduct proceedings in a timely and orderly manner. *Modification of

Regulation Regarding the Extension of Time Limits*, 78 Fed. Reg. at 3,368; *see also id.* at 3,370

(explaining that disallowing untimely extension requests altogether would be "too inflexible" to

effectively and fairly administer unfair trade statutes).  Likewise, the Court has observed that

"{d}ue to stringent time deadlines and the significant limitations on Commerce's resources, it is

vital that accurate information be provided promptly to allow the agency sufficient time for

review."  *Yantai Timken*, 521 F. Supp. 2d at 1371 (citation and quotation marks omitted).

　　　The Importers argue that "{o}ther federal agencies and administrative law judges have

agreed that a certain degree of leniency should be afforded for human error and unforeseen

circumstances."  Importers Br. 32.  Commerce's regulations do provide opportunities to request

extensions and allow for retroactive deadline extensions due to unforeseen circumstances;

however, Commerce reasonably found that the reasons for Antique Group's untimely filing were

not unforeseen and did not meet the regulatory requirements to demonstrate extraordinary

circumstances.  *See* IDM at 19.  As Commerce explained, Antique Group should have had

reasonable measures in place to ensure that it was aware of the deadline, and to the extent that

COVID-19 impacted its ability to timely file its response, it had sufficient time to request an

extension when it became aware of the situation.  *Id*.  Rather than abusing its discretion,

Commerce denied Antique Group's untimely filing because Antique Group did not demonstrate

extraordinary circumstances, thereby enforcing the agency's rules uniformly and fairly so as not

to allow some parties to submit untimely extension requests "when other parties have taken due

care to submit timely requests and responses under identical or similar circumstances."  IDM at 17.  The Importers may prefer that Commerce had adopted a more lenient standard, but that does not make Commerce's rulemaking invalid.

The Importers also contend that Commerce's governing statute is remedial in nature and that Commerce's strict enforcement of its time limits in this proceeding is punitive.  Importers Br. 31.  In *Trinity*, the Court rejected arguments that Commerce should consider the interests of accuracy and fairness prior to rejecting untimely filings:  "The current regulation defines how Commerce will exercise its discretion when it receives an untimely extension request."  549 F. Supp. 3d at 1378.  "Rather than abuse that discretion, Commerce reasonably applied the criteria {19 C.F.R. § 351.302(c)} sets forth."  *Id.*  The Court also held that Commerce's "interest in the orderly administration of the antidumping duty law" was valid and that "{t}hese interests are served by a rule confining the granting of such requests to extraordinary circumstances."  *Id.* at 1378-79.  Although the regulation's validity was not at issue in *Trinity*, the Court acknowledged the lawful purpose of Commerce' extraordinary circumstance standard—to ensure the proper administration of its proceedings.  Commerce's regulation and its application in this case are a lawful exercise of Commerce's wide discretion to establish and enforce its deadlines in order to discharge its duties under the statute, and should therefore be sustained.  *See Bebitz Flanges Works*, 433 F. Supp. 3d at 1305 (rejecting similar accuracy-focused argument).

### E.   Commerce's Regulations At 19 C.F.R. § 351.302(c) Govern The Acceptance Of Untimely Filed Extension Requests, Not A "Second Chance" Practice

Commerce's decision whether to grant an untimely filed extension request is governed by 19 C.F.R. § 351.302(c).  *See* IDM at 18-19.  As discussed above, Commerce lawfully evaluated and rejected Antique Group's untimely filed extension requests under that regulation.  Antique Group and the Importers nonetheless argue that Commerce should have allowed Antique Group

to submit its response because it had not previously missed a deadline and Commerce has a

"policy of lenience for initial filing errors."  Antique Group Br. 19-23; *see also* Importers Br. 19-

25.  These arguments are misplaced because Commerce does not have such a policy.

Antique Group and the Importers point to *Oman Fasteners, LLC v. United States*, in

which the Court quoted a previous Commerce statement that "Commerce's practice is to allow a

law firm that misses a filing deadline one opportunity to submit the untimely information where

{the} law firm failed to . . . file a complete submission before the specified hour on the date of

the deadline" so long as "that law firm has: 1) not previously been afforded such an opportunity

in a past segment of any proceeding; and 2) identified the steps it has taken to avoid untimely

filings in the future.'"  No. 22-00348, 2023 WL 2233642, at *6 (Ct. Int'l Trade Feb. 15, 2023)

(citations omitted), *appeal pending* Fed. Cir. No. 23-1661.  However, Commerce stated in that

proceeding that "it does not have an established practice of leniency for first-time offenders for

late submissions."  *Id.*  Despite past statements, Commerce maintains that it does not have such a

practice.  Commerce's regulations at 19 C.F.R. § 351.302(c) squarely address how Commerce

will evaluate untimely extension requests.  *See* IDM at 18-19.  Commerce's practice is to apply

19 C.F.R. § 351.302(c) on a case-by-case basis as it did here.  *Id.* at 19.  Thus, subsequent to the

statements cited in *Oman Fasteners*, Commerce clarified in *Wind Towers from Vietnam* that

"Commerce does not have a 'second chance' policy and strictly enforces its deadlines in order to

meet its statutory deadlines, as required by section 351.302(d) of Commerce's regulations."

*Utility Scale Wind Towers from the Socialist Republic of Vietnam*, 85 Fed. Reg. 40,226 (Dep't of

Commerce July 6, 2020), at IDM Cmt. 1 (*Wind Towers from Vietnam*).

Notwithstanding that Commerce does not maintain a second chance "practice," Antique

Group and the Importers seek to show such a practice by citing letters and memoranda in which

Commerce discussed accepting untimely submissions (although some of the materials overlap and only one letter refers explicitly to Commerce having a "practice").  *See* Importers Br. App'x A at Att. A-L.  As an initial matter, none of these materials are part of the record, and therefore should not be considered by the Court.  We established above that Commerce bases its determinations on the record developed during the administrative proceeding, and these materials from other proceedings constitute factual information that must be on the record for Commerce to consider them.  *See* 19 U.S.C. 1516a(b)(1)-(2); *Axiom Res. Mgmt.*, 564 F.3d at 1379-80; *Silicon Metal from Kazakhstan*, 83 Fed. Reg. 9,831, at IDM Cmt. 4.

