# UNITED STATES COURT OF INTERNATIONAL TRADE
## NEW YORK

<u>BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE</u>

CAMBRIA COMPANY LLC,

      Plaintiff,

      and

ANTIQUE MARBONITE PRIVATE LIMITED,
SHIVAM ENTERPRISES, PRISM JOHNSON
LIMITED; ARIZONA TILE, LLC; M S
INTERNATIONAL, INC.; AND PNS
CLEARANCE LLC,

      Consolidated Plaintiffs,

      v.

UNITED STATES,

      Defendant,

      and

APB TRADING, LLC; COSMOS GRANITE
(WEST) LLC;COSMOS GRANITE (SOUTH
EAST) LLC; COSMOS GRANITE (SOUTH
WEST) LLC; CURAVA CORPORATION;
DIVYASHAKTI GRANITES LIMITED;
DIVYASHAKTI LIMITED; MARUDHAR ROCKS
INTERNATIONAL PVT LTD;
OVERSEASMANUFACTURING AND
SUPPLY INC. D/B/A MERRIMACK STONE
INDUSTRIES; QUARTZKRAFT LLP;
STRATUS SURFACES LLC;  FEDERATION OF
INDIAN QUARTZ  SURFACE INDUSTRY;
ARIZONA TILE, LLC; M S INTERNATIONAL,
INC.; AND PNS CLEARANCE LLC,

      Defendant-Intervenors.

Consol. Court No. 23-00007
**NON-CONFIDENTIAL VERSION**
Business Proprietary Information removed on Page 21

**DEFENDANT INTERVENORS ARIZONA TILE, LLC, M S INTERNATIONAL, INC., AND PNS CLEARANCE LLC RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Jonathan T. Stoel
Jared R. Wessel
Cayla D. Ebert

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel to Arizona Tile, LLC, M S International, Inc., and PNS Clearance LLC*

December 11, 2023

# TABLE OF CONTENTS

Page

I.  ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED.....................1

II.  ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT.................................2

III.  STATEMENT OF FACTS ..............................................................................................2

IV.  STANDARD OF REVIEW ...........................................................................................6

V.  COMMERCE CORRECTLY PULLED FORWARD THE ALL-OTHERS RATE FROM THE ORIGINAL INVESTIGATION FOR THE NON-SELECTED RESPONDENTS....7

VI.  COMMERCE'S CALCULATION OF THE NON-RESPONDENT AD RATE IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW ...................................................................................................................................13

  A.  Cambria Has Misinterpreted the Legal Standard...................................................13

  B.  The Averaging Method Results in a Rate for Non-Selected Respondents Not Reasonably Reflective of their Potential Dumping Margins ................................16

    1.  Commerce Correctly Determined that the Calculated Rates Under the AD Order Supported Departure from the Averaging Method......................... 18

    2.  Contemporaneous Data Supports Departure from the Averaging Method21

VII.  CONCLUSION.............................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Tech. & Materials Co., Ltd. v. United States*,
  35 C.I.T. 1380 (2011) .............................................................. 6

*Albemarle Corp. & Subsidiaries v. United States*,
  821 F.3d 1345 (Fed. Cir. 2016)....................................... 7, 8, 10, 16

*Bosun Tools Co. Ltd. v. United States*,
  2022 WL 94172 (Fed. Cir. 2022)........................................... 19, 20

*Bosun Tools Co. v. United States*,
  463 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ................................ 19

*Changzhou Hawd Flooring Co., Ltd. v. United States*,
  848 F.3d 1006 (Fed. Cir. 2017)............................................. 16

*Colakoglu Metalurji A.S. v. United States*,
  553 F. Supp. 3d 1344 (Ct. Int'l Trade 2021) ................................ 10

*Downhole Pipe & Equip., L.P. v. United States*,
  776 F.3d 1369 (Fed. Cir. 2015).............................................. 6

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996)............................................... 6

*Matsushita Elec. Indus. Co., Ltd. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984)............................................... 6

*Mittal Steel Roman v. United States*,
  32 C.I.T. 42 (2008) ........................................................ 6

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003).............................................. 6

*Olympia Indus., Inc. v. United States*,
  22 C.I.T. 387 (1998) ....................................................... 6

*Primesource Building Products, Inc. v. United States*,
  581 F.Supp.3d 1331 (Ct. Int'l Trade 2022) ............................... 17, 19

*Rhone Poulenc, Inc. v. United States*,
  899 F. 2d 1185 (Fed. Cir. 1990)........................................... 7, 13

*Thai Pineapple Canning Indus. Corp. v. United States,*
 273 F.3d 1077 (Fed. Cir. 2001)........................................................................ 15

*United States v. Eurodif S.A.,*
 555 U.S. 305 (2009) ........................................................................................ 14

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,*
 716 F.3d 1370 (Fed. Cir. 2013)................................................................. passim

*Zhejiang DunAn Hetian Metal Co. v. United States,*
 652 F.3d 1333 (Fed. Cir. 2011).......................................................................... 6

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................. 6

19 U.S.C. § 1673d(c)(1)(B)(i)(II) ......................................................................... 13

19 U.S.C. § 1673d(c)(5).................................................................................. 14, 15

19 U.S.C. § 1677a(c)................................................................................................ 4

19 U.S.C. § 1677f–1(c)(2) ..................................................................................... 13

**Administrative Materials**

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 83 Fed. Reg. 12,717 (Dep't Commerce March 23, 2018), and accompanying Issues and Decision Memorandum.......... 11

*Certain Lined Paper Products from India*, 79 Fed. Reg. 26,205 (Dep't Commerce May 7, 2014), and accompanying Issues and Decision Memorandum ........................................................ 11

