## UNITED STATES COURT OF INTERNATIONAL TRADE

CAMBRIA COMPANY LLC,

      Plaintiff,

ANTIQUE MARBONITE PRIVATE
LIMITED, *et al.*,

      Consolidated-Plaintiffs,

v.

UNITED STATES,

      Defendant,

APB TRADING, LLC, *et al.*,

      Defendant-Intervenors.

**PUBLIC VERSION**

Before: Mark A. Barnett, Chief Judge
Court No. 23-00007

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Cambria Company LLC*

Dated: January 31, 2024

PUBLIC VERSION

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

I.   COMMERCE HAD THE BURDEN OF SHOWING A DEPARTURE FROM THE EXPECTED METHOD WAS WARRANTED ................................................. 2

II.  SUBSTANTIAL EVIDENCE DOES NOT SUPPORT COMMERCE'S DECISION TO DEPART FROM THE EXPECTED METHOD ........................... 8

   A.  The Historical Rates Calculated Under the Order Are Insufficient Evidence to Depart from the Expected Method ............................................... 8

   B.  Commerce Ignored the Probative Value of Antique's AFA Rate During the Current Review ........................................................................... 11

   C.  Commerce Ignored Evidence Regarding the AUVs of the Respondents ......... 12

   D.  Commerce Contradicted Its Own Findings on Representativeness During Respondent Selection ................................................................... 15

III. COMMERCE'S DECISION IS INCONSISTENT WITH AGENCY PRACTICE 17

IV.  FOLLOWING THE EXPECTED METHOD IS NOT EQUIVALENT TO APPLYING AFA TO THE NON-SELECTED RESPONDENTS ........................ 20

V.   COMMERCE'S DECISION TO PULL FORWARD THE ALL-OTHERS RATE WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE OR IN ACCORDANCE   WITH LAW ..................................................................... 22

VI.  CONCLUSION ................................................................................ 26

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases**

*Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024 (Fed. Cir. 2007)................ 24

*Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016).................... passim

*Allegheny Ludlum Corp. v. United States*, 112 F.Supp.2d 1141 (Ct. Int'l Trade 2000) ........................................................................................................ 12

*Bosun Tools Co. v. United States*, No. 2021-1930, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) ...................................................................................................... 5, 20

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ...................................................................................... 13

*Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ......................... 10

*Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017)...... 2

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)...................... 24

*Gallant Ocean (Thailand) Co. v. United States,* 602 F.3d 1319 (Fed. Cir. 2010)........ 4

*Hubscher Ribbon Corp. v. United States*, 979 F.Supp.2d 1360 (Ct. Int'l Trade 2014) .......................................................................................................... 5

*Itochu Bldg. Prod., Co. v. United States,* 163 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ........................................................................................................ 13

*Mid-Continent Steel & Wire, Inc. v. United States,* 321 F.Supp.3d 1313 (Ct. Int'l Trade 2018)................................................................................................ 10, 11

*Mitsubishi Heavy Indus., Ltd. v. United States*, 24 CIT 275, 97 F.Supp.2d 1203 (2000) ...................................................................................................... 14

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) .................................................................................................. 14

*Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F.Supp. 1364, 15 C.I.T. 548 (1991) ................................................................................................ 16

*Navneet Publications (India) Ltd. v. United States*, 999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014)................................................................................................ 13

*Ozdemir Boru San. v. Tic. Ltd. Sti.*, 273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017)...... 4

*Primesource Building Products, Inc. v. United States*, 581 F.Supp.3d 1331 (Ct. Int'l Trade 2022) .............................................................................. passim

*Pro-Team Coil Nail Enter., Inc. v. United States,* No. 18-00027, 2022 WL 2783885 (Ct. Int'l Trade July 15, 2022) ................................................................ 17

*Sao Ta Foods Joint Stock Co. v. United States*, 475 F. Supp. 3d 1283 (Ct. Int'l Trade 2020) ........................................................................................ 10

*Solianus, Inc. v. United States*, 391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019) ............ 6

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ...................................................................................... 4, 5, 6

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ......................................................................... 10

19 U.S.C. § 1637d(c)(1)(B)(i)(II) ................................................................... 21

19 U.S.C. § 1637d(c)(5)(B) ............................................................................ 22

**Other Authorities**

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 73 Fed. Reg. 52,273 (Dep't Commerce Sept. 9, 2008) (final results) ................................... 18

*Certain Lined Paper Products from India*, 78 Fed. Reg. 22,232 (Dep't Commerce Apr. 15, 2013) (final results) ..................................................................... 18

*Steel Concrete Reinforcing Bar from Mexico*, 87 Fed. Reg. 34,848 (Dep't Commerce Jun. 8, 2022) (final results of 2019–2020 review) ................................... 17

*Steel Nails from Oman,* 87 Fed. Reg. 43.240 (Dep't Commerce July 20, 2022) (prelim. results) ........................................................................................ 20

*Steel Nails from Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) (final results) ...................................................................................... 19, 26

*Steel Nails from Taiwan*, 85 Fed. Reg. 76,014 (Dep't Commerce Nov. 27, 2020) (final results of 2018-2019 review) ......................................................... 17

*Wooden Cabinet and Vanities and Components Thereof from China*, 87 Fed. Reg. 67674 (Dep't Commerce Nov. 9, 2022) (final results of 2019-2021 review) .......... 17