We, however, do not dispute that there "are some past instances . . . in which Commerce has accepted certain late filings resulting from mistakes by a law firm," but such instances do not constitute a policy or practice that is binding on Commerce in this case.  *See Wind Towers from Vietnam*, 85 Fed. Reg. 40,226, at IDM Cmt. 1.  Indeed, subsequent to the proceedings identified by Antique Group and the Importers (which date to 2018 or earlier),[2] Commerce stated its intent to "adhere strictly to its regulations, and apply them uniformly across all cases."  *Id.*  Commerce also articulated why that is the case, explaining that "such a 'second chance' policy would be inconsistent with Commerce's regulations and practice."  *Id.*  Thus, to the extent that Commerce may be deemed to have had a practice of providing law firms a second chance to make untimely filings—and any such practice appears inconsistent at best, given the many cases in which Commerce has rejected untimely filings—Commerce discontinued any such practice prior to the determination in this case.

---

[2] The one exception is a 2023 memorandum in a proceeding concerning *Large Diameter Welded Pipe from Greece*, in which Commerce does not refer to a "second chance" practice and in which the Importers acknowledge that the party filed a last-minute—but timely—5:00pm extension request and completed its filing by 5:03pm.  *See* Importers Br. 23-24 & Att. G.  Thus, the memorandum is not evidence of Commerce having an ongoing "second chance" practice.

Additionally, although the Importers argue that the facts in this case "mirror" those in *Oman Fasteners*, this argument is misplaced. *See* Importers Br. 39. *Oman Fasteners* is inapplicable because, among other distinguishing facts, the *Oman Fasteners* decision relies on a next business day rule that is not relevant here. In *Oman Fasteners*, the Court found that "it is an abuse of discretion for Commerce to require a showing of 'extraordinary circumstances' to support a retroactive extension request in the narrow circumstance where, as here, the filing is completed after 5:00 p.m. but prior to 8:30 a.m. the following work day—that is, when the filing is completed within the automatic window that Commerce's rulemaking comment response authorizes." *Oman Fasteners*, 2023 WL 2233642, at *5 (footnote omitted). That circumstance is inapplicable here because Antique Group missed a 10:00am deadline at the beginning of a standard work day, rather than a 5:00pm deadline at close of business.

In sum, as Commerce stated in the final results, "{w}hile commenting parties argue that Commerce has, in the past, accepted untimely submissions where a respondent has demonstrated that it had put into place remedies to avoid such issues in the future, Commerce notes that it evaluates each individual situation when making a determination of whether accepting a late submission is warranted, basing this decision on the specific facts of each proceeding." IDM at 19.[3] *Cf. Tau-Ken Temir LLP v. United States*, 587 F. Supp. 3d 1346, 1360–61 (Ct. Int'l Trade 2022) ("In fact, the only conclusion that can be drawn from Commerce's prior determinations is that Commerce has an administrative 'practice' to treat extensions on a case-by-case basis."), *appeal pending*, Fed. Cir. No. 2022-2204. Commerce evaluated Antique Group's extension request under 19 C.F.R. § 351.302(c) and lawfully confined its analysis to the facts at hand.

---

[3] Commerce's statement also contradicts the Importers' claim that Commerce did not address the "second chance" issue in its determination. *See* Importers Br. 20.

**III.**   **Commerce's Application Of AFA To Antique Group Is Supported By Substantial Evidence And Otherwise Lawful**

    **A.**   **Legal Framework**

Commerce applies the facts otherwise available to make a determination when necessary information is unavailable, or when an interested party withholds information requested by Commerce, fails to provide the information by the deadline, significantly impedes the proceeding, or provides information that cannot be verified.  *See* 19 U.S.C. § 1677e(a)(1)-(2). Commerce may also apply an adverse inference in selecting among the facts otherwise available if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1).

A respondent's failure to cooperate to the "best of its ability" is "determined by assessing whether {the} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries{.}"  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  The statutory trigger for an adverse inference "is simply a failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*."  *Id.* at 1383 (emphasis added).  Although this standard does not require perfection and recognizes that mistakes sometimes occur, "it does not condone inattentiveness, carelessness, or inadequate record keeping."  *Id.* at 1382.  Ultimately, "Commerce enjoys broad discretion when considering whether to apply adverse facts available in antidumping proceedings."  *Tianjin Magnesium Int'l Co. v. United States*, 844 F. Supp. 2d 1342, 1346 (Ct. Int'l Trade 2012).

When selecting an AFA rate, Commerce may rely on information from (1) the petition; (2) the final determination in the investigation; (3) any previous administrative review; or (4) any other information on the record.  19 U.S.C. § 1677e(b)(2) ; 19 C.F.R. § 351.308(c).  Further, when Commerce relies on secondary information, rather than information obtained during the

current investigation or review, it must corroborate that information to the extent practicable.  19

U.S.C. § 1677e(c).  "Corroborate means that {Commerce} will satisfy {itself} that the secondary

information has probative value."  Statement of Administrative Action (SAA) accompanying the

Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 870 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4199.  Commerce "is not required to determine, or make any adjustments to,

a . . . weighted average dumping margin based on any assumptions about information the

interested party would have provided if the interested party would have complied with the

request for information." 19 U.S.C. § 1677e(b)(1)(B).  Further, Commerce is not required to

demonstrate that the dumping margin selected "reflects an alleged commercial reality of the

interested party." 19 U.S.C. § 1677e(d)(3)(B).

### B.   Antique Group Did Not Cooperate To The Best Of Its Ability

Commerce determined that necessary information was not available in this case because

Antique Group's untimely questionnaire response contained information that Commerce needed

to calculate a dumping margin for Antique Group.  *See* IDM at 21-35; 19 U.S.C. § 1677e(a)(1).

In particular, in the second supplemental questionnaire, Commerce requested information from

Antique Group relating to significant deficiencies in its United States sales and cost reporting,

including the absence of a reliable sales reconciliation.  *See* IDM at 28-31 (detailing multiple

deficiencies in Antique Group's reporting).  When Antique Group failed to submit a timely

response to the questionnaire, Commerce found that "the U.S. sales and {cost of production}

data deficiencies are sufficiently extensive such that it is simply impossible for Commerce to

calculate an accurate dumping margin using the data currently on the record."  IDM at 32; *see id.*

at 27 ("the supplemental questionnaire response that was rejected was an opportunity for Antique

Group to remedy the deficiencies that Commerce identified").  In addition, Commerce found that

PUBLIC VERSION

Antique Group withheld information requested by Commerce, failed to provide information by the specified deadlines, and significantly impeded the proceeding by failing to respond to the second supplemental questionnaire, pursuant to 19 U.S.C. § 1677e(a)(2)(A), (B), and (C).  PDM at 8.  Therefore, Commerce based its determination with respect to Antique Group on the facts otherwise available in accordance with 19 U.S.C. § 1677e(a)(1) and (2).