*Certain Quartz Surface Products from India and Turkey*, 85 Fed. Reg. 37,422 (Dep't Commerce June 22, 2020) .................................................................................. 1, 4, 18

*Certain Quartz Surface Products from India*, 85 Fed. Reg. 25,391 (Dep't Commerce May 1, 2020), and accompanying Issues and Decision Memorandum .................................................... 3, 21

*Certain Quartz Surface Products from India*, 88 Fed. Reg. 80,689 (Dep't Commerce Nov. 20, 2023) ............................................................................................................... 5, 18

*Certain Steel Nails from Taiwan*, 85 Fed. Reg. 76,014 (Dep't Commerce Nov. 27, 2020), and accompanying Issues and Decision Memorandum ................................................................ 11

*Certain Steel Nails From the Sultanate of Oman*, 87 Fed. Reg. 43,240 (Dep't Commerce July 20, 2022), and accompanying Issues and Decision Memorandum ................................................. 9

*Certain Steel Nails From the Sultanate of Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022), and accompanying Issues and Decision Memorandum ......................................... 9, 10

*Diamond Sawblades and Parts Thereof From the People's Republic of China,* 83 Fed. Reg. 64,331 (Dep't Commerce Dec. 14, 2018), and accompanying Issues and Decision Memorandum ...................................................................................................................................... 15, 16

*Multilayered Wood Flooring From the People's Republic of China*, 84 Fed. Reg. 38,002 (Dep't Commerce Aug. 5, 2019), and accompanying Issues and Decision Memorandum ............... 12

*Stainless Steel Bar from India,* 86 Fed. Reg. 11,235 (Dep't Commerce Feb. 24, 2021), and accompanying Issues and Decisions Memorandum ............................................................... 10

*Xanthan Gum from the People's Republic of China*, 87 Fed. Reg. 7,104 (Dep't Commerce Feb. 8, 2022), and accompanying Issues and Decision Memorandum............................................. 12

**Legislative Materials**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 , vol. 1 (1994).............................................................................. 12, 14, 17

**DEFENDANT INTERVENORS ARIZONA TILE, LLC, M S INTERNATIONAL, INC., AND PNS CLEARANCE LLC RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant-Intervenors Arizona Tile, LLC, M S International, Inc., and PNS Clearance LLC (collectively, "Defendant-Intervenors") respectfully submit the following response to Plaintiff Cambria Company, LLC's June 30, 2023 Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of the United States Court of International Trade ("CIT" or "the Court"). Pl.'s Mot. for Judgment on Agency Record, ECF No. 55, 56 (hereinafter Pl.'s Br.). Cambria Company, LLC ("Cambria" or "Plaintiff") challenges the U.S. Department of Commerce ("the Department" or "Commerce") final results of its first administrative review of the antidumping duty ("AD") order on certain quartz surface products ("QSPs") from India, Case No. A-533-889. Specifically, Cambria challenges the following:

1) Commerce's determination to not use the averaging method for calculating the AD rate for the non-selected respondents; and

2) Commerce's decision to pull forward the all-others rates from the original investigation.

Plaintiff's contentions are without merit and should be rejected by this Court. Defendant-Intervenors respectfully request that this Court uphold Commerce's determination with respect to these particular issues and deny Cambria's motion for judgment on the agency record.

## RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT

## I.     ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

Cambria contests certain aspects of the final results of the first administrative review of the AD order on QSPs from India, Case No. A-533-889. The AD order was published as *Certain Quartz Surface Products from India and Turkey*, 85 Fed. Reg. 37,422 (Dep't Commerce June 22, 2020) (antidumping duty orders) (the "AD Order"). Commerce's AD administrative review final results were published in the *Federal Register* on January 9, 2023. *Certain Quartz*

*Surface Products From India*, 88 Fed. Reg. 1,188 (Dep't Commerce Jan. 9, 2023) (final results of antidumping duty administrative review; 2019–2021) ("*Final Results*") (P.R. 355). 1/ The issues set forth in Plaintiff's appeal also contest certain aspects of the findings and conclusions set forth in Commerce's Issues and Decision Memorandum accompanying the *Final Results*. Memorandum from Scott Fullerton to Lisa W. Wang, *Certain Quartz Surface Products from India: Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2019-2021*, Case No. A-533-889 (2019–21 Review) (Dec. 30, 2022) ("Final IDM") (P.R. 346); Memorandum from David Lindgren to Erin Benegal, *Allegation of Ministerial Error*, Case No. A-533-889 (2019–21 Review) (Jan. 24, 2023) ("Ministerial Error Memorandum") (P.R. 362). The period of review ("POR") was December 13, 2019 through May 31, 2021.

## II.    ISSUES PRESENTED AND SUMMARY OF THE ARGUMENT

1.  Whether Commerce's determination to pull-forward the all-others rate established in the investigation is supported by substantial evidence and otherwise in accordance with law.

2.  Whether Commerce's assessment of the AD rate to be assigned to the non-selected respondents in the first administrative review is supported by substantial evidence and otherwise in accordance with law.

## III.   STATEMENT OF FACTS

As described in Consolidated Plaintiffs' Motion for Judgment Upon the Agency Record, in its July 8, 2022 Preliminary Results, Commerce applied adverse facts available ("AFA") and assigned a punitive rate of 323.12% to Antique Marbonite Pvt. Ltd. and its affiliates Shivam Enterprises, and Prism Johnson Limited (collectively, "Antique"). *Certain Quartz Surface*

---

1/    References to public and confidential documents in the administrative record for this appeal are identified as "P.R." and "C.R.," respectively.