PUBLIC VERSION

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| CAMBRIA COMPANY LLC, | |
| Plaintiff, | |
| ANTIQUE MARBONITE PRIVATE LIMITED, *et al.*, | |
| Consolidated-Plaintiffs, | Before: Mark A. Barnett, Chief Judge |
| v. | Court No. 23-00007 |
| UNITED STATES, | |
| Defendant, | |
| APB TRADING, LLC, *et al.*, | |
| Defendant-Intervenors. | |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Cambria Company LLC ("Cambria") hereby submits the following reply brief in support of its motion for judgment on the agency record in the above-captioned action. As demonstrated below, there is no merit to the arguments raised in the response briefs of the Defendant, the Defendant-Intervenor Federation of Indian Quartz Surface Industry (the "Federation"), or the Defendant-Intervenors Arizona Tile, LLC, M S International, Inc., and PNS Clearance LLC (collectively, the "Importers"). Accordingly, the Court should hold that the decision by the U.S. Department of Commerce ("Commerce") to depart from the expected method and pull forward the all-others rate from the original investigation to calculate the antidumping duty ("AD") rate for the non-selected respondents in the first

administrative review of the AD order on quartz surface products from India (the "*Final Results*") is not supported by substantial evidence or in accordance with law.

## I. COMMERCE HAD THE BURDEN OF SHOWING A DEPARTURE FROM THE EXPECTED METHOD WAS WARRANTED

As established in Cambria's opening brief, when all dumping margins calculated by Commerce are either zero, *de minimis*, or rates based entirely on adverse facts available ("AFA"), the "expected method" for calculating the rate for the non-selected respondents is to weight-average the zero, *de minimis*, and AFA rates. *See* Cambria Opening Brief (June 30, 2023) (ECF 55, 56) ("Cambria Opening Br.") at 13-16. As implied by its name, "the expected method is the default method and … the burden of proof lies with the party seeking to depart from the expected method (or with Commerce as the case may be)." *Primesource Building Products, Inc. v. United States*, 581 F.Supp.3d 1331, 1338 (Ct. Int'l Trade 2022) (citing *Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016); *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017)). In its response brief, the government does not dispute that Cambria has accurately set forth the relevant legal standard and instead focuses on arguing that, unlike the situation in *Albemarle*, Commerce had a sufficient basis in this case for departing from the expected method. *See* Government Response Brief (Nov. 20, 2023) (ECF 67, 68) ("Gov't Br.") at 48. The Federation and the Importers dispute that this is the relevant standard. Their arguments should be rejected.

The Federation argues that there is no requirement for Commerce "to assume" that any dumping margin calculated in the first review – and more

PUBLIC VERSION

specifically the rate based on total AFA in the first review – is "more representative of the expected dumping behavior of cooperative, non-selected exporters than the actual dumping margins calculated by Commerce in the prior segment of the proceeding." *See* Federation Response Brief (Dec. 11, 2023) (ECF 72) ("Federation Br.") at 6. To the contrary, prior cases on this issue "all recognize an important assumption that is built into Commerce's statutory authority to engage in respondent selection: that *the largest exporters by volume are assumed to be representative of the non-selected respondents*." *Primesource*, 581 F.Supp.3d 1340 (emphasis added). In fact, the Federal Circuit has held that Commerce cannot do what it did in the *Final Results – i.e.*, assume that dumping margins from a prior segment are more representative than dumping margins from the current segment, including *de minimis* and AFA margins, because "{t}here is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period." *Albemarle*, 821 F.3d at 1356. Under the statutory scheme, the expected method is assumed to be representative of the non-selected respondents' rates, and "Commerce needed some *contemporaneous data* to establish that the market and margins relevant to the subject merchandise had not changed such that the prior rates could be considered reflective of current rates." *Primesource*, 581 F.Supp.3d at 1338 (citing *Albemarle*, 821 F.3 at 1357).

The Importers, for their part, argue that the assumption in favor of the expected method "is limited by the fact that, as explained by the Federal Circuit, the 'rate determinations for nonmandatory, cooperating separate rate respondents

*must {} bear some relationship to their actual dumping margins.*'" Importers' Br. at

15 (citing *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d

1370, 1380 (Fed. Cir. 2013)) (emphasis added by Importers). The Importers go so far

as arguing that, in *Bestpak,* the Federal Circuit "held that the need for the selected

separate rate to be both fair and representative supersedes the statement in the

{Statement of Administrative Action ('SAA')} that the rate be calculated as a simple

average of the mandatory respondents' rates." *Id.* at 13. Their citation to *Bestpak* in

this regard is unavailing.

In *Bestpak*, the Federal Circuit remanded Commerce's application of the

"expected method" to calculate the all-others rate based on the reasoning in *Gallant*

*Ocean* that there was no information on the record to tie the all-others rate to the

respondent's "commercial activity." *Bestpak*, 716 F.3d at 1380 (citing *Gallant Ocean*

*(Thailand) Co. v. United States,* 602 F.3d 1319, 1324 (Fed. Cir. 2010)). *Bestpak* no

longer has the precedential value that it had in the past. First, after *Bestpak* was

decided, Congress passed the Trade Preferences Extension Act of 2015, which

removed any requirement that a dumping margin "reflect{} an alleged commercial

reality of the interested party." 19 U.S.C. § 1677e(d)(3); *see also Ozdemir Boru San.*

*V. Tic. Ltd. Sti.*, 273 F. Supp. 3d 1225, 1248 (Ct. Int'l Trade 2017) ("As the current

statute disclaims any obligation to consider an interested party's alleged

commercial reality 'for any ... purpose,' there exists no basis upon which to conclude

that such an analysis remains relevant....."). Thus, the requirement in *Bestpak* that

the all-others' rate must be tied to the respondent's commercial reality has been

PUBLIC VERSION

superseded by this amendment to the statute.