The parties do not dispute Commerce's reliance on facts otherwise available, but Antique Group argues that Commerce failed to demonstrate that Antique Group failed to cooperate to the best of its ability.  Antique Group Br. 27-30.  As Commerce explained, however, it properly applied an adverse inference "because Antique Group did not cooperate to the best of its ability, as it was careless or inattentive when reviewing the deadlines for its submissions."  IDM at 31.

Antique Group argues that, other than its delay in filing the second supplemental response, it "consistently exemplified the conduct expected of a respondent throughout the entirety of the administrative review."  Antique Group Br. 27.  Further, Antique Group contends that Commerce incorrectly construed the "best of its ability" standard to mean perfection, and that the "minor mistake" leading to a five-hour delay does not reflect Antique Group not responding to the best of its ability.  *Id.* at 27-29.  But as Commerce explained, "compliance with the 'best of its ability' standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in a segment of a proceeding."  IDM at 27.  Antique Group failed to submit its response by the established deadline and failed to notify Commerce of challenges it was facing in meeting the deadline or of its need for an extension.  *See id*. at 16-17, 19, 33.  Commerce notified Antique Group of the deadline and consequences for not complying with the deadline, stating:

> We have evaluated your request and are granting the extension in-
> part.  Accordingly, the deadline for Antique Group to submit its

> response to the Second Supplemental Questionnaire is now **10:00 a.m. Eastern Time, May 16, 2022.**
>
> Pursuant to 19 CFR 351.302(d)(1)(i) of Commerce's regulations, any information submitted after the applicable deadline will be considered untimely filed and may be rejected.  In such a case, we may have to resort to the use of facts available, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended.

Antique Group Second Extension (P.R. 201).  Despite being granted two extensions to submit information to remedy numerous and significant discrepancies in its initially reported data, Antique Group failed to timely submit the information.  *See* IDM at 34.  Further, Antique Group did so without demonstrating that an extraordinary circumstance existed.  *See id*. at 33-34.

Additionally, as we explain above, Commerce found that Antique Group should have had reasonable measures in place to meet the deadline or to timely request an extension, given that it became aware that one of its team members caught COVID-19 a week before the deadline.  *See* IDM at 19.  Antique Group missed the deadline due to inattentiveness, carelessness, and/or inadequate recordkeeping—not because of a lack of clarity from Commerce regarding when the submission was due or circumstances preventing Antique Group from seeking an additional extension.  *See id*. at 17, 33.  While perfection is not required, the "best of its ability" standard articulated in *Nippon Steel* does not "condone inattentiveness, carelessness or inadequate record keeping."  *Id*. (quoting *Nippon Steel*, 337 F.3d at 1382-83).

Overall, Commerce reasonably concluded that Antique Group did not "do the maximum it was able to do" in accordance with *Nippon Steel* because Antique Group could have submitted an extension request or taken reasonable steps to prevent its oversight.  *Nippon Steel*, 337 F.3d at 1382.  Commerce's finding that Antique Group did not cooperate to the best of its ability under 19 U.S.C. § 1677e(b)(1) and application of AFA should thus be sustained.

PUBLIC VERSION

**C.**   **Commerce Lawfully Selected The AFA Rate For Antique Group**

Commerce's selection of the AFA rate it applied to Antique Group is in accordance with 19 U.S.C. § 1677e(b)(2) and (c).  *See* IDM at 35-44.  In selecting an AFA rate, Commerce's practice is to select the higher of the highest dumping margin alleged in the petition or the highest calculated rate for any respondent.  IDM at 41.  In this review, Commerce assigned the highest dumping rate alleged in the petition, 323.12 percent, as the AFA rate and corroborated the rate in accordance with the statute.  *See id*. at 42.  Commerce observed that "{t}his rate is sufficiently adverse to ensure that a non-cooperative party does not obtain a more favorable result by failing to cooperate than if it fully cooperated, while also being within the individually calculated margins of the cooperating party in this review as described below."  *Id*. at 41-42.

The Importers argue that Commerce failed to corroborate the Antique Group AFA rate and that the data Commerce relied upon to calculate the rate lacks probative value.  Importers Br. 36-39.  As Commerce explained, however, "{t}o determine the probative value of the dumping margin of 323.12 percent alleged in the Petition, we examined the information on the record of the instant review."  PDM at 10.  Commerce sufficiently corroborated the rate because "{w}hen we compared the dumping margin of 323.12 percent alleged in the Petition to the preliminary individual dumping margins for {mandatory respondent} PESL in this review, we found the rate of 323.12 percent to be within the range of PESL's calculated individual dumping margins."  PDM at 10-11; *see* IDM at 42.

The Importers claim that the range of PESL's dumping margins that Commerce used to corroborate the AFA rate involves types of transactions that are not representative of Antique Group's sales and lacks a probative relationship to the products sold by Antique Group.  Importers Br. 36-38.  Contrary to these claims, however, Commerce explained that "PESL did

not request that Commerce exclude any sales from the margin calculations in the instant review and, more to point, Commerce did not identify any information on the record that would lead it to conclude that the sales in question are not *bona fide*." IDM at 44. Likewise, "{t}he sales Commerce has used to corroborate the petition rate are being used as part of PESL's weighted-average margin calculation, and there is no record information that would lead Commerce to reconsider their inclusion in PESL's calculation." *Id*. Further, "{t}he fact that Commerce has accepted PESL's reporting as actual sales information is indicative of the probative value of this secondary information and, as such, the individual margins generated in PESL's calculations corroborate the use of the highest petition rate as the AFA rate." *Id*. at 42; *see also generally Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1381 (Fed. Cir. 2016) (discussing instances in which Commerce relied on transaction-specific margins to corroborate AFA rates).

Moreover, "Commerce routinely relies on the petition rate when selecting the highest available rate for AFA, and the fact that Commerce accepted the petition rate, which is based on factual information provided during the initial petition phase of an investigation, is indicative of the fact that it is a reasonable rate." IDM at 42. Additionally, "Commerce's practice is not to recalculate dumping margins provided in petitions, but rather, as stated above, to corroborate the applicable petition rate when applying that rate as AFA." *Id*. Thus, to now allege that the petition rate was incorrectly calculated or that it should be updated to reflect the current review period because parties are faced with the prospect of being assigned that rate is an insufficient reason for concluding that the petition rate is somehow unreliable, when it was deemed reliable in the initial investigation. *Id*. Accordingly, Commerce properly corroborated the AFA rate in accordance with 19 U.S.C. § 1677e(c).