*Products From India*, 87 Fed. Reg. 40,786 (Dep't Commerce July 8, 2022) (preliminary results of antidumping duty administrative review and partial rescission of antidumping duty administrative review; 2019-2021) ("*Preliminary Results*") (P.R. 248). Commerce applied AFA with respect to a submission made by Antique under unusual circumstances that was inadvertently a few hours late. Commerce also preliminarily assigned a dumping margin of zero to Pokarna Engineered Stone Limited ("Pokarna"), the other mandatory respondent. *Id.*

In its *Preliminary Results*, Commerce calculated a simple average of the two mandatory respondents' AD rates, and then assigned that average rate, 161.56%, to the non-selected respondents (i.e., the exporters participating in the AD review that were not selected by Commerce as mandatory respondents). *Id.* Notably, the AD all-others rate assigned to non-selected respondents in the original investigation was 3.19%. *Certain Quartz Surface Products from India*, 85 Fed. Reg. 25,391 (Dep't Commerce May 1, 2020) (final determination of sales at less than fair value and final negative determination of critical circumstances), and accompanying Issues and Decision Memorandum. This all-others rate from the investigation was calculated by averaging the actual rates (i.e. non-AFA rates) calculated for Pokarna and Antique – the very same mandatory respondents selected in AR1. Not only is the non-selected respondents rate in the review astronomically higher than its equivalent in the investigation, it is similarly much larger than any other AD rate calculated by Commerce with respect to India. *See* Brief from Craven Trade Law LLC to U.S. Department of Commerce, *Quartz Surface Produces India; A-533-889; Case Brief*, Case No. A-533-889 (2019–21 Review) (Aug 17, 2022) ("Divya Case Br.") at 31–33 (P.R. 293).

Defendant-Intervenors demonstrated in their case brief that Commerce should establish the AD rate assigned to non-selected respondents in the final results by "pulling-forward" the all-others rate calculated in the original investigation, rather than employing a simple average. Brief

from Hogan Lovells US LLP to Commerce, *Case Brief of Arizona Tile, LLC, M S International, Inc., and PNS Clearance LLC* (Aug. 17, 2022) ("Importers' Case Brief") (P.R. 306; C.R. 248). Defendant-Intervenors and other respondents showed that the "pull-forward" rate is the most accurate AD rate for the non-selected respondents in light of the very low rates calculated by Commerce in the original investigation and the first review, exclusive of the AFA rate unreasonably assigned to Antique. *Id.* In contrast, the Department's preliminary decision to employ a simple average of the margin calculated for Pokarna and the AFA margin assigned to Antique created an absurdly high AD rate that is inconsistent with the export behavior of the non-selected respondents.

In its *Final Results*, Commerce correctly lowered the rate assigned to the non-selected respondents from the highly unreasonable average of 161.56%. Commerce instead determined to "pull forward" the all-others rate calculated in the original investigation, 3.19%. *Final Results* (P.R. 355); Final IDM at Cmt. 5 (P.R. 346). 2/ Specifically, Commerce found that "the margin assigned to the non-selected companies in the *Preliminary Results* is not reasonably reflective of the non-selected companies' potential dumping margins during the POR." Final IDM at 54 (P.R. 346). Commerce then "reviewed the history of rates in this *Order*," and found that "other than the AFA rate we applied to the Antique Group in the Preliminary Results . . . all of the rates in this *Order* are significantly lower than the rate of 161.53 percent assigned to the non-selected companies in the Preliminary Results." *Id.*

_____

2/    As discussed in detail in Consolidated Plaintiff's Motion for Judgment Upon the Agency Record, ECF No. 54, Commerce failed, however, to apply the appropriate export subsidy offset required by the governing statute. In contravention of the statute, Commerce pulled forward an AD rate that was unequivocally not adjusted to take into account export subsidies. 19 U.S.C. § 1677a(c); *see* AD Order.

This Court should also take judicial notice of the fact that Commerce has recently completed its second administrative review of the *QSP from India* AD Order. Commerce's final results determined AD rates of 0.00% with respect to Pokarna, Marudhar Rocks International Pvt. Ltd and Marudhar Quartz Surface Private Limited, and the non-selected respondent companies. *Certain Quartz Surface Products from India*, 88 Fed. Reg. 80,689 (Dep't Commerce Nov. 20, 2023) (final results of antidumping duty administrative review, and final determination of no shipments; 2021-22). These final results corroborate the unreasonableness of Commerce's assignment of a 323.12% to Antique in the first administrative review, and demonstrate why Cambria's arguments with respect to the AD rate assigned to the non-selected respondents must fail.

Below, Defendant-Intervenors first demonstrate that Commerce pulled-forward the all-others rate assigned to the non-selected respondents in the original investigation in accordance with law. Courts have affirmed on numerous occassions that this is a reasonable alternative approach for Commerce to employ when the averaging method is not reasonably reflective of the non-selected respondents' potential dumping margins. Second, Defendant-Intervenors demonstrate that the record evidence before Commerce meets these circumstances—that is, the 161.56% rate resulting from the averaging method proposed by Cambria is not reasonably reflective of non-selected respondents' potential dumping margins. Thus, substantial evidence supports the use of an alternative reasonable method in calculating the non-selected respondents rate. In sum, contrary to Plaintiff's unfounded assertions, Commerce's determination to pull-forward the all-others rate from the original investigation is supported by substantial evidence and in accordance with law.

## IV.    STANDARD OF REVIEW

This Court must sustain any determination, finding, or conclusion found by an agency that is supported by "substantial evidence on the record" and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996).  The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Fujitsu Gen. Ltd.*, 88 F.3d at 1044; *see also* 19 U.S.C. § 1516a(b)(1)(B)(i); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)).