Second, *Bestpak* was decided before the Federal Circuit's seminal decision in *Albemarle*, where the court clarified that there is an assumption that the expected method reasonably reflects the non-selected respondents' rates and that this assumption may only be overcome where there is substantial evidence to the contrary. *Albemarle*, 821 F.3d at 1353; *see also Bosun Tools Co. v. United States*, No. 2021-1930, 2022 WL 94172, at *4 (Fed. Cir. Jan. 10, 2022).

Third, in the remand proceedings following the Federal Circuit's decision in *Bestpak*, the respondent voluntarily dismissed the litigation rather than be individually reviewed, conceding that all its entries would be covered by the 123.83 percent separate rate. *See* Form 8 Notice of Dismissal, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, No. 10-00295 (USCIT Nov. 13, 2013), ECF No. 76 ("Yangzhou Bestpak will remain subject to the anti-dumping duty order on narrow woven ribbon with woven selvedge from the People's Republic of China at the antidumping duty rate of 123.83%, and all of Bestpak's entries suspended in this action will be liquidated at that rate."). As the CIT has remarked, the remand proceedings thus validated the all-others rate at issue in the *Bestpak* decision. *See Hubscher Ribbon Corp. v. United States*, 979 F.Supp.2d 1360, 1363-64 (Ct. Int'l Trade 2014) ("One wonders what Bestpak's actual rate and commercial reality would have been had Commerce completed the individual review. Would it have been higher than 123.83%? In any event, though seemingly struck down by the Federal Circuit as unreasonable, the 123.83% separate rate now appears to have

5

PUBLIC VERSION

regained some validity.").

In subsequent cases, the Court has rejected citation to *Bestpak* as a basis to challenge the expected method. For example, in *Solianus, Inc. v. United States*, 391 F. Supp. 3d 1331, 1339 (Ct. Int'l Trade 2019), this Court reviewed Commerce's antidumping duty investigation of fine denier polyester staple fiber from Korea, where the agency had assigned two mandatory respondents an AFA rate of 45.23 percent and the third mandatory respondent a *de minimis* margin. *Id.* In its final determination, Commerce followed the expected method and calculated an all-others rate of 30.15 percent based on the average of the rates for all three mandatory respondents. *Id.* The plaintiffs cited *Bestpak* to argue that "the circumstances of this investigation render a simple average of a *de minimis* rate and two AFA rates unreasonable as applied" and that "the record reveals no evidence showing that such a determination reflects economic reality." *Id.* The Court rejected this argument because the plaintiffs "offered no reason *why* the resulting 30.15 percent all-others rate failed to 'reflect{} economic reality' of the 'all-other' firms." *Id.* Moreover, Commerce had justified the application of the expected method by selecting the mandatory respondents based on the assumption that, as the largest volume exporters, they were "representative of the rest of the market." *Id.* In addition, there was no information on the record to support the claim that the non-selected companies were more like the mandatory respondent that received a *de minimis* margin and unlike the mandatory respondent that received an AFA rate. *Id.* The Court thus sustained Commerce's determination. *Id.*

PUBLIC VERSION

The Court should likewise reject the Importers' argument that Commerce's "discretion" to depart from the expected method is "enhanced" by the fact that the statutory provision on the expected method "only applied to original investigations, not administrative reviews." *See* Importers' Response Brief (Dec. 11, 2023) (ECF 74, 75) ("Importers' Br."). The Federal Circuit rejected this as a basis for Commerce departing from the expected method in *Albemarle*:

> It is true, as the government points out, that 19 U.S.C. § 1673d applies on its face only to investigations, not periodic administrative reviews. … But the statutory framework contemplates that Commerce will employ the same methods for calculating a separate rate in periodic administrative reviews as it does in initial investigations. *See* 19 U.S.C. § 1675(a) (amended 2016) (In conducting periodic administrative reviews, Commerce is required to "determine the dumping margin" to calculate "the amount of any antidumping duty," just as it must do in initial investigations). Indeed, for this reason Commerce itself has found the statute's methodology applicable in periodic administrative reviews as well as initial investigations, as it did in this case.

*Albemarle*, 821 F.3d at 1352-1353 (internal citation omitted).

In sum, the burden of proof lay with Commerce if it chose to depart from the expected method to show with data contemporaneous to the period of review ("POR") that the dumping margins of the mandatory respondents did not reflect the dumping margins of the non-selected companies. Commerce did not have an affirmative burden to tie the expected method to the "commercial reality" of the non-selected respondents. Moreover, the fact that the underlying proceeding was an administrative review rather than an investigation did not give Commerce "enhanced discretion" to depart from the expected method.

PUBLIC VERSION

## II.    SUBSTANTIAL EVIDENCE DOES NOT SUPPORT COMMERCE'S DECISION TO DEPART FROM THE EXPECTED METHOD

Commerce's decision to depart from the expected method in the *Final Results* was not supported by substantial evidence. None of the arguments raised by the government or the defendant-intervenors in their response briefs detract from this conclusion.