Antique Group and the Importers argue that the rate applied to Antique Group is punitive and inaccurate.  Antique Group Br. 30-32; Importers Br. 34-35.  As we showed above, however, Commerce selected the AFA rate in accordance with the statute.  "An AFA dumping margin determined in accordance with the statutory requirements is not a punitive measure, and the limitations applicable to punitive damages assessments therefore have no pertinence to duties imposed based on lawfully derived margins{.}"  *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010).  The Importers also argue that Commerce abused its discretion in applying an AFA rate that is more than a 315 percent increase from the rate that Antique Group received in the original investigation.  Importers Br. 35.  This argument is not persuasive because Commerce is not required "to estimate what the . . . dumping margin would have been if the interested party found to have failed to cooperate under subsection (b)(1) had cooperated," nor to demonstrate that the AFA rate "reflects an alleged commercial reality of the interested party."  19 U.S.C. § 1677e(d)(3)(A)-(B); PDM at 10; IDM at 41.  Accordingly, it is lawful that the adverse rate is higher than the one calculated for Antique Group in the investigation.

Finally, Antique Group and the Importers argue that record evidence does not justify the selection of the highest rate for AFA and that the selected rate must be proportional to the non-cooperating party's misconduct.  Antique Group Br. 30-32; Importers Br. 38-39.  This argument is unpersuasive because Commerce properly applied the statutory requirements and followed its established practice.  When applying an adverse inference, Commerce selects from "the higher of: (1) the highest dumping margin alleged in the petition; or (2) the highest calculated rate for any respondent from any segment of the proceeding."  PDM at 10; IDM at 41-42.  Again, an AFA rate determined in accordance with the statute is not punitive.  *KYD*, 607 F.3d at 768*.*

The Importers relatedly point to *BMW of North America LLC v. United States* (as quoted in *Oman* Fasteners) for the proposition that the AFA rate must reflect the seriousness of Antique Group's mistake and argue that Commerce abused its discretion by selecting a rate that allegedly is disproportionately high compared to the mistake.  *See* Importers Br. 38 (citing *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301 (Fed. Cir. 2019)).[4]  In *BMW*, the Federal Circuit found that Commerce did not consider BMW's arguments regarding mitigating circumstances, such as that BMW was unaware of the administrative review due to the prior issuance of a revocation notice and that there were numerous procedural anomalies during the review.  926 F.3d at 1302.  The Court held that "Commerce must consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party."  *Id.*  Unlike in *BMW*, Commerce considered at length the "mitigating circumstances" that Antique Group asserts caused its untimely submission (such as the COVID-19 diagnosis and the 10:00am deadline) in determining to apply an adverse inference.  IDM at 26-35.  Commerce also considered the seriousness of the information gaps caused by Antique Group's inattentiveness.  *See* IDM at 28-31 (detailing multiple deficiencies in Antique Group's reporting).  Additionally, Commerce found that the AFA rate is "sufficiently adverse to ensure that a non-cooperative party does not obtain a more favorable result by failing to cooperate than if it fully cooperated, while also being within the individually calculated margins of the cooperating party."  *Id.* at 41-42; *see also* SAA at 870 (discussing such considerations).

Thus, Commerce's selection of the AFA rate was consistent with its established practice,

---

[4] The Importers also cite this Court's decision in *POSCO v. United States*, 296 F. Supp. 3d 1320, 1349 (Ct. Int'l Trade 2018).  *See id.*  However, the Court has distinguished the analysis at issue in *POSCO* from situations in which Commerce is relying on a petition rate (as in this case), rather than relying on information from another segment of the proceeding.  *Pro-Team Coil Nail Enter., Inc. v. United States*, 483 F. Supp. 3d 1242, 1252 n.11 (Ct. Int'l Trade 2020).

properly corroborated in accordance with the statutory requirements, and not punitive.  For these reasons, Commerce's selection of the AFA rate was lawful and should be sustained.

## IV.   Commerce's Determination To Use The All Others Rate From The Investigation As The Non-Selected Rate Is Supported By Substantial Evidence And Lawful

### A.   Legal Framework

Because the governing statute is silent with respect to the calculation of the rate for companies not selected for individual examination in an administrative review, Commerce, in calculating that rate, gathers guidance from 19 U.S.C § 1673d(c)(5), which provides instructions for calculating the all-others rate in an investigation.  Pursuant to subsection 1673d(c)(5)(A), Commerce generally calculates the all-others rate by taking a weighted average of the dumping margins assigned to the individually investigated  mandatory respondents, excluding margins that are zero, *de minimis*, or determined entirely based on AFA.  *See* 19 U.S.C. § 1673d(c)(5)(A).

However, when the dumping margins for all of the individually investigated entities are zero, *de minimis*, or determined based entirely on AFA, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for exporters and producers individually investigated."  19 U.S.C. § 1673d(c)(5)(B).  The SAA directs that, when the dumping margin for all of the individually investigated exporters and producers are determined entirely on the basis of facts available or are zero or *de minimis*, "{t}he expected method in such cases will be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." SAA at 873.  At the same time, the SAA states that "if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods."  *Id.*

### B.   Commerce's Determination To Depart From The Expected Method Is Supported By Substantial Evidence

Here, Commerce determined that the expected method resulted in an average that would not be reasonably reflective of the potential dumping margins for the non-selected respondents. IDM at 44-55.  After calculating a rate of 161.56 percent to approximate the expected method in the preliminary results,[5] Commerce reviewed the arguments presented in the case and rebuttal briefs and found that "that the margin assigned to the non-selected companies in the Preliminary Results is not reasonably reflective of the non-selected companies' potential dumping margins during the POR."  IDM at 54.  In reaching this conclusion, Commerce reviewed the history of the rates under the order.  *Id*.  Commerce observed that "{i}n the underlying investigation, Commerce calculated weighted-average dumping margins for the mandatory respondents ranging from 2.67 to 5.15 percent" and "{t}his resulted in an all-others margin of 3.19 percent." *Id*.  Commerce further observed that "the one fully calculated weighted-average dumping margin, for PESL, in this instant review is zero percent."  *Id*.  Thus, Commerce explained that "other than the AFA rate we applied to Antique Group in the Preliminary Results (and continue to apply for these final results), all of the rates in this Order are significantly lower than the rate of 161.5{6} percent assigned to the non-selected companies in the Preliminary Results."  *Id*.