In reviewing Commerce's decision, "the Court must consider { } whether the Department has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Advanced Tech. & Materials Co., Ltd. v. United States*, 35 C.I.T. 1380, 1387 (2011) (internal citations and quotation marks omitted).  If such rational connection exists, the Court must uphold Commerce's determination. *Id.*  The Court should affirm Commerce's decision as long as it is "reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions." *Mittal Steel Roman v. United States*, 32 C.I.T. 42, 44 (2008) (citing *Olympia Indus., Inc. v. United States*, 22 C.I.T. 387, 389 (1998)).

Moreover, it is not the role of this Court to re-weigh the evidence on the record. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376–77 (Fed. Cir. 2015) (internal citation omitted).  Even if there is a possibility of drawing two inconsistent conclusions from record evidence, this does not preclude Commerce's finding from being supported by substantial evidence. *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

Lastly, Commerce is required to determine AD margins as accurately as possible. *Rhone Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990).

## V. COMMERCE CORRECTLY PULLED FORWARD THE ALL-OTHERS RATE FROM THE ORIGINAL INVESTIGATION FOR THE NON-SELECTED RESPONDENTS

Commerce's use of the pull-forward rate from the original investigation is the most accurate method of assigning an AD rate to the non-selected respondents and therefore is in accordance with law. In its Final IDM, Commerce explained its reasoning:

> In determining a reasonable methodology for calculating a rate for the non-selected companies, Commerce relied on guidance from the SAA and from the CAFC in *Albemarle*. Similar to *Nails from Oman Final Results*, we find that the most reasonable approach in assigning a rate to the non-selected companies in this instance is to pull forward the all-others rate calculated in the underlying investigation. While Commerce's preference continues to be that we will use contemporaneous information where possible, in this instance, the expected method is not reasonably reflective of the potential dumping margins of the non-selected companies, and pulling forward the all-others rate from the investigation is a reasonable method to determine the rate for the non-examined respondents. The all-others rate from the investigation is an average of individually calculated rates from two respondents, and follows the general rule, which excludes margins that are zero or de minimis and margins determined entirely on the basis of facts available. Therefore, we are assigning the dumping margin of 3.19 percent to the non-selected companies subject to this administrative review, which is the all-others rate from the underlying investigation.

Final IDM at 55 (P.R. 346); Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 , vol. 1 (1994) ("SAA"); *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1349 (Fed. Cir. 2016). Commerce has sufficiently articulated its reasoning for pulling forward the investigation all-others rate and provided a rational connection between the facts found and the choice made. This Court should uphold Commerce's determination in this respect.

Cambria posits that even if Commerce's departure from its expected method was lawful, Commerce erred in pulling forward the all-others rate from the investigation as that rate is not supported by substantial evidence. 3/ Cambria challenges Commerce's chosen method (i.e., pulling forward the all-others rate) and yet failed to propose any alternative to Commerce. This was the case in the administrative proceedings, nor here in this appeal.

Both the Federal Circuit and the CIT have affirmed Commerce's use of pull-forward rates from previous review segments as a reasonable method for assigning dumping margins to non-selected respondents. As noted by Commerce in its Final IDM, in *Albemarle*, the Federal Circuit highlighted the non-representativeness of averaged margins as a reason why Commerce may use the pull-forward methodology. Final IDM at 55 (P.R. 346). In particular, the Federal Circuit has outlined at least two circumstances where the use of pull-forward rates from a prior period is reasonable – (1) when there is evidence that the overall market and the dumping margins have not changed from period to period, and (2) in the AFA context. *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1349 (Fed. Cir. 2016). Here, both circumstances exist. The overall market and dumping margins have not changed from the prior period, and all calculated margins continue to be low (including in the recently completed AD second administrative review). In addition, this proceeding involves a mandatory respondent that received an AFA rate.

Significant precedent in like circumstances supports Commerce's decision to employ the pull-forward methodology in the underlying first administrative review. In *Nails from Oman*, the Department found that the "sole mandatory respondent's margin, based entirely on AFA, {was}

---

3/    Defendant-Intervenors note the Government argues that Cambria failed to exhaust its administrative remedies on this claim, by failing to bring this argument in the administrative proceeding. Gov't Br., ECF No. 68 at 46–48. Defendant-Intervenors support the Government's position on this issue.

not reasonably reflective of the non-selected companies' potential dumping margins during the POR." *Certain Steel Nails From the Sultanate of Oman*, 87 Fed. Reg. 43,240 (Dep't Commerce July 20, 2022) (preliminary results of antidumping duty administrative review and preliminary determination of no shipments), and accompanying Issues and Decision Memorandum ("Nails from Oman Prelim IDM") at 13; *see also Certain Steel Nails From the Sultanate of Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) (final results of antidumping duty administrative review; 2020-2021), and accompanying Issues and Decision Memorandum (determining not to change the rates from the preliminary results and assigning final rates of 154.33% to the sole mandatory respondents and 9.10% to the non-selected companies). In facts that mirror those here, the Department observed that in previous proceeding segments:

> Commerce calculated margins for the mandatory respondents ranging from zero to 1.65 percent. Moreover, the all-others rate in those reviews continued to be the 9.10 percent rate calculated in the investigation. Because the 154.33 percent rate for this review's mandatory respondent is based entirely on facts available with an adverse inference, and because all of the individually calculated rates and the all-others rate from the several recently preceding administrative reviews in this proceeding are significantly lower than 154.33 percent, *Commerce determines that applying this rate to the companies not individually examined would not be reasonably reflective of the non-selected companies' potential dumping margins during the POR*.