### A.    The Historical Rates Calculated Under the Order Are Insufficient Evidence to Depart from the Expected Method

As discussed above, to depart from the expected method, Commerce needs "contemporaneous data" to establish that the rates from the mandatory respondents are not reflective of the current rates of the non-selected companies. Cambria Opening Br. at 18-19 (citing *Primesource*, 581 F.Supp.3d at 1338; *Albemarle*, 821 F.3d at 1356). In the underlying review, however, Commerce failed to cite any contemporaneous data supporting a departure from the expected method and instead cited the limited "history of rates" in this proceeding, which consisted solely of the rates from the original investigation. Commerce's Issues and Decision Memorandum ("IDM") for the Final Results of Antidumping Duty Administrative Review (Dec. 30, 2022) ("*Final IDM*") at Comment 5 (P.R. 346). Under *Primesource* and *Albemarle*, the historical rates of the *Order* do not constitute substantial evidence that the mandatory respondents' rates were different from the non-selected respondents.

The government fails in its response brief to address this fundamental problem. For example, the government first asserts that "Cambria misunderstands *Primesource*," but it does not show how there is any misunderstanding of the central

PUBLIC VERSION

holding of that case – *i.e.*, that historical rates are not contemporaneous data and thus not a sufficient basis to depart from the expected method.  *See* Gov't Br. at 42. The government then asserts that this case is distinguishable from *Primesource* because "Commerce engaged with the history of the rates under the order." Gov't Br. at 42. The Federation similarly discusses how "the rates in the original investigation were far lower" than the rate based on the expected method. *See* Federation Br. at 9. In other words, rather than pointing to contemporaneous data that would support departing from the expected method, the government and the Federation double down on the false doctrine that historical rates are a sufficient basis for a departure.

The Importers at least use the correct standard when they argue that contemporaneous data supported a departure from the expected method because "Pokarna's fully calculated rate for the AD first administrative review was 0%, a fact that must not be ignored." *See* Importers' Br. at 21. This argument fails to grasp that, as discussed below, Antique's AFA rate from the first review could likewise not be ignored. The best way to take into account both Pokarna's and Antique's contemporaneous rates was to follow the expected method by averaging both rates together to derive the rate for the non-selected respondents.

The Importers also cite to the rates for the respondents in the second review of QSP from India as evidence to depart from the expected method in the first review. *See* Importers' Br. at 20. When Commerce reached its final decision, these rates were not and could not have been part of the record. Moreover, the Court's

PUBLIC VERSION

judicial review is limited to whether Commerce's determination is supported by substantial evidence *on the record*. 19 U.S.C. § 1516a(b)(1)(B)(i). As the U.S. Supreme Court has recognized, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *see also Sao Ta Foods Joint Stock Co. v. United States*, 475 F. Supp. 3d 1283, 1287 (Ct. Int'l Trade 2020) ("Judicial review is generally limited to the full administrative record before the agency at the time it rendered its decision.") (internal citation omitted). More importantly, the rates from the second review, like the historical rates from the investigation, are not contemporaneous with the first review and thus cannot serve as a basis for departing from the expected method.[1]

Cambria also demonstrated in its opening brief that when rates fluctuate significantly across different segments of an AD proceeding, it is illogical to rely on historical rates to depart from the expected method. Cambria Opening Br. at 19 (citing *Primesource*, 581 F.Supp.3d at 1343. *See also Mid-Continent Steel & Wire, Inc. v. United States,* 321 F.Supp.3d 1313, 1323-24 (Ct. Int'l Trade 2018). In response, the government once again doubles down on the relevance of historical rates even when it is illogical to consider them relevant: "Commerce does not only consider historical rates when they do not fluctuate. Rather, Commerce considers

---

[1]  Cambria notes that, if Commerce publishes the rates for the third review while this case is pending and the rates increase, it is highly doubtful that the Importers will be citing to the rates from the third review as relevant evidence of the non-selected respondents' dumping behavior in the first review.

the history of the rates generally - whether the rates fluctuate or not." *See* Gov't Br. at 41. This is in blatant contradiction to numerous cases from the CIT and warrants a reversal.

As Cambria discussed in its opening brief, historical rates from prior segments have even less probative value as to the non-selected respondents' rates when they do not pertain to any of the non-selected respondents in the current review. *See* Cambria Opening Br. at 19-20 (citing *Primesource*, 581 F.Supp.3d at 1343; *Mid-Continent*, 321 F.Supp.3d at 1323-24). In the underlying review, all 53 non-selected respondents had never been examined in any prior segment, and thus the historical rates had zero probative value as to their dumping behavior. *Id.* The government has no answer to this problem. In fact, the government appears to mistakenly cite the fact that none of the non-selected respondents in *Primesource* had been previously reviewed as something that distinguishes *Primesource* from this case. *See* Gov't Br. at 42. But this fact is actually one of the many reasons that makes this case so similar to *Primesource*.

### B. Commerce Ignored the Probative Value of Antique's AFA Rate During the Current Review

As established in Cambria's opening brief, when departing from the expected method, Commerce ignored the probative value of Antique's AFA rate, which was inconsistent with the SAA, contrary to Commerce's own practice, and against the holding of prior cases decided by this Court. *See* Cambria's Opening Br. at 21-23. In its response brief, the government argues that, by claiming that Commerce ignored the probative value of Antique's AFA rate, Commerce is improperly inviting the

PUBLIC VERSION

Court to reweigh the evidence. Gov't Br. at 43. There is a difference, however, between asking Commerce to reweigh evidence that was previously weighed and asking Commerce to actually consider evidence that it previously ignored. *See, e.g., Allegheny Ludlum Corp. v. United States*, 112 F.Supp.2d 1141, 1165 (Ct. Int'l Trade 2000) ("Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence.")