---

[5] This Court has found that a simple average is a departure from the expected method. *Pro-Team Coil Nail Enter. v. United States*, 532 F. Supp. 3d 1281, 1293 (Ct. Int'l Trade 2021). Because calculating a weighted-average margin using the actual net United States sales values and dumping margins for Antique Group and PESL could indirectly disclose proprietary information, Commerce calculated an average margin for non-selected respondents using the publicly-available, ranged total United States sales values of the selected respondents, compared the resulting public weighted-average margin to the simple average of the dumping margins, and used the amount that is closer to the actual weighted-average margin of the selected respondents as the margin for the non-selected respondents.  *See* PDM at 12; IDM at 54.  Commerce found that the simple average margin of 161.56 percent were the best proxy for the weighted-average margin based on the actual net United States sales quantities reported by Antique Group and PESL.  Preliminary Non-Selected Companies Rate Memorandum at 3 (P.R. 244; C.R. 229).

40

Consequently, Commerce found that "based on the history of rates for this Order, we determine that the 161.5{6} percent margin is not reasonably reflective of the non-selected companies' potential dumping margins during the POR."  IDM at 54.

Cambria argues that the history of the rates is not sufficient for Commerce to depart from the expected method because the rates are not contemporaneous.  Cambria Br. 18-19.  However, Commerce has considered historical rates in other cases, and courts have acknowledged Commerce's examination of that history in determining whether Commerce's departures from the expected method are supported by substantial evidence.  *See*, *e.g.*, *PrimeSource Bldg. Prods. v. United States*, 581 F. Supp. 3d 1331, 1341 (Ct. Int'l Trade 2022) (holding that Commerce met substantial evidence standard when it reviewed historical rates); *Pro-Team Coil Nail Enter., Inc. v. United States*, 587 F. Supp. 3d 1364, 1372 (Ct. Int'l Trade 2022) (finding that Commerce's analysis of historical rates indicated that Commerce's use of expected method was supported by substantial evidence), *appeal pending*, Fed. Cir. No. 2022-2241; *Bosun Tools Co. v. United States*, No. 2021-1929, 2022 WL 94172, at *5-6 (Fed. Cir. Jan. 10, 2022) (unpublished) (sustaining Commerce's analysis of Bosun's historical dumping rates and concluding that Commerce's calculation of the separate rate was supported by substantial evidence).

Cambria relies on *PrimeSource* to argue that Commerce cannot rely on historical rates if the rates fluctuate and that Antique Group's rates in this case did fluctuate.  Cambria Br. 19.  Based upon *PrimeSource*, Cambria also contends that Commerce and this Court have stated that historical rates lack probative value.  *See id.* at 19-20.  As an initial matter, however, Commerce does not only consider historical rates when they do not fluctuate.  Rather, Commerce considers the history of the rates generally—whether the rates fluctuate or not.  Commerce will not ignore that history merely because the rates do or do not fluctuate.  IDM at 53-55; *see also Certain Steel*

*Nails from the Sultanate of Oman*, 87 Fed. Reg. 43,240 (Dep't of Commerce July 20, 2022)

(prelim. admin. review), and PDM at 12-13, *unchanged in* 87 Fed. Reg. 78,639 (Dep't of

Commerce December 22, 2022) (final admin. review).  In this case, although Antique Group's

calculated rate of 5.15 percent from the investigation increased to a 323.12 percent AFA rate in

the first administrative review, other than that AFA rate all of the other rates in the proceeding

ranged from zero to 5.15 percent.  *See* IDM at 54.

Moreover, Cambria misunderstands *PrimeSource*.  In *PrimeSource*, Commerce examined

the history of the rates when determining whether to use the expected method and found that the

rates fluctuated, as well as that it had previously assigned multiple AFA rates.  *PrimeSource*, 581

F. Supp. 3d at 1342-43.  As a result, Commerce determined that it was appropriate to use the

expected method in *PrimeSource*.  *Id.*  Commerce additionally explained that there was limited

relevant data about the non-selected respondents in past reviews in *PrimeSource* because the

non-selected respondents had not been individually reviewed, and "Commerce also noted that in

each segment of this proceeding, the mandatory respondents' rates have formed the basis for any

non-selected respondents' rate."  *Id.* at 1343.  Correspondingly, this Court found that, "{a}s

required by the substantial evidence standard, Commerce engaged with the data from past

reviews and considered its relevance to the present review, finding that the lack of consistency in

prior rates made past review data unusable for determining present rates."  *Id.*

Here, Commerce engaged with the history of the rates under the order and found that,

other than the AFA rate assigned to Antique Group, the rates ranged from zero to 5.15 percent.

IDM at 54.  The best public proxy for the expected method resulted in a rate of 161.56 percent.

*Id.*  Consequently, it was reasonable for Commerce to determine that "all of the rates in this

*Order* are significantly lower than the rate of 161.5{6} percent assigned to the non-selected

42

companies in the *Preliminary Results*" and that "based on the history of rates for this Order, we determine that the 161.5{6} percent margin is not reasonably reflective of the non-selected companies' potential dumping margins during the POR." *Id.*

Citing *PrimeSource*, *Large Power Transformers from Korea*, and *Certain Frozen Fish Fillets from Vietnam,* Cambria argues that Commerce ignored the probative value of Antique's AFA rate. Cambria Br. 21-23. Cambria's argument, however, is improper because it invites this Court to reweigh the evidence. *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376 (Fed. Cir. 2015) ("While Appellants invite this court to reweigh this evidence, this court may not do so."). Commerce considered Antique Group's 323.12 percent AFA rate, along with the other rates, but observed that all of the other rates were considerably lower than both Antique Group's AFA rate and the 161.56 percent rate that would result from applying the closest approximation to the expected method. *See* IDM at 54. Moreover, unlike the history of the rates in *PrimeSource* and *Large Power Transformers from Korea*, which included multiple previous AFA rates, in this case the Antique Group AFA rate is the only one in the history of the proceeding. *See PrimeSource*, 581 F. Supp. 3d at 1342; *Large Power Transformers from the Republic of Korea*, 83 Fed. Reg. 11,679 (Dep't of Commerce Mar. 16, 2018), at IDM Cmt. 5. Additionally, in *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, the AFA rate at issue was a weighted-average dumping margin calculated during a prior segment of the proceeding. *See* 83 Fed. Reg. 12,717 (Dep't of Commerce Mar. 23, 2018), at IDM Cmt. 2.

Cambria next argues that average unit values (AUVs) derived from U.S. Customs and Border Protection data show that the [

]. Cambria Br. 24-25. However, "there are AUVs [

] AUV for smaller exporters." Respondent Selection Memorandum at 6

(P.R. 53: C.R. 13) (citing Petitioner Respondent Selection Cmts. at Ex. 6 (Aug. 20, 2021) (P.R. 37; C.R. 5)).  Moreover, "entry values are not necessarily the same as U.S. net sale prices" and "entry values are not necessarily indicative of the level of dumping because there is no further information on the record to establish normal value for comparing U.S. net sale prices to." *Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*, 87 Fed. Reg. 67,674 (Dep't of Commerce Nov. 9, 2022), at IDM Cmt. 5 (*Wooden Cabinet and Vanities*).