Nails from Oman Prelim IDM at 13 (emphasis added). Relying on the SAA and Federal Circuit precedent, the Department instead elected to pull forward the 9.10% dumping margin that was calculated in the original investigation. *Id*. Cambria contends that the fact that there was only one mandatory respondent in *Nails from Oman* precludes *that case* from being instructive here (where there were two mandatory respondents). That is a distinction without a difference. The facts are essentially identical – almost exactly the same difference in AD rates at issue—150%. *Compare Final Results* (assigning final rates of 0% and 323.12% to mandatory respondents and 161.56% to

non-selected respondents), *with Certain Steel Nails From the Sultanate of Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) (final results of antidumping duty administrative review; 2020-2021) (assigning a final rate of 154.33% to the sole mandatory respondents and 9.10% to the non-selected respondents).  Moreover, Cambria ignores the underlying message Commerce makes in this case—a rate that is entirely based on AFA that is 150% larger than previously assigned rates in the same Order cannot be reasonably reflective of those companies' potential dumping margins.

In *Stainless Steel Bar from India* the Department determined that a "reasonable method" for assigning the non-selected rate was to pull forward the dumping margin applied in the most recently completed administrative review.  *Stainless Steel Bar from India,* 86 Fed. Reg. 11,235 (Dep't Commerce Feb. 24, 2021) (preliminary results of antidumping duty administrative review; 2019-2020), and accompanying Issues and Decisions Memorandum ("*Stainless Steel Bar* IDM") at 8.  *See also Colakoglu Metalurji A.S. v. United States*, 553 F. Supp. 3d 1344, 1352 (Ct. Int'l Trade 2021) (affirming Commerce's use of the pull-forward method and noting that "by specifically carving out an exception to the general rule that Commerce should calculate all-others rates by using a weighted average of the mandatory respondents' rates . . . Congress contemplated Commerce pulling forward previously determined rates.").  The Department explained that, given the application of AFA to the administrative review's mandatory respondent, the pull-forward rate was "the most accurate and current possible rate which Commerce {could} assign in light of the lack of data on this record."  *Stainless Steel Bar* IDM at 9.  Citing *Albemarle*, the Department recognized that the facts of the case presented a "situation in which there {was} consistency with respect to the dumping margins of the individually examined respondents throughout the reviews."  *Id*. at 8–9.  Here too, pulling forward the original investigation all-others rate would produce the most accurate and contemporaneous dumping margin possible.  And here too, there is

consistency with respect to the dumping margins of the individually examined respondents at low rates – certainly not in excess of 100 percent.

Similarly, in *Certain Lined Paper Products from India,* the Department "reached back" to pull forward a margin calculated in prior review. 79 Fed. Reg. 26,205 (Dep't Commerce May 7, 2014) (final results of antidumping duty administrative review; 2011-2012), and accompanying Issues and Decision Memorandum at 3. Commerce explained "that a 'reasonable method' to use . . . is to assign non-selected respondents *the average of the most recently determined margins that are not zero, de minimis, or based entirely on facts available*." *Id.* (emphasis added). Commerce has used this exact method here—the 3.19% all-others rate was an average of the most recently determined margins not zero or based on AFA in the investigation.

Notably, cases where the pull-forward method has been rejected by Commerce are inapposite. For instance, in *Certain Steel Nails from Taiwan*, the Department elected not to pull forward the previous rate because there was a history over the order of applying margins that were, in three of five segments, based on AFA and thus not zero or low. 85 Fed. Reg. 76,014 (Dep't Commerce Nov. 27, 2020) (final results of antidumping duty administrative review and final determination of no shipments; 2018-2019), and accompanying Issues and Decision Memorandum at Cmt. 1. Similarly, in *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, there was a lack of consistency with respect to the margins. 83 Fed. Reg. 12,717 (Dep't Commerce March 23, 2018) (final results, final results of no shipments, and partial rescission of the antidumping duty administrative review; 2015-2016), and accompanying Issues and Decision Memorandum at Cmt. 3. In *Xanthan Gum from the People's Republic of China*, the non-selected respondent at issue had a history of being assigned AFA. 87 Fed. Reg. 7,104 (Dep't Commerce Feb. 8, 2022) (final results of antidumping duty administrative review and final determination of

no shipments; 2019–2020), and accompanying Issues and Decision Memorandum at 6–7. Finally, in *Multilayered Wood Flooring From the People's Republic of China*, the Department rejected the pull-forward method due to a lack of consistency in the margins. 84 Fed. Reg. 38,002 (Dep't Commerce Aug. 5, 2019) (final results of antidumping duty administrative review and final determination of no shipments; 2016-2017), and accompanying Issues and Decision Memorandum at Cmt. 3.

In contrast, the facts in the underlying administrative review here are consistent with those where Commerce decided to adopt the pull-forward method, as opposed to rejecting it. The record evidence contradicts Cambria's naked assertion that "there is not a single shred of 'contemporaneous data' on the record to show that the market and margins had not changed between the original investigation and the first review." Pl.'s Br. at 32. Not only is this statement conclusory, it is inaccurate. Cambria ignores the important fact that there has been a full calculation of Pokarna's rate, resulting in a 0% margin in the AD first administrative review.

Moreover, as Commerce articulated, the pull-forward rate "is an average of individually calculated rates from two respondents, and follows the general rule, which excludes margins that are zero or *de minimis* and margins determined entirely on the basis of facts available." Final IDM at 55 (P.R. 346). Commerce's approach thus produces the most accurate, fair and representative rate for the non-respondent companies. As discussed below, there is no evidence demonstrating that the market has changed between the investigation and AR1, and Commerce has articulated a rational reasoning for its determination to pull-forward the all-others rate. Accordingly, this Court should uphold Commerce's determination on this point.