The Federation is at least honest when it concedes that "Commerce understandably and appropriately gave {Antique's AFA rate} little probative weight when evaluating the history of the margins." Federation Br. at 11. The Federation argues this was appropriate because Antique's rate was not a "contemporaneous dumping margin" and, conveniently, that Pokarna's *de minimis* dumping margin was the only relevant contemporaneous dumping margin because it was the only calculated margin on the record. But this is precisely the argument that this Court rejected in *Primesource*, finding that "examining only the calculated margins and *excluding from consideration the AFA-based margins would not have yielded a full picture of the historical trends.*" *Primesource*, 581 F.Supp.3d at 1342 (emphasis added).

Commerce's willful ignorance of the relevance of the AFA rate was not understandable. It was contrary to law and warrants reversal.

### C. Commerce Ignored Evidence Regarding the AUVs of the Respondents

Cambria demonstrated in its opening brief that the average unit values

PUBLIC VERSION

("AUVs") of the non-selected respondents [

]. Cambria Opening Br. at 24-25. This evidence

showed that the expected method did, in fact, reasonably reflect the non-selected

respondents' dumping behavior. *Id.* Commerce erred when it failed to even mention

– let alone analyze – this highly relevant evidence that directly contradicts its

conclusion in the *Final Results*. *See Final IDM* at Comment 5 (P.R. 346). This

failure, by itself, warrants a remand of this case. *See, e.g., Navneet Publications

(India) Ltd. v. United States*, 999 F. Supp. 2d 1354, 1365 (Ct. Int'l Trade 2014)

(finding that Commerce's calculation of the all-others rate was not supported by

substantial evidence based on AUV data on the record).

    In its response brief, the Government argues that the evidence on AUVs does

not show that the non-selected respondents' prices were [

] because "there are AUVs [                                                    ]

AUV for smaller exporters" and that "entry values are not necessarily the same as

U.S. net sales prices." Gov't Br. at 43-44. As an initial matter, this argument should

be rejected because it was never set forth in Commerce's *Final Results* but instead

is a post-hoc rationalization being offered for the first time by Commerce's litigation

counsel. The Court may not accept "post hoc rationalizations for agency action" and

may only sustain the agency's decision "on the same basis articulated in the order

by the agency itself." *Itochu Bldg. Prod., Co. v. United States,* 163 F. Supp. 3d 1330,

1337 (Ct. Int'l Trade 2016) (citing *Burlington Truck Lines, Inc. v. United States*, 371

U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). *See also Mitsubishi Heavy*

13

*Indus., Ltd. v. United States*, 24 CIT 275, 281 n. 9, 97 F.Supp.2d 1203, 1209 n. 9

(2000)) ("'{T}he courts may not accept appellate counsel's post hoc rationalizations

for agency action.... It is well-established that an agency's action must be upheld, if

at all, on the basis articulated by the agency itself.'") (quoting *Motor Vehicle Mfrs.*

*Ass'n v. State Farm*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

    Even on the merits, however, the government's post hoc rationalization is

unpersuasive. Pokarna's AUV for its U.S. sales during the POR was [     ], and

Antique's AUV for its U.S. sales during the POR was [      ] – *i.e.* [

    ]. *See* Importers' Case Brief (Aug. 17, 2022) (P.R. 306, CR.

249) at Exhibit 3. The non-selected respondents' aggregated AUV was [    ],

which is [                  ]. *Id.* Thus, the [


    ]. Noting that [

      ] does not detract from the relevance of this fact.

Muggsy Bogues played basketball in the NBA with a height of 5'3", whereas most

NBA players' heights exceed six feet. The fact that many Americans [


       ].

    The Importers' position on the AUV data is even less persuasive. The

Importers state that the fact that "Commerce did not explicitly rely on the AUV

data" means that "Cambria is precluded from now arguing that Commerce ignored

the AUV evidence." *See* Importers' Br. at 22. This is a real head scratcher that frankly makes no sense.

### D. Commerce Contradicted Its Own Findings on Representativeness During Respondent Selection

Another problem with the *Final Results* is that Commerce ignored its own finding during respondent selection that the history of rates under the order was insufficient to show that the rates for the two largest Indian exporters selected as the mandatory respondents would be unrepresentative of the remaining non-selected respondents. *See* Cambria Opening Br. at 25-27. In particular, in rejecting Cambria's request that the agency use its sampling methodology to select the mandatory respondents for the first review, Commerce found that because this was only the first review of the AD order, there was "*limited evidence* to provide Commerce with a reasonable basis to believe or suspect that the average export prices and/or dumping margins for the largest exporters differ from those of smaller exporters." Commerce Respondent Selection Memo (Sept. 28, 2021) (P.R. 53) at 6 (emphasis added). This finding is impossible to square with Commerce's finding in the *Final Results* that the history of the order was a sufficient basis to find that the largest exporters' dumping margins did not reasonably reflect the dumping margins of the smaller non-selected respondents.