Cambria further argues that Commerce's finding, that the 161.56 percent rate resulting from the best public proxy of the expected method is not reasonably reflective of non-selected respondents' potential dumping margins, is contradicted by Commerce's own findings during respondent selection.  Cambria Br. 25-27.  However, although Commerce may have considered evidence such as AUVs to determine whether sampling was appropriate, sampling is a separate consideration from whether the expected method reasonably reflects non-selected respondents' potential dumping margins.  Sampling is a method of respondent selection involving several different criteria that need to be satisfied.  *See Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Proceedings*, 78 Fed. Reg. 65,963 (Dep't of Commerce Nov. 4, 2013).  Respondent selection occurs early in the review and Commerce decided against sampling because it lacked resources to review more than two respondents.  Respondent Selection Memorandum at 5-6 (P.R. 53; C.R. 13).  Commerce also declined to sample because Commerce found that there was limited evidence to determine that smaller companies were dumping at a higher rate than larger companies.  *Id.* at 6.  These findings do not undermine Commerce's determination in the final results that, other than the AFA rate

applied to Antique Group, the historical rates ranged from zero to 5.15 percent and were

significantly lower than the 161.56 percent rate that Commerce calculated using the closest

approximation to the expected method.  IDM at 54.

Cambria additionally argues that Commerce's decision was contrary to its established

practice; however, the cases that Cambria cites are factually dissimilar to this one.  Cambria Br.

28-31.  For example, in *Steel Nails from Taiwan*, all three mandatory respondents had received

AFA rates in the review, whereas in this case the AFA rate that Commerce assigned to Antique

Group is the only AFA rate that a respondent has received in the proceeding.  *See Certain Steel

Nails From Taiwan*, 83 Fed. Reg. 6,163 (Dep't of Commerce Feb. 13, 2018), at IDM Cmt. 1.

Moreover, on remand in *Steel Nails from Taiwan*, after one respondent's rate was re-calculated

as a *de minimis* rate, the expected method resulted in a 35.30 percent rate for non-selected

respondents, which was similar to the 27.69 percent rate calculated among the historical rates for

that order.  *See Pro-Team*, 587 F. Supp. 3d at 1373.  In this case, only one respondent received

an AFA rate, and outside Antique Group's AFA rate, the rates have been substantially lower than

the 161.56 percent rate approximating the expected method.

In *Steel Rebar from Mexico*, Commerce calculated the non-selected rate of 33.35 percent

using the expected method.  *Steel Concrete Reinforcing Bar from Mexico*, 87 Fed. Reg. 34,848

(Dep't of Commerce Jun. 8, 2022), at IDM Cmt. 7.  In so doing, Commerce engaged with the

historical rates under the order and explained that a non-selected respondent had previously

received the same margin as the mandatory respondent in that particular review, and although

another non-selected respondent had not been previously examined, it had been subject to the all-

others rate of 20.58.  *Id.*  Therefore, the historical rates supported using the expected method in

that case, which is not true here.

In *Wooden Cabinet and Vanities*, Commerce used the expected method to calculate the separate rate. *Wooden Cabinet and Vanities*, 87 Fed. Reg. 67,674, at IDM Cmt. 5. Regarding whether the rate was reasonably reflective, Commerce reviewed the AUVs that the petitioner in that case presented and found that "there is no record evidence which demonstrates that Qufu Xinyu's individually calculated margin assigned to the separate rate companies is not reasonably reflective of the separate rate companies' dumping behavior during the POR." *Id.* Although Commerce did not address the history of the rates calculated in other reviews of the order, the parties did not make specific arguments regarding the history of the rates beyond citing generally to *Bosun Tools*. *See id.* As we have explained, in this case Commerce engaged with the historical rates and found that the result of the expected method was not reasonably reflective of the potential dumping margins of non-selected respondents. *See* IDM at 53-54.

Cambria alternatively argues that, even if Commerce's decision to depart from the expected method is supported by substantial evidence, Commerce should not have pulled forward the all-others rate from the investigation. Cambria Br. 31-36. Specifically, Cambria argues that *Albemarle Corp. v. United States* outlined two circumstances under which Commerce may carry a rate forward: (1) when contemporaneous data support using the rate, or (2) when AFA considerations requiring deterrence. Cambria Br. 31-33 (citing *Albemarle Corp. v. United States,* 821 F.3d 1345, 1356-57 (Fed. Cir. 2016)). Cambria thus asserts that Commerce should have identified another reasonable option for determining the non-selected rate. *Id.* at 34-36.

Cambria, however, failed to exhaust its administrative remedies with respect to this argument in its administrative case and rebuttal briefs. *See* 28 U.S.C. § 2637(d) ("the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies"). The antidumping statute "indicates a congressional intent that, absent a strong contrary reason,

the court should insist that parties exhaust their remedies before the pertinent administrative

agencies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citation

omitted). "Simple fairness," moreover, "requires as a general rule that courts should not topple

over administrative decisions unless the administrative body not only has erred but has erred

*against objection made at the time appropriate under its practice*." *Mittal Steel Point Lisas Ltd.*

*v. United States*, 548 F.3d 1375, 1583-84 (Fed. Cir. 2008) (quoting *United States v. L.A. Tucker*

*Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (emphasis added by Court)); *see also Stanley Works*

*(Langfang) Fastening Sys., Co. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade

2017) (discussing purposes of exhaustion doctrine). Parties must exhaust both overall issues *and*

individual arguments. *E.g.*, *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir.

1990) (party failed to exhaust argument characterized as "simply another angle to an issue").