## VI. COMMERCE'S CALCULATION OF THE NON-RESPONDENT AD RATE IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

Commerce's calculation of the non-respondent AD rate is supported by substantial evidence and otherwise in accordance with law. In its final results, Commerce correctly found that the astronomical and non-representative preliminary rate assigned to the non-respondent companies was not "reasonably reflective" of those companies' potential dumping margins. Final IDM at 54 (P.R. 346) (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 , vol. 1 (1994) at 873). Commerce explained that such an approach would be unlawful under the SAA. *Id.*

### A. Cambria Has Misinterpreted the Legal Standard

The governing AD statute provides that the Department must typically assign individual dumping margins for each known exporter of merchandise subject to antidumping duties. If this is not practicable because there is a large number of exporters, Commerce may limit its examination to a "reasonable number of exporters." 19 U.S.C. § 1677f–1(c)(2). If the Department invokes this exception and limits its examination to a "reasonable number of exporters," then Commerce must assign a separate rate to all non-individually examined exporters. 19 U.S.C. § 1673d(c)(1)(B)(i)(II). In so doing Commerce must ensure that the resulting AD all-others rate is both fair and representative, and grounded in economic reality. *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378–1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." (citing *Rhone Poulenc, Inc.*, 899 F.2d at 1191)). The Federal Circuit has held that the need for the selected separate rate to be both fair and representative supersedes the statement in the SAA that the rate be calculated as a simple average of the mandatory respondents' rates, which

as discussed below does not apply to administrative reviews. *Id.* The Supreme Court has further stated that "form should be disregarded for substance and the emphasis should be economical reality." *United States v. Eurodif S.A.*, 555 U.S. 305, 317–18 (2009) (internal citations omitted). In the intermediate appeal of *Yangzhou Bestpak Gifts & Crafts Co., Ltd.*, this Court stated that the while the SAA "allow{ed} for use of a simple average of an {AFA} rate and zero or *de minimis* rates {it did} not absolve the agency from ensuring that a separate rate reasonably reflect{ed} potential dumping margins . . . or from rationally connecting the record evidence with the final conclusions." *Yangzhou Bestpak Gifts & Crafts Co.*, 716 F.3d at 1376.

The general rule set forth in Section 1673d(c)(5)(A) of the Trade Act of 1930, as amended, provides that in determining an all-others rate Commerce is to calculate the weighted average of the dumping margins for individually investigated respondents, excluding any zero and de minimis margins, and any margins determined entirely on the basis of facts available, including AFA. Final IDM at 53 (P.R. 346). Cambria has suggested that this method is a blanket rule. This is not the case. Commerce explains in its Final IDM:

> {W}here the dumping margins for individually examined respondents are ***all*** zero, *de minimis*, or based entirely on the basis of facts available, section 735(c)(5)(B) of the Act provides that Commerce *may use 'any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated*, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.'

*Id.* at 53–54 (emphasis added). In other words, Commerce has the discretion to determine the rate for non-selected respondents based on the average of the zero and de minimis margins and margins determined on the basis of facts available. 19 U.S.C. § 1673d(c)(5)(B). But, Commerce is also permitted to employ any reasonable calculation method. *Id.* The Federal Circuit has explained that "{w}hile various methodologies are permitted by the statute, it is possible for the application

of a particular methodology to be unreasonable in a given case." *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1085 (Fed. Cir. 2001).

The SAA provides that Commerce may not employ an average rate (1) if such "method is not feasible," or (2) "if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 , vol. 1 (1994) at 873. In these circumstances, Commerce "may use other reasonable methods." *Id.* Commerce's discretion in its selection of the rate for non-selected respondents is limited by the fact, as explained by the Federal Circuit, that the "rate determinations for nonmandatory, cooperating separate rate respondents ***must {} bear some relationship to their actual dumping margins***." *Yangzhou Bestpak Gifts & Crafts Co., Ltd.*, 716 F.3d at 1380 (emphasis added).

Commerce's discretion is also enhanced by that fact that Section 1673d(c)(5)(B) and its provision on the so-called "expected method" – i.e., the averaging of the AFA and de minimis rates – only applies to original investigations, not administrative reviews. Commerce has explained in *Diamond Sawblades from China* as follows:

> The statute and Commerce's regulations do not address the establishment of a rate ***to be applied to individual companies not selected for examination when Commerce limits its examination in an administrative review*** pursuant to section 777A(c)(2) of the Act, but generally we have used section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in investigations, ***for guidance*** when calculating the rate for respondents we did not examine in an administrative review.

*Diamond Sawblades and Parts Thereof From the People's Republic of China,* 83 Fed. Reg. 64,331 (Dep't Commerce Dec. 14, 2018) (final results of antidumping duty administrative review; 2016-2017), and accompanying Issues and Decision Memorandum at Cmt. 1 (emphases added).

Commerce's explanation in *Diamond Sawblades from China* is instructive in this regard. In that proceeding, Commerce found that an original investigation only establishes a cash deposit rate, that is, an estimate of expected pricing behavior going forward. *Id.* Commerce must be more critical and exercise more discretion in its selection of the rate applied to non-selected respondents in an administrative review where actual (and retroactive) tariff liability applies. This warrants against the blanket application of an average, which may fail the requirement that the non-selected respondents rate be fair and representative, and reflect economic reality. Furthermore, Commerce should have a better understanding of the export behavior of the examined industry in administrative reviews, as opposed to original investigations, having gone through at least one prior examination of the industry's pricing behavior. Accordingly, given its increased discretion to assess a fair and representative rate in an administrative review, it is permissible for the agency to use this understanding, as it has done here, in determining the rate assigned to non-selected respondents.

**B.    The Averaging Method Results in a Rate for Non-Selected Respondents Not Reasonably Reflective of their Potential Dumping Margins**

In its *Final Results*, Commerce correctly found that of averaging the rates assigned to the mandatory respondents produced a result not "reasonably reflective" of the potential dumping margins for the non-selected respondents. As a result, the averaging methodology could not be used.