The government responds that the methodology for selecting the mandatory respondents is "a separate consideration from whether the expected method reasonably reflects non-selected respondents' potential dumping margins." Gov't Br. at 14. Nothing could be further from the truth. In fact, one of the primary reasons

that Commerce was justified in rejecting the sampling methodology and instead selecting the largest exporters as the mandatory respondents is that "the largest exporters by volume are assumed to be representative of the non-selected respondents." *Primesource*, 581 F.Supp.3d at 1340. This is why Commerce is generally expected to use the mandatory respondents' rates to determine the rate for the non-selected respondents. *Id.* In fact, the entire statutory framework for respondent selection dictates this outcome:

> These concepts, representativeness and expectedness, are connected. Representativeness allows Commerce to select certain respondents for individual examination and, in so doing, decline to individually examine other respondents. By allowing Commerce to focus its resources on certain respondents, the statute necessarily creates the assumption of representativeness because Commerce often will lack further information about the non-selected respondents. … Commerce is not otherwise required to collect information about the non-selected respondents because Commerce is permitted, in fact, expected, to treat the mandatory respondents as representative of the non-selected respondents when it determines the non-selected respondents' rate.

*Id.* (citations omitted). *See also Albemarle*, 821 F.3d at 1353 ("The representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents.") (quoting *Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F. Supp. 1364, 1373–74, 15 C.I.T. 548, 559 (1991)). Thus, Commerce's respondent selection methodology and its application of the expected method for calculating the non-selected respondents' dumping margin are not a "separate consideration." They are connected, and Commerce's failure to consider them together thus warrants reversal of its *Final Results*.

16

PUBLIC VERSION

## III.   COMMERCE'S DECISION IS INCONSISTENT WITH AGENCY PRACTICE

Cambria established in its opening brief that Commerce's decision to depart from the expected method based on historical rates was not in accordance with law because it is not consistent with agency practice. Cambria's Opening Br. at 28-31. Cambria cited numerous decisions where Commerce has declined to depart from the expected method based on historical rates. *See id.* (citing *Pro-Team Coil Nail Enter., Inc. v. United States,* No. 18-00027, 2022 WL 2783885, at *7 (Ct. Int'l Trade July 15, 2022)); *Steel Nails from Taiwan*, 85 Fed. Reg. 76,014 (Dep't Commerce Nov. 27, 2020) (final results of 2018-2019 review), and accompanying IDM at Comment 1; *Steel Concrete Reinforcing Bar from Mexico*, 87 Fed. Reg. 34,848 (Dep't Commerce Jun. 8, 2022) (final results of 2019–2020 review) and accompanying IDM at Comment 7 ("*Steel Rebar from Mexico*"); *Wooden Cabinet and Vanities and Components Thereof from China*, 87 Fed. Reg. 67,674 (Dep't Commerce Nov. 9, 2022) (final results of 2019-2021 review) and accompanying IDM at Comment 5).

In its response brief, the government argues that "the cases that Cambria cites are factually dissimilar to this one." Gov't Br. at 45. But the only factual dissimilarities that the government cites involve the number of respondents receiving AFA and the magnitude of the AFA rate that was applied. *Id.* These dissimilarities do not alter the fact that in all these cases Commerce rejected the notion that historical rates warrant a departure from the expected method. *See, e.g.* IDM in *Steel Rebar from Mexico* at Comment 7 ("{W}e take the non-examined respondents' assertion to be (at most) that their claim is the rate assigned to them

17

is not reasonably reflective of their potential dumping margins during the POR, in reference to language in the SAA. However, there is no record evidence to support this assertion. The only analysis that the non-examined respondents provide relates to margins assigned in various administrative review segments under the Order, and *not to their experience during the POR*.") (emphasis added). Commerce's *Final Results* are inconsistent with the practice in these cases.

The Federation argues that Commerce has a practice of holding that "a 'reasonable method' to use when the margins of selected mandatory respondents are zero or *de minimis* is to assign non-selected respondents the average of the most recently determined margins that are not zero, *de minimis*, or based entirely on facts available." Federation Br. at 15 (citing *Certain Lined Paper Products from India*, 78 Fed. Reg. 22,232 (Dep't Commerce Apr. 15, 2013) (final results) ("*Lined Paper from India*")). This line of cases is inapposite, however, because it involves cases where all mandatory respondents receive a zero or *de minimis* margin. *See id.* That is not what happened here. While Pokarna received a zero margin, Antique received a margin based on AFA. The Federation has, at best, pointed to a different practice for a different set of circumstances that were not present in this case.

The Federation also cites to Commerce's decision in *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 73 Fed. Reg. 52,273 (Dep't Commerce Sept. 9, 2008) (final results) ("*Shrimp from Vietnam*"). Federation Br. at 16-17. As an initial matter, this was a case like *Lined Paper from India* where both mandatory respondents received *de minimis* or zero rates and

PUBLIC VERSION

Commerce then pulled forward the all-others rate from the investigation. *See* IDM in *Shrimp from Vietnam* at Comment 6. None of the mandatory respondents received a rate based on AFA. *Id.* Moreover, *Shrimp from Vietnam* was issued before *Albemarle* and thus did not follow *Albemarle*'s guidance. In particular, in *Shrimp from Vietnam*, Commerce determined to pull forward a rate from a prior segment rather than applying expected method to assign an all-others rate of zero because "there is no reason to find that {the prior rate} is not reasonably reflective of potential dumping margins for the non-selected companies." *Id.* This gets the burden of proof backwards under *Albemarle*, as the Federal Circuit held that Commerce can only depart from the expected method where there is reason to find that the expected method is not reasonably reflective of potential dumping margins for the non-selected companies.