By failing to make their argument before Commerce, Cambria deprived Commerce of the

opportunity to address it in the first instance—which is precisely why Congress and the courts

require exhaustion. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (exhaustion requirements are

designed "to give the agency a fair and full opportunity" to adjudicate parties' claims); *see also*

*generally* Cambria Case Br. (Aug. 17, 2022) (P.R. 298); Cambria Rebuttal Br. (Aug. 26, 2022)

(P.R. 321; C.R. 251). Before Commerce in this case, multiple parties argued that Commerce

should find that the expected method produces a result that is not reasonably reflective of their

dumping margins and that Commerce should pull forward the all-others rate of 3.19 percent from

the investigation. *See*, *e.g.*, Importers Case Br. 19-27 (Aug. 17, 2022) (P.R. 306; C.R. 248);

DivyaShakti Case Br. 33-36 (Aug. 17, 2022) (P.R. 293); Federation Case Br. 9-10 (Aug. 17,

2022) (P.R 296); Jessie-Kan Case Br. 15-17 (P.R. 302). As such, Cambria was aware that the

issue was in play, and that Commerce could potentially change its position from the preliminary

results.  *See Boomerang Tube*, 856 F.3d at 913 (requiring exhaustion when parties "either knew or should have known" that issue was in play).  Nonetheless, Cambria deprived Commerce of the opportunity to consider Cambria's arguments about determining another reasonable method to calculate the non-selected rate.  Therefore, the Court should not entertain the argument now.

Finally, Commerce explained its reasoning for its calculation of the non-selected rate.  Although Commerce indicated that its preference is to use contemporaneous information when possible, "the expected method is not reasonably reflective of the potential dumping margins of the non-selected companies."  IDM at 55.  Commerce also found that "pulling forward the all-others rate from the investigation is a reasonable method to determine the rate for the non-examined respondents."  *Id.*  Commerce elaborated that "{t}he all-others rate from the investigation is an average of individually calculated rates from two respondents, and follows the general rule, which excludes margins that are zero or de minimis and margins determined entirely on the basis of facts available."  *Id.*  Unlike the situation in *Albemarle*, this is not a situation in which Commerce has departed from the expected method without sufficient basis for doing so.  Thus, it was reasonable for Commerce assign the 3.19 percent all-others rate from the investigation to the non-selected companies in this administrative review.  *Id.*

**V.     Commerce's Determination That The Importers' Allegation Regarding The Export Subsidy Offset Does Not Reflect A Ministerial Error Is Lawful**

   **A.     Legal Framework**

The statute allows Commerce to correct ministerial errors and instructs Commerce to establish procedures for doing so.  19 U.S.C. § 1675(h).  At the same time, the Federal Circuit has recognized that "there is a strong interest in the finality of Commerce's decisions."  *Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1292 (Fed. Cir. 2003) (citation omitted).  Likewise, this Court recognizes that "{i}n directing Commerce to establish procedures

for the correction of ministerial errors after issuance of the final results of an investigation or

review, Congress established an exception to the general principle of finality." *Husteel Co. v.*

*United States*, 77 F. Supp. 3d 1286, 1300 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1675(h)).

     The statute and Commerce's regulations define a ministerial error as "an error in

addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate

copying, duplication, or the like, and any other similar type of unintentional error which the

Secretary considers ministerial."  19 C.F.R. § 351.224(f); 19 U.S.C. § 1675(h).  Consequently, an

alleged error that is the result of a methodological decision by Commerce is not a ministerial

error.  *See QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011) (holding

that plaintiff's argument was "methodological in nature" and thus did not meet definition of

ministerial error).  The ministerial error procedures also are not the appropriate method to raise

new substantive legal argument.  *See Fischer S.A. Comercio, Industria & Agricultura v. United*

*States*, 885 F. Supp. 2d 1366, 1376 (Ct. Int'l Trade 2012).  Hence, this Court "will not allow

Plaintiffs to make an end run around the exhaustion requirement by entertaining an unexhausted

substantive issue disguised as a ministerial error."  *Id.*  Doing otherwise "would enable a party to

preserve a substantive legal challenge to Commerce's determination using the protection of the

ministerial error process, thus depriving Commerce of its opportunity to defend its decision at

the proper time."  *Id*. (citing *L.A. Tucker*, 344 U.S. at 37).

    **B.**    **The Importers' Allegation Regarding The Export Subsidy Offset Does Not Reflect A Ministerial Error**

     The Importers' allegation that Commerce failed to adjust the all-others rate that it pulled

forward from the investigation to account for an export subsidy offset pursuant to 19 U.S.C.

§ 1677a(c) does not constitute a ministerial error.  *See* Importers Br. 40-44.  As we established

above, in seeking a reasonable method to set the rate for non-selected respondents, Commerce

determined to use the 3.19 percent rate from the investigation.  In other words, Commerce did

not calculate the 3.19 percent rate in the review.  Rather, Commerce explained that it was

"assigning the dumping margin of 3.19 percent to the non-selected companies subject to this

administrative review, which is the all-others rate from the underlying investigation."  IDM at

55.  Consequently, Commerce's assignment of a 3.19 percent rate to the non-selected companies

was *not* unintentional.  *See* Ministerial Error Memorandum at 4 (P.R. 362).  Indeed, in

identifying 3.19 percent as a reasonable rate under the circumstances, Commerce "made no

statements of intent to adjust for export subsidies or to rely upon a cash deposit rate as the rate

that would be assigned to the non-selected companies."  *Id.*

Commerce also explained in response to the ministerial error allegations that its selection

of the 3.19 percent margin as the non-selected rate was methodological.  *See* Ministerial Error

Memorandum at 4 (P.R. 362).  The Importers characterize application of the export subsidy

offset as an arithmetic function by claiming that Commerce should subtract the 2.17 percent

export subsidy found in the companion countervailing duty investigation from the 3.19 percent

dumping margin assigned in the antidumping duty investigation to arrive at a non-selected rate of

1.02 percent.  Importers Br. 42-43.  This is not a purely arithmetic issue because it involves the

legal interplay between the statute's export subsidy offset provision, 19 U.S.C. § 1677a(c)(1),

and its provisions regarding assignment of a non-selected rate using a reasonable method under

19 U.S.C. § 1673d(c)(5)(B).  In fact, the Importers' ministerial error allegation before Commerce

explained that there are different approaches to applying the export subsidy offset.  *See* Importers

Ministerial Error Allegation at 6-7 n.15 (P.R. 354).  Therefore, Commerce's selection of the 3.19

percent rate and determination regarding whether an export subsidy offset should be applied to

that rate are methodological decisions, rather than an error in "addition, subtraction, or other

arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, {or} any other similar type of unintentional error."  19 C.F.R. § 351.224(f).

The Importers take issue with Commerce's determination that their arguments regarding methodological issues should have been submitted before the final results.  *See* Importers Br. 40. However, both the statute and Commerce's regulations instruct Commerce to create procedures for the correction of *ministerial* errors, not methodological decisions.  19 U.S.C. § 1675(h); 19 C.F.R. § 351.224(e).  Otherwise, the principle of finality applies to Commerce's determination. *See Husteel*, 77 F. Supp. 3d at 1300 (recognizing ministerial error procedures as "an exception to the general principle of finality."); *Alloy Piping*, 334 F.3d at 1292 (recognizing "strong interest" in finality of Commerce decisions).  It is thus inappropriate to treat substantive arguments as a ministerial error issue.  *See Catfish Farmers of Am. v. United States*, No. 21-00380, 2023 WL 4560815, at *10-12 (Ct. Int'l Trade July 7, 2023) (declining to consider issue when plaintiffs first raised substantive argument in ministerial error allegation).