Moreover, Commerce found substantial evidence that there is a "reasonable basis for concluding that {non-selected respondents'} dumping is different" than the AFA rate erroneously assigned to Antique. *Albemarle Corp. v. United States*, 821 F.3d 1345, 1353 (Fed. Cir. 2016); *see Changzhou Hawd Flooring Co., Ltd. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017) ("... mandatory respondents {are} representative unless evidence shows otherwise"). First, the

consistently low rates calculated in proceedings conducted with respect to the AD Order support not using the averaging method.  Second, an analysis of average unit values ("AUVs") on the record demonstrates that a dumping rate of 161% does not reasonably reflect the potential dumping margins of the non-selected respondents.  Accordingly, Commerce has met its burden, and its determination should be upheld.

As a preliminary matter, Cambria overstates the "assumption" discussed in prior cases that "the largest exporters by volume are assumed to be representative of the non-selected respondents."  Pl.'s Br. at 15 (quoting *Primesource Building Products, Inc. v. United States*, 581 F.Supp.3d 1331, 1338 (Ct. Int'l Trade 2022)).  If such an assumption was intended to apply blanketly, the SAA would not instruct Commerce to use an alternative method when an average results in a rate that would not be "reasonably reflective" of potential dumping margins for non-investigated exporters or producers.  Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 , vol. 1 (1994) at 873.  The SAA is fundamentally at odds with Cambria's argument.

Lastly, there is no evidence demonstrating that an inadvertently late  filing by a single consultant – and the resulting unlawful application of AFA to Antique at an extraordinarily high rate – is indicative of broader industry behavior.  As discussed in detail in Consolidated Plaintiffs' opening brief, Antique and the industry more generally has no history of being assigned AFA, has no history of being assigned high AD margins, and had worked diligently to cooperate to the best of its ability with the Department's requests in the original investigation (and, we would contend, in this proceeding).

### 1. Commerce Correctly Determined that the Calculated Rates Under the AD Order Supported Departure from the Averaging Method

Commerce examined the history of rates under the AD Order, including those from the original investigation, which ranged from 2.67% to 5.15% for the mandatory respondents and 3.19% for the all-others rate. Additionally, the calculated rate assigned to Pokarna in the first administrative review was 0%. Thus, Commerce found:

> . . . other than the AFA rate we applied to Antique Group in the Preliminary Results (and continue to apply for these final results), all of the rates in this Order are significantly lower than the rate of 161.53 percent assigned to the non-selected companies in the Preliminary Results. Accordingly, based on the history of rates for this Order, we determine that the 161.53 percent margin is not reasonably reflective of the non-selected companies' potential dumping margins during the POR AFA rate assigned to Antique.

Final IDM at 54 (P.R. 346).

Commerce went on to explain that its "evaluation of whether a margin is reasonably reflective is a case-specific analysis." *Id.* at 55. Commerce then rejected Cambria's argument that the history of the Order was too short to take into account. The correctness of Commerce's decision has been justified by what recently occurred in the AD second administrative review—that is, Commerce assessed 0% AD rates for all respondents (two mandatory respondents and the non-selected respondents). *Certain Quartz Surface Products from India*, 88 Fed. Reg. 80,689 (Dep't Commerce Nov. 20, 2023) (final results of antidumping duty administrative review, and final determination of no shipments; 2021-22).

Cambria contends to this Court that Commerce's review of historical rates is insufficient and claims that "Commerce needs 'contemporaneous data' to establish that the rates from the mandatory respondents are not reflective of the current rates of the non-selected companies." Pl.'s

Br. at 18 (citing *Primesource*, 581 F.Supp.3d 1331 (Ct. Int'l Trade 2022)). Cambria misreads *Primesource*.

In *Primesource*, Commerce assigned total AFA rates of 78.17% to both mandatory respondents, and subsequently assigned the same rate to the non-selected respondents. *Primesource*, 581 F.Supp.3d 1331 (Ct. Int'l Trade 2022). Commerce found that the lack of consistency in the historical rates made them unusable for determining present rates, and thus did not depart from the averaging method. *Id.* The Court upheld the rate assigned to the non-selected respondents rate because "Commerce engaged with the data from past reviews and considered its relevance to the present review." *Id.* at 1343. Similarly, Commerce has here engaged with the data and made a reasonable decision.

Moreover, *Primesource* is factually distinct from the case here. In *Primesource*, Commerce assigned total AFA rates to **both** mandatory respondents. This was because they failed to respond **at all** to questionnaires, as opposed to missing by only a few hours an unusual Commerce deadline to respond to a supplemental questionnaire. *Id.*

Additionally, Cambria erroneously attempts to rely on *Bosun Tools Co. Ltd. v. United States*. The facts in that case are also distinguishable. In *Bosun Tools*, Commerce initially determined to assign to the non-selected respondents an AD rate of 41.025%, which was the simple average of the AD rates assigned to the mandatory respondents rates (an AFA rate of 82.05% and a calculated rate of 0%). *Bosun Tools Co. Ltd. v. United States*, 2022 WL 94172 at *3 (Fed. Cir. 2022). The CIT remanded because Commerce had "failed to consider evidence indicating the 41.025% rate is not reasonably reflective of the separate rate respondents' dumping." *Id.* (quoting *Bosun Tools Co. v. United States*, 463 F. Supp. 3d 1309, 1318 (Ct. Int'l Trade 2020)). On remand, Commerce justified its 41.025% AD rate as consistent with a general trend of increasing rates. *Id.*

The CIT upheld Commerce's determination, and Bosun Tools appealed to the Federal Circuit. The Federal Circuit upheld Commerce, but the historical rates at issue in that case are significantly different from those at issue here. There, the historical AD rates encompassed a wide range: 9.55%, 8.10%, 4.65%, 3.45%, 12.05%, 39.66%, 15.91%, and 0% with an upward trend. *Id.* at *5. The differences between these historical rates and the 41.025% average rate, are not comparable to the unjustifiable difference between the 3.19% pull-forward rate and the 161.53% average rate presented here. Nor are the rates trending upwards in this case—on the contrary, as explained above, Commerce just calculated 0.00% rates for ***all respondents*** in the recently completed second administrative review. Put another way, a single assigned rate of 323.12% – based on Commerce's unlawrful imposition of AFA and drastically higher than the 5.15% calculated rate assigned to Antique in the original investigation – does not constitute a trend, and does not support a finding that the average rate reasonably reflects the dumping margin Commerce should have expected to be calculated for non-selected respondents.