Both the Federation and the Importers cite *Steel Nails from Oman*, 87 Fed. Reg. 78,639 (Dep't Commerce Dec. 22, 2022) (final results) ("*Steel Nails from Oman*") as being contrary to Commerce's practice of not relying on historical rates to depart from the expected method. Federation Br. at 16; Importers' Br. at 9. However, as discussed in Cambria's opening brief, *Steel Nails from Oman* was wrongly decided because Commerce cited no "contemporaneous data to establish that the market and margins relevant to the subject merchandise had not changed such that the prior rates could be considered reflective of current rates." Cambria Opening Br. at 34. Moreover, *Steel Nails from Oman* involved a lengthy history where, in the four most recent administrative reviews of the order, Commerce had

calculated margins ranging from zero to 1.65%, and the all-others rate in those reviews continued to be the 9.10% rate calculated in the investigation. *Steel Nails from Oman,* 87 Fed. Reg. 43,240 (July 20, 2022) (prelim. results) and accompanying Preliminary Decision Memorandum (unchanged in final results). This is in stark contrast to the review at issue in this case, which was the first review of the order on QSP from India that had ever been conducted, meaning the history of the order was much more limited.

In sum, the weight of the cases establishes that Commerce's established practice is not to rely on historical rates as a reason to depart from the expected method. Commerce's *Final Results* were not in accordance with law because Commerce failed to follow this practice. To the extent Commerce has been inconsistent in following the Federal Circuit's guidance on following the expected method, however, this Court should assist Commerce in reaching a clear and uniform practice that adheres to the relevant precedent by remanding this case to the agency.

## IV. FOLLOWING THE EXPECTED METHOD IS NOT EQUIVALENT TO APPLYING AFA TO THE NON-SELECTED RESPONDENTS

The Court should reject the Federation's argument that following the expected method would effectively be "taking the adverse inference drawn for Antique and applying it to cooperating non-selected respondents." Federation Br. at 12, 17. The Federal Circuit rejected this argument in *Bosun*. There, the appellant Bosun argued that Commerce's application of the expected method – averaging the rate of 0.00% assigned to one mandatory respondent and the total AFA rate of

PUBLIC VERSION

82.05% to the second mandatory respondent – was "unreasonable" because it was based in part on the AFA rate. *Bosun*, 2022 WL 94172 at *3. Bosun argued that "because it cooperated throughout the review, Commerce should not have assigned it a separate rate based on AFA." *Id.* The Federal Circuit explained that "Bosun's argument is expressly foreclosed by statute. As explained above, § 1673d(c)(5)(B) provides that Commerce may factor an AFA rate into its calculation of a separate rate. The SAA reinforces the statute. It provides that relying on an AFA rate is not only permitted, but expected." *Id.* This is precisely right.

In a similar vein, the Federation argues that Commerce's departure from the expected method was reasonable because "it used a methodology that is consistent with the statutory instruction to avoid including in the non-selected company rate dumping margins determined solely on the basis of AFA." Federation Br. at 13. 1. This argument echoes Commerce's logic in the *Final Results*, where the agency explained that pulling forward the all-others rate from the investigation "follows the general rule, which excludes margins that are zero or *de minimis* and margins determined entirely on the basis of facts available." Final IDM at 55 (P.R. 346). But this "general rule" is only supposed to be followed when Commerce has assigned at least one margin that is not zero, *de minimis*, or based on AFA. 19 U.S.C. § 1637d(c)(1)(B)(i)(II). When all dumping margins for the mandatory respondents are either zero, *de minimis* or AFA rates, Commerce is supposed to apply the exception to the general rule and "use any reasonable method to establish the estimated all others rate for exporters and producers not individually investigated, including

averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1637d(c)(5)(B). The SAA clarifies that the "expected method" in these circumstances is "to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available." SAA, H.R. Doc. No. 103–316, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4200.

In other words, the Federation's argument underscores how Commerce's departure from the expected method completely mangled the relevant statutory standard and Congress's explicit instructions in the SAA. Commerce was not supposed to "avoid" relying on the AFA rate. It was expected to rely on it under these circumstances. The fact that Commerce bent over backward to avoid relying on the AFA rate demands a remand of this case.

## V.   COMMERCE'S DECISION TO PULL FORWARD THE ALL-OTHERS RATE WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE OR IN ACCORDANCE WITH LAW

Cambria's opening brief demonstrated that even assuming for the sake of argument that there was substantial evidence to depart from the expected method, Commerce still erred in the *Final Results* when it pulled forward the all-others rate from the original investigation, because neither of the two circumstances outlined in *Albemarle* for pulling forward the all-others rate applied. Cambria Opening Br. at 31-35. Namely, there were no contemporaneous data to establish that the market and margins relevant to the subject merchandise had not changed such that the prior rates could be considered reflective of current rates. *Id.* Nor was this a

PUBLIC VERSION

situation where Commerce was applying a prior AFA rate against a non-cooperating respondent. *Id.*