**C.  Because The Importers Failed To Exhaust Their Administrative Remedies With Respect To Their Export Subsidy Offset Allegation, The Court Should Not Consider The Merits Of That Allegation**

The Importers argue that this Court should consider their export subsidy offset arguments on the merits even though their arguments do not involve a ministerial error.  Importers Br. 44. This would be a misuse of the ministerial error process.  *See Fischer*, 885 F. Supp. 2d at 1376 ("Plaintiffs can challenge Commerce's ministerial error decision, but they cannot abuse that opportunity by introducing a new substantive legal claim before the court.").  Courts reject attempts to preserve untimely arguments regarding methodological issues using the ministerial error process.  *See, e.g., id.*; *QVD Food*, 658 F.3d at 1328; *Catfish Farmers*, 2023 WL 4560815, at *10-12.  Moreover, as we established above, this Court "will not allow Plaintiffs to make an

end run around the exhaustion requirement by entertaining an unexhausted substantive issue

disguised as a ministerial error" because it "would enable a party to preserve a substantive legal

challenge to Commerce's determination using the protection of the ministerial error process, thus

depriving Commerce of its opportunity to defend its decision at the proper time." *Fischer*, 885

F. Supp. 2d at 1376 (citing *L.A. Tucker*, 344 U.S. at 37).

As we have also established, "{s}imple fairness . . . requires as a general rule that courts

should not topple over administrative decisions unless the administrative body not only has erred

but has erred *against objection made at the time appropriate under its practice*." *Mittal Steel*

*Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1583-84 (Fed. Cir. 2008) (quoting *L.A. Tucker*,

344 U.S. at 37 (emphasis added by Court)); *see* 28 U.S.C. § 2637(d) (requiring exhaustion).

Moreover, in addition to the statutory exhaustion requirement, Commerce's regulations

specifically require parties to raise all arguments in a timely manner before the agency. *See*

*Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (citing 19 C.F.R. §

351.309(c)(2)). "The exhaustion requirement in this context is therefore not simply a creature of

court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as

a prerequisite to judicial review." *Id.*

In this case, the Importers failed to exhaust their arguments advocating that Commerce

apply an export subsidy offset to the 3.19 percent non-selected rate. The method for determining

the non-selected rate and the prospect of pulling forward the all-others rate from the investigation

were both at issue in the case briefs before Commerce. Indeed, in advocating for Commerce to

pull forward the all-others rate from the investigation, the Importers explicitly referenced "the

original investigation's all-others rate of 3.19%," which is the rate Commerce ultimately used.

Importers Case Br. 19 (P.R. 306; C.R. 248). The same reference to "the original investigation's

all-others rate of 3.19%" also appears in the Importers' rebuttal brief.  Importers Rebuttal Br. 3 (Aug. 25, 2022) (P.R. 319).

At the same time, contrary to the Importers' claims, neither the Importers' case brief nor their rebuttal case brief mentioned the all-others cash deposit rate of 1.02 percent.  *See generally* Importers Case Br. (P.R. 306; C.R. 248); Importers Rebuttal Br. (P.R. 319).  Commerce's order has two columns for rates—one titled the "Weighted-average dumping margin (percent)" and the other titled the "Cash deposit rate (adjusted for subsidy offset(s)) (percent)."  *Certain Quartz Surface Products From India and Turkey*, 85 Fed. Reg. 37,422, 37,423 (Dep't of Commerce June 22, 2020).  The all-others rate under the weighted-average dumping margin column is 3.19 percent, whereas the cash deposit rate column lists 1.02 percent.  *Id.*  Moreover, the weighted-average dumping margin is not the same as the cash deposit rate; this Court has explained that they involve distinct inquiries.  *See Dupont Teijin Films USA, LP v. United States*, 273 F. Supp. 2d 1347, 1352 (Ct. Int'l Trade 2003).

Given the issues in play, the Importers could have made substantive arguments for pulling forward the cash deposit rate of 1.02 percent, but instead referred to the 3.19 percent weighted-average dumping margin.  Notably, not only did the Importers decline to address the cash deposit rate in their case briefs, neither did any other interested party.  As a result, Commerce never had an opportunity to consider the merits of the Importers' arguments about the export subsidy offset and using the cash deposit rate.  The Federal Circuit has made clear that the exhaustion requirement applies to circumstances in which an issue was in play before Commerce and parties were aware that Commerce could potentially change its position from the preliminary results.  *See Boomerang Tube*, 856 F.3d at 913 (requiring exhaustion when parties "either knew or should have known" that issue was in play).  Here, Commerce adopted the position that the

PUBLIC VERSION

Importers themselves advocated; they did not advocate using the cash deposit rate from the investigation rather than the weight-average dumping margin.  The ministerial error process is not the appropriate avenue for arguments about such substantive issues.

Finally, none of the exceptions to the exhaustion doctrine—such as futility, an intervening judicial act, or a pure legal question—apply in this case.  In particular, the "mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies."  *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1372 (Ct. Int'l Trade 2018) (citation omitted).  Likewise, there was no intervening judicial act and this case involves factual issues concerning Commerce's calculation of the non-selected rate based upon the record evidence.  The Court should thus decline to entertain the Importers' export subsidy offset claim.

## CONCLUSION

For these reasons, we respectfully request that the Court deny the plaintiffs' motions, sustain Commerce's final results, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General


PATRICIA M. McCARTHY
Director


/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:                                     /s/ Joshua E. Kurland
VANIA WANG                                      JOSHUA E. KURLAND
Senior Attorney                                 Senior Trial Counsel
JOSEPH GROSSMAN                                 U.S. Department of Justice
Attorney                                        Civil Division
Office of the Chief Counsel                      Commercial Litigation Branch
for Trade Enforcement & Compliance              P.O. Box 480, Ben Franklin Station
U.S. Department of Commerce                     Washington, D.C. 20044
                                                Telephone: (202) 616-0477
                                                Email: Joshua E. Kurland@usdoj.gov

November 20, 2023                               *Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation in Court of International Trade Standard Chambers Procedures § 2(B)(1), as modified by the Court's order of November 16, 2023, and contains approximately 16,915 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


/s/ Joshua E. Kurland