Finally, the rate assigned to the non-selected respondents in this case is buttressed by the AD rates determined by Commerce in India cases more generally. Specifically, the record evidence reflects that margins in other AD proceedings involving India demonstrate that a rate of 161.56% is not reflective of non-selected respondents' potential dumping. *See* Divya Case Br. at 31–33 (P.R. 293).

For all of these reasons, Commerce's determination that the historical rates support a departure from the averaging method is both in accordance with law and supported by substantial evidence.

2.     **Contemporaneous Data Supports Departure from the Averaging Method**

In addition to the historical rates discussed above, record evidence demonstrates that there is also contemporaneous data to support Commerce's use of a reasonable method alternative to averaging.

The Average Unit Value ("AUV") data on Commerce's administrative review record provide no credence for the exorbitantly high 161% dumping margin preliminarily assigned to non-selected respondents.  Cambria argues that the non-selected companies' AUV is [

].  Pl.'s Br. at 24.  That argument ignores the fact that the aggregated AUV of the non-selected respondents is only approximately [      ] lower than Pokarna's AUV (i.e., significantly different than a 161.56% difference).  *See id.*; *see also* Importers' Case Brief at Ex. 3. ((P.R. 306; C.R.  248, 249) (providing a chart of calculations using Cambria's data).  A non-selected companies rate that is [           ] based simply on raw AUV data, which do not account for important factors like product mix, cannot be fair and representative, as required by *Yangzhou Bestpak Gifts & Crafts Co., Ltd*.

Additionally, Pokarna's fully calculated rate for the AD first administrative review was 0%, a fact that must not be ignored.  The small change from Pokarna's 2.67% rate in the AD original investigation to a 0% rate in the first administrative review is further evidence that the market and margins for QSP from India have not changed.  *See Certain Quartz Surface Products from India*, 85 Fed. Reg. 25,391 (Dep't Commerce May 1, 2020) (final determination of sales at less than fair value and final negative determination of critical circumstances).

A complete review of these data, rather than the narrow glimpse Cambria provides, demonstrates that Commerce's departure from the averaging method is warranted. That is, the

averaging method would not result in a rate reasonably reflective of non-respondent companies' potential dumping margins.

Cambria argues that Commerce ignored AUV data in its determination. While this evidence supports Commerce's determination, the agency is not required to review the AUV data on the record to determine that an alternative reasonable method should be used to calculate the non-selected respondents' rate. Cambria's attempted reliance on *Yangzhou Bestpak Gifts & Crafts Co., Ltd*. (Pl.'s Br. at 24), is again misplaced. The Federal Circuit observed in that case that "Commerce acknowledged the flaws in its reliance on AUVs as support for its determination, but stated that the record was limited and AUVs were the 'only basis' for comparison between these respondents." *Yangzhou Bestpak Gifts & Crafts Co., Ltd* , 716 F.3d at 1376 (quoting Final Results of Redetermination Pursuant to Court Order, Case No. A-570-952 (Remand, slip op. 11-90) (Sept. 26, 2011) at 16). That is not the case here. As noted above, Commerce also had Pokarna's fully calculated rate for the first administrative review as a basis for comparison.

Moreover, Defendant-Intervenors provided the AUV data as support for pulling forward the all-others rate from the investigation in its affirmative case brief during the administrative review. Importers' Case Brief at 23, Ex. 3 (P.R. 306; C.R. 248). In its rebuttal brief, Cambria argued the AUV data did not support these claims. Brief from Schagrin Associates to Commerce, *Certain Quartz Surface Products from India: Petitioner's Rebuttal Brief*, Case No. A-533-889 (2019–21 Review) (Aug. 26, 2022) at 50–51 (P.R. 321, C.R. 251). Moreover, Commerce did not explicitly rely on the AUV data in its Final IDM. As such, Cambria is precluded from now arguing that Commerce ignored the AUV evidence.

# VII.    CONCLUSION

For the forgoing reasons, Plaintiff's Motion for Judgment on the Agency Record should be denied.   Defendant-Intervenors respectfully request that this Court uphold Commerce's *Final Results* with respect to Commerce's application of the pull-forward rate to the Non-Selected Respondents rate.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Jared R. Wessel
Cayla D. Ebert

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.6634
Fax:  +1.202.637.5910
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to Arizona Tile, LLC, M S International, Inc., and PNS Clearance LLC*

Dated: December 11, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to the September 15, 2023 Scheduling Order, ECF No. 59, the undersigned counsel at Hogan Lovells US LLP hereby certify that this Response to Plaintiff's Motion for Judgment Upon the Agency Record complies with the word-count limitation requirement. This Response contains 6,732 words as computed by Hogan Lovells US LLP's word processing system (Microsoft Word 2010).

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Jared R. Wessel
Cayla D. Ebert

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
(202) 637-6634
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to Arizona Tile, LLC, M S International, Inc., and PNS Clearance LLC*

Dated: December 11, 2023