The government argues that Cambria waived this argument because it did not exhaust its administrative remedies by raising the argument in its case brief below. *See* Gov't Br. at 47. The Federation similarly argues that Cambria failed to argue that *Albemarle* "places the burden of proof on Commerce to demonstrate with contemporaneous data that the dumping margins of the mandatory respondents are not reflective of expected dumping margins for the non-selected respondents, and that Commerce failed to do so in this case." Federation Br. at 10. Cambria did not waive this argument. Cambria argued in its rebuttal brief that the rates from the original investigation "have little probative value" and specifically cited *Albemarle* for the proposition that "there is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period." Cambria Rebuttal Brief at 46-47 (quoting *Albemarle*, 821 F.3d at 1356) (other citation omitted) (P.R. 321). Cambria also argued in its rebuttal brief, citing *Albemarle*, that "the burden is on the parties seeking a departure from the expected method – and ultimately Commerce – to show 'based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different.'" *Id.* at 45-46 (quoting *Albemarle*, 821 F.3d at 1353). Significantly, in the *Final Results*, Commerce stated that it "relied on guidance from … *Albemarle*." Final IDM at 55 (P.R. 346). Thus, Cambria's rebuttal brief gave Commerce a full and fair opportunity to consider the legal principles laid out in *Albemarle*, and

PUBLIC VERSION

Commerce ultimately claimed to adhere to those principles. There are no real exhaustion concerns at play here. *C.f. Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (exhaustion requirements are designed "to give the agency a fair and full opportunity" to adjudicate parties' claims).

Even if Cambria had not actually raised this argument in its rebuttal brief, however, the Court has discretion not to require exhaustion of administrative remedies where a pure legal question arises. 28 U.S.C. § 2637(d); s*ee also Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007). A pure legal question is one that does not require additional factual development or resort to agency expertise for the court to dispose of the question. *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003–04 (Fed. Cir. 2003). Application of the holding in *Albemarle* fits squarely within the exception for pure legal questions. No additional factual development is required to determine whether Commerce complied with the guidance in *Albemarle* when it pulled forward the all-others rate from the investigation. Nor is any special agency expertise required to dispose of the question of whether one of the two circumstances set forth in *Albemarle* applies in this case. Thus, the Court can and should reach the merits of this argument.

Turning to the merits, neither the government nor the defendant-intervenors have any answer to the charge that there were no contemporaneous data on the record to establish that the market and margins relevant to the subject merchandise had not changed such that the prior rates from the investigation could be considered reflective of current rates during the first review. *See* Gov't Br. at 48.

24

The government claims that "{u}nlike the situation in *Albemarle*, this is not a situation in which Commerce has departed from the expected method without sufficient basis for doing so." Gov't Br. at 48. But the government fails to point to any "contemporaneous data" that would provide a "sufficient basis" to pull forward an old rate, as contemplated by *Albemarle*.

The Importers claim that Commerce was justified in pulling forward the all-others rate because "there is no evidence demonstrating that the market has changed between the investigation and {the first review}." Importers' Br. at 12. This argument gets the burden of proof backwards. The burden of showing that the all-others rate should be pulled forward fell on Commerce, and the agency could only pull forward that rate if there was affirmative evidence that the market had not changed. In fact, the Federal Circuit rejected this same argument for this same reasoning in *Albemarle*:

> {T}he government's repeated argument that "no record evidence demonstrated that the separate rate respondents engaged in pricing behavior similar to {the mandatory respondents} is backwards. The burden is not on the separate respondents to show that their dumping is the same as that of the individually examined respondents. Rather, Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different.

*Albemarle*, 821 F.3d at 1353.

The Importers also mischaracterize the Federal Circuit's holding in *Albemarle* as outlining "*at least* two circumstances" where Commerce can pull forward rates from a prior period. Importers' Br. at 8. As this Court has recognized, *Albemarle* held that "*{o}ther than* in these two circumstances, '{t}here is no basis to

25

simply assume that the underlying facts or calculated dumping margins remain the same from period to period," thus reinforcing the notion that the expected method is the default." *PrimeSource*, 581 F. Supp. 3d 1331, 1338–39 (Ct. Int'l Trade 2022) (quoting *Albemarle* at 1356) (emphasis added). In other words, there are two and only two circumstances under *Albemarle* in which Commerce can pull forward a rate from a prior segment.

Finally, citing to *Steel Nails from Oman*, the Importers claim that "{s}ignificant precedent in like circumstances supports Commerce's decision to employ the pull-forward methodology in the underlying first administrative review." Importers' Br. at 8. As discussed above, *Steel Nails from Oman* is both factually distinguishable from this case and was wrongly decided. More importantly, one wrongly decided case from Commerce is not the kind of "significant precedent" that can override binding precedent handed down from the Federal Circuit.

The bottom line is that Commerce utterly failed to show that it met the requirements in *Albemarle* for pulling forward the all-others rate from the investigation to use as the rate for the non-selected respondents in the first review. For this last and final reason, Commerce's *Final Results* should be reversed and remanded.

## VI.   CONCLUSION

For the foregoing reasons and the reasons set forth in Cambria's opening brief, Cambria requests that this Court: (i) hold that Commerce's decision to depart from the expected method and instead pull forward the all-others rate from the original investigation to calculate the AD rate for the non-selected respondents in

PUBLIC VERSION

the first administrative review of the AD order is not supported by substantial

evidence or in accordance with law; and (ii) and remand Commerce's *Final Results*

with instructions to issue a new determination consistent with the Court's decision.

Respectfully submitted,

*/s/ Luke A. Meisner*
Luke A. Meisner, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Cambria Company LLC*

Dated: January 31, 2024

PUBLIC VERSION

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response brief contains 6,906 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures.


Dated: January 31, 2024                    /s/ Luke A. Meisner
                                           Luke A. Meisner