**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HONORABLE MARK A. BARNETT, CHIEF JUDGE**

CAMBRIA COMPANY LLC,

                   Plaintiff,

ANTIQUE MARBONITE PRIVATE
LIMITED; PRISM JOHNSON LIMITED;
and SHIVAM ENTERPRISES,

                   Consolidated-Plaintiffs,

      v.

UNITED STATES,                            Court No. 23-00007

                   Defendant,

APB TRADING, LLC; ARIZONA TILE
LLC; COSMOS GRANITE (SOUTH EAST)
LLC; COSMOS GRANITE (SOUTH WEST)
LLC; COSMOS GRANITE (WEST) LLC;
CURAVA CORPORATION;
DIVYASHAKTI GRANITES LIMITED;
DIVYASHAKTI LIMITED; FEDERATION
OF INDIAN QUARTZ SURFACE
INDUSTRY; M S INTERNATIONAL, INC.;
MARUDHAR ROCKS INTERNATIONAL
PVT LTD.; OVERSEAS
MANUFACTURING AND SUPPLY INC.;
PNS CLEARANCE LLC; QUARTZKRAFT
LLP; and STRATUS SURFACES LLC,

                   Defendant-Intervenors.

## DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

**MORRIS MANNING & MARTIN LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4819

Julie C. Mendoza
R. Will Planert
Donald B. Cameron
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

Dated: December 11, 2023

*Counsel to Federation of Indian Quartz Surface Industry*

## TABLE OF CONTENTS

I.     RULE 56.2 STATEMENT ................................................................2

II.    ISSUES OF LAW PRESENTED.......................................................2

III.   STATEMENT OF FACTS...............................................................3

IV.    SUMMARY OF ARGUMENT .........................................................4

V.     ARGUMENT ...................................................................................6

     A.     Commerce's Use Of The Exception To The "Expected Method" To
           Determine The Non-Selected Companies' Rate Was Reasonable.................7

     B.     Commerce's Decision To "Pull Forward" The Investigation Rate Based On
           Consideration Of Historical Rates Was Supported By Substantial Evidence
           And In Accordance With Law.....................................................14

     C.     A Simple Average Including Antique's AFA Rate Would Be Inequitable By
           Applying An Adverse Inference to Cooperative Parties. .............................17

VI.    CONCLUSION AND RELIEF REQUESTED ........................................19

CERTIFICATE OF COMPLIANCE ........................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albemarle Corp. v. United States*,
    821 F.3d 1345 (Fed. Cir. 2016)........................................................................ *passim*

*Bio-Lab, Inc. v. United States*,
    435 F. Supp. 3d 1361 (Ct. Int'l Trade 2020) .......................................................17

*Bosun Tools Co. v. United States,*
    463 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ................................................14, 15

*De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F. 3d 1027 (Fed. Cir. 2000)........................................................................17

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
    216 F. 3d 1027 (Fed. Cir. 2000) ..................................................................16, 17

*Navneet Publications (India) Ltd. v. United States*,
    999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014) .......................................5, 8, 13, 14

*Thai Pineapple Canning Indus. Corp. v. United States*,
    273 F.3d 1077 (Fed. Cir. 2001)..................................................................8, 12

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ......................................................................................12

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013)..............................................................5, 8, 12, 13

**Statutes**

19 U.S.C. § 1673d(c)(5)...........................................................................................7

**Other Authorities**

*Certain Frozen Warmwater Shrimp From the Socialist Republic of*
    *Vietnam: Final Results and Final Partial Rescission of Antidumping*
    *Duty Administrative Review*,
    73 Fed. Reg. 52,273 (Dep't Commerce Sept. 9, 2008).......................................16

*Certain Lined Paper Products From India: Final Results of Antidumping*
    *Duty Administrative Review; 2010–2011*,
    78 Fed. Reg. 22,232 (Dep't Commerce Apr. 15, 2013)..................................5, 15

*Certain Quartz Surface Products From India and Turkey: Antidumping Duty Orders,*
  85 Fed. Reg. 37,422 (Dep't Commerce June 22, 2020) ........................................................9

*Certain Quartz Surface Products From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,*
  85 Fed. Reg. 25,391 (Dep't Commerce May 1, 2020) ...........................................................3

*Certain Quartz Surface Products From India: Final Results of Antidumping Duty Administrative Review; 2019-2021,*
  88 Fed. Reg. 1,188 (Dep't Commerce Jan. 9, 2023) ................................................... *passim*

*Certain Quartz Surface Products From India: Final Results of Antidumping Duty Administrative Review, and Final Determination of No Shipments; 2021–2022,*
  88 Fed. Reg. 80,689 (Dep't Commerce Nov. 20, 2023) .......................................................15

*Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020–2021,*
  87 Fed. Reg. 43,240 (Dep't Commerce July 20, 2022) .................................................15, 16

H.R. Doc. No. 103-316, vol. 1 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.............................8

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  HONORABLE MARK A. BARNETT, CHIEF JUDGE**

|  |  |
|---|---|
| CAMBRIA COMPANY LLC,<br><br>Plaintiff,<br><br>ANTIQUE MARBONITE PRIVATE LIMITED; PRISM JOHNSON LIMITED; and SHIVAM ENTERPRISES,<br><br>Consolidated-Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>APB TRADING, LLC; ARIZONA TILE LLC; COSMOS GRANITE (SOUTH EAST) LLC; COSMOS GRANITE (SOUTH WEST) LLC; COSMOS GRANITE (WEST) LLC; CURAVA CORPORATION; DIVYASHAKTI GRANITES LIMITED; DIVYASHAKTI LIMITED; FEDERATION OF INDIAN QUARTZ SURFACE INDUSTRY; M S INTERNATIONAL, INC.; MARUDHAR ROCKS INTERNATIONAL PVT LTD.; OVERSEAS MANUFACTURING AND SUPPLY INC.; PNS CLEARANCE LLC; QUARTZKRAFT LLP; and STRATUS SURFACES LLC,<br><br>Defendant-Intervenors. | Court No. 23-00007 |

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, and this Court's September 15, 2023

Order, ECF No. 59, Defendant-Intervenor, Federation of Indian Quartz Surface Industry (the

"Federation") hereby responds to Plaintiff Cambria Company LLC's ("Cambria") June 30, 2023

Motion for Judgement on the Agency Record, ECF No. 56 ("Cambria Br."). As discussed

herein, and in Defendant United States' November 20, 2023 Response Brief, ECF No. 68, ("Def.

Br."), the arguments made by Cambria challenging the non-selected company rate in the U.S.

Department of Commerce's ("Commerce") *Final Results* in the antidumping duty ("AD")

administrative review of quartz surface products from India are without merit and should be

rejected. In accordance with the Court's April 20, 2023 Scheduling Order, the Federation has

made its best efforts not to merely repeat arguments made in earlier filed briefs.

## I.   RULE 56.2 STATEMENT

The administrative determination under review is *Certain Quartz Surface Products From*

*India: Final Results of Antidumping Duty Administrative Review; 2019-2021*, 88 Fed. Reg. 1,188

(Dep't Commerce Jan. 9, 2023) ("*Final Results*") (P.R. 355) and accompanying Issues and

Decision Memorandum ("*Final Results IDM*") (P.R. 346).[1] The period of review ("POR") is

December 13, 2019 through May 31, 2021.

## II.   ISSUES OF LAW PRESENTED

Whether Commerce's determination to depart from the "expected method" to calculate

the rate for non-selected respondents by pulling forward the all-others rate from the 2020

Investigation of the antidumping Order on Quartz Surface Products from India is supported by

substantial evidence and in accordance with law.

---

[1] Citations to the administrative record shall be to the public or confidential record document
number ("P.R." or "C.R.").

III.   **STATEMENT OF FACTS**

The Federation agrees generally with Defendant's statement of facts, but has provided below additional facts and context that it believes are relevant to the legal arguments presented in this appeal.

Fifty-one exporters of quartz surface products from India were not selected for individual examination in this review.  *See Final Results IDM* (P.R. 346) at 53.  One mandatory respondent, Pokarna Engineered Stone Limited ("Pokarna"), received a calculated dumping margin of 0.00 percent.  *Final Results* (P.R. 355).  The other mandatory respondent, Antique Marbonite Private Limited, India and its affiliated companies (collectively, "Antique"), was assigned a rate of 323.12 percent based on adverse facts available ("AFA").  *Id.*  That AFA rate was not based on any dumping margin previously determined by Commerce in any prior segment of this proceeding.  Rather, it is the uncorroborated highest dumping margin alleged by Cambria in the petition.  *See* Consolidated Plaintiffs Arizona Tile, LLC, M S International, Inc., and PNS Clearance LLC's Motion for Judgment on the Agency Record, ECF No. 54 at 34-39; Consolidated Plaintiff Antique's Motion for Judgment on the Agency Record, ECF No. 52 at 30-32.  The highest dumping margin calculated by Commerce in any previous segment of the proceeding was 5.15 percent calculated in the investigation for Pokarna.  *See Certain Quartz Surface Products From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 Fed. Reg. 25,391 (Dep't Commerce May 1, 2020) ("*Investigation Final Determination*").

Commerce assigned the 323.12 percent dumping margin to Antique because it submitted a supplemental questionnaire response between 2:56 p.m. and 3:45 p.m. EST on the due date when Commerce had set a deadline of 10:00 a.m. EST.  *See* Def. Br. at 5.  In the *Preliminary*

*Results*, Commerce determined the dumping margin for the non-selected producers using the "expected method" of calculating a simple average of the zero dumping margin calculated in the review for Pokarna and the AFA rate assigned to Antique, resulting in a preliminary dumping margin of 161.56 percent assigned to the fifty-one Indian quartz exporters who were not selected for individual examination. *See* P.R. 248.

After reviewing the weighted-average dumping margins assigned to the mandatory respondents in the underlying investigation, and taking into account interested party arguments made in case briefs before the agency, in the *Final Results* Commerce determined that an assigned rate of 161.56 percent was not reasonably reflective of the non-selected companies' potential dumping margins during the POR. *See* P.R. 346 at 54. The calculated weighted-average dumping margins in the underlying investigation ranged from 2.67 percent to 5.15 percent, resulting in an all-others dumping margin rate of 3.19 percent. *Id.* Accordingly, relying on guidance found in the Tariff Act of 1930 ("the Act") and the Statement of Administrative Action ("SAA"), Commerce determined that the most reasonable method of determining the dumping margin for non-selected Indian producers in the review was to "pull forward" that all-others rate from the investigation, which had been computed as the weighted average of the mandatory respondents' calculated rates in the investigation. Cambria challenges Commerce's determination and contends that Commerce was required in this case to adhere to the "expected method" and assign all non-selected companies under review the 161.56 percent dumping margin that would result from a simple average of Pokarna's zero dumping margin and the 323.12 AFA dumping margin assigned to Antique.

## IV.   SUMMARY OF ARGUMENT

The Act does not instruct Commerce how to calculate the dumping margin rate for companies not selected for individual examination in an administrative review. In light of this

silence, when the only dumping margins are either zero or *de minimis*, Commerce follows the guidance of the SAA and uses its discretion to evaluate whether rates calculated in previous segments of a review are more reflective of parties' potential dumping during the POR.

In the instant case, the dumping margin that would result from application of the "expected method" is more than thirty-one times higher than the highest dumping margin calculated by Commerce for any Indian Quartz producer either in this review or in the investigation. Commerce reasonably concluded that using this AFA-derived rate in determining the non-selected companies' dumping margins would not be "reasonably reflective" of the potential dumping margins of the fifty-one non-selected companies.

Commerce has made similar determinations in cases with facts closely analogous to the facts at issue here. Indeed, Commerce has long held that "a 'reasonable method' to use when the margins of selected mandatory respondents are zero or *de minimis* is to assign non-selected respondents the average of the most recently determined margins that are not zero, *de minimis*, or based entirely on facts available (which may be from a prior review or a new shipper review or the investigation)." *Certain Lined Paper Products From India: Final Results of Antidumping Duty Administrative Review; 2010–2011*, 78 Fed. Reg. 22,232 (Dep't Commerce Apr. 15, 2013) and accompanying Issues and Decision Memorandum ("*Certain Lined Paper Products IDM*") at 14. Commerce's use of historical rates has been upheld by this Court and the U.S. Court of Appeals for the Federal Circuit ("CAFC"). *See Navneet Publications (India) Ltd. v. United States*, 999 F. Supp. 2d 1354, 1359-60 (Ct. Int'l Trade 2014); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1373 (Fed. Cir. 2013).

Cambria argues in its brief, however, that Commerce is not permitted to depart from the expected method by pulling forward a prior rate unless it can demonstrate with contemporaneous

data that dumping margins of the mandatory respondents do not reflect the dumping margins of the non-selected companies, citing *Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016). As noted by the United States, however, Cambria failed to exhaust its administrative remedies on this argument so it should not be heard here. In any event, *Albemarle Corp.* does not require a different result in this case. There, the U.S. Court of Appeals for the Federal Circuit reversed Commerce because it had disregarded contemporaneous *de minimis* dumping margins actually calculated by Commerce in the review (not uncorroborated AFA dumping margins), in favor of higher dumping margins calculated in a previous review. Significantly, in reversing Commerce's determination in that case, the court emphasized that accuracy and fairness must be Commerce's objective when calculating dumping margins for cooperative non-selected companies. *Albemarle Corp.*, 821 F.3d at 1354. The court held that Commerce is not permitted to penalize such cooperative, non-selected respondents by drawing adverse inferences regarding their expected dumping behavior when they had no opportunity to be individually examined. *Id.* at 1358-59. Yet that result is precisely the result Cambria is advocating in this action. According to Cambria, Commerce is required to assume, without evidence, that a dumping margin that is driven by a punitive 323.21 percent AFA dumping margin is more representative of the expected dumping behavior of cooperative, non-selected exporters than the actual dumping margins calculated by Commerce in the prior segment of the proceeding.

## V.   **ARGUMENT**

Commerce's departure from the "expected method" by pulling forward the all-others rate from the investigation was a reasonable application of Commerce's methodology and was supported by substantial evidence. Nothing in the history of the Order supports a finding that the AFA rate assigned to Antique in the *Final Results* (or the 161.56 percent rate that results from

averaging that rate with the *de minimis* dumping margin of Pokarna) is "reasonably reflective" of the non-selected companies' potential dumping.  Consistent with case law and prior agency practice, Commerce considered previous rates from the investigation in determining that the "expected method" rate, which resulted from an average including Antique's AFA rate, was not "reasonably reflective" of the dumping margins of non-selected producers.

Accordingly, this Court should affirm Commerce's *Final Results* and reject Cambria's arguments which ignore the reality of the historical rates in this review and Commerce's practice allowing the agency to consider those historical rates.

### A. Commerce's Use Of The Exception To The "Expected Method" To Determine The Non-Selected Companies' Rate Was Reasonable.

The Act does not instruct Commerce how to calculate the AD rate for companies not selected for individual examination in an administrative review.  Therefore, in calculating the rate, Commerce and the courts look for guidance from the Act's provision on calculating the all-others rate in investigations, and from the SAA.  *Albemarle Corp.*, 821 F.3d at 1352.

The statute provides:

(A) General rule
. . . {T}he estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under {the AFA provision}.

(B) Exception
If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins, or are determined entirely under {the AFA provision}, the administering authority may use *any reasonable method* to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.

7

The Act, *as amended*, § 735(c), 19 U.S.C. § 1673d(c)(5) (emphasis added).

While the SAA acknowledges that the "general rule" of weight-averaging zero and *de minimis* margins along with AFA margins is the "expected method" for Commerce to follow, it also cautions that it may not be reasonable to follow that method in some cases.  Specifically, the SAA instructs that, if the expected method "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods."  H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201.[2]  Similarly, the CAFC has advised that, "while various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case."  *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1085 (Fed. Cir. 2001).

As an initial matter, when the statute gives as little guidance as it does here, "Commerce has considerable discretion when selecting among possible methodologies."  *Navneet*, 999 F. Supp. 2d at 1359-60.  Specifically with respect to Commerce's method for determining the non-selected companies' rate, the CAFC has previously noted that the statute's "any reasonable method" language presents a "lenient standard" for Commerce to use in calculating the separate rate.  *Bestpak*, 716 F.3d at 1378.

Here, Commerce reasonably departed from the "expected method" by pulling forward the all-others rate from the investigation because (1) the expected method did not yield a dumping margin that was "reasonably reflective" of the potential dumping margins of non-selected companies and (2) the all-others rate from the investigation "follow{ed} the general rule, {by}

---

[2] The SAA is considered by Congress "an authoritative expression concerning the interpretation and application of the Tariff Act."  *Bestpak*, 716 F.3d at 1373.

exclud{ing} margins that {were} zero or *de minimis* and margins determined entirely on the basis of facts available." P.R. 346 at 55.

First, Commerce reasonably determined that, because all of the rates in the original investigation were far lower than the 161.56 percent rate assigned to non-selected companies in the *Preliminary Results*, using this AFA-derived rate in determining the non-selected companies' rate would not be "reasonably reflective" of the potential dumping margins of the fifty-one non-selected companies. *See* P.R. 346 at 54. Nothing in the history of the proceeding supports a finding that the AFA rate, even when averaged with a zero rate, is "reasonably reflective" of the non-selected companies' potential dumping. In the original investigation, Commerce determined a weighted average dumping margin of 2.67 percent for Pokarna and 5.15 percent for Antique. The all-others dumping margin rate was 3.19 percent. *See Investigation Final Determination*; *see also Certain Quartz Surface Products From India and Turkey: Antidumping Duty Orders*, 85 Fed. Reg. 37,422 (Dep't Commerce June 22, 2020). And, in this review, Commerce calculated a dumping margin, based on information contemporaneous to this review for Pokarna, of zero. Thus, the only dumping margin rates actually calculated by Commerce that were based on the actual sales prices and production costs of any Indian exporters of quartz surface products in any segment of this proceeding ranged from a low of zero to a high of 5.15 percent. In contrast, the "expected method" of calculating a simple average of Pokarna's zero dumping margin and the 323.12 percent AFA rate assigned to Antique yields a rate of 161.56 percent. That rate is nearly thirty-one times higher than the highest rate actually calculated in any segment of the proceeding. It is not difficult to understand why Commerce concluded that, in light of the dumping margins previously calculated over the course of this proceeding, such a rate would not be reasonably reflective of the expected dumping margins of non-examined respondents.

Cambria nevertheless argues that Commerce's determination that a 161.56 percent margin is not reasonably reflective of expected dumping margins for non-examined respondents was unreasonable, relying principally on the CAFC's decision in *Albemarle Corp.*  In that case, which involved the third review of an antidumping duty order on activated carbon from China, the review covered five exporters, two of which were selected for individual examination.  821 F.3d at 1348-49.  Both individually examined producers were found to have zero or *de minimis* dumping margins.  *Id.* at 1349.  Rather than use the expected method and average the *de minimis* dumping margins for purposes of calculating the separate rate applicable to the non-examined respondents, Commerce decided to pull forward dumping margins from the previous review for the non-examined respondents, finding that the *de minimis* dumping margins in that case would not be reflective of the potential dumping margins of the non-examined companies.  *Id*. at 1349-50.  The CAFC reversed, finding that Commerce's determination in that case lacked substantial evidence.  *Id*. at 1359.  Contrary to Cambria's contentions, however, the facts and reasoning of the court in *Albemarle Corp.* support Commerce's decision in this case.

Cambria argues that *Albemarle Corp.* places the burden of proof on Commerce to demonstrate with contemporaneous data that the dumping margins of the mandatory respondents are not reflective of expected dumping margins for non-selected respondents, and that Commerce failed to do so in this case.  Cambria Br. at 17-20 (citing *Albemarle Corp.* at 1353, 1356).  As noted by Defendant in its brief, Cambria failed to make this argument before the agency.  Def. Br. at 46-47.  Because Cambria failed to exhaust its administrative remedies, the Court should deem this argument to have been waived.

Alternatively, if the Court nevertheless considers this argument on the merits, the Court should hold that *Albemarle Corp.* is inapposite, and if anything, the reasoning of that case

supports Commerce's decision in this case to pull through the all-others rate from the investigation.  In *Albemarle Corp.* Commerce had rejected contemporary evidence on the record of actual dumping margins determined for the two largest exporters under review—*de minimis* dumping margin rates calculated by Commerce using actual sales and cost data for the applicable period of review—in favor of historical dumping margins from a prior period.  Here, in contrast, the only contemporaneous dumping margin calculated by Commerce in the review is the *de minimis* dumping margin determined for Pokarna.  The 323.12 percent AFA dumping margin assigned to Antique is not a "contemporaneous" dumping margin in the sense addressed by the court in *Albemarle Corp.*  While it was technically determined in the current review, this dumping rate is not the product of Commerce's examination of actual pricing behavior.  That is, it is not a calculated dumping margin based on an examination of the sales prices, expenses, and production costs of Antique or any other Indian producer, whether in the current review period or in any prior segment of the proceeding.  Rather, it is an assigned rate based on the dumping margin *alleged* by Cambria in its antidumping petition.  *See Petition For The Imposition Of Antidumping And Countervailing Duties Pursuant To Sections 701 And 731 Of The Tariff Act Of 1930, As Amended: Vol. II: Information Relating To India – Dumping* (May 8, 2019) (on the record of the Investigation, document barcode 3830993-04).  Whatever legal support may exist for assigning such an extreme dumping margin rate to Antique, a company that was found not to have cooperated to the best of its ability, Commerce understandably and appropriately gave that AFA rate little probative weight when evaluating the history of dumping margins determined in this proceeding and instead found that, based on a consideration of the dumping margins previously determined by Commerce, the 161.56 percent dumping margin that results from

application of the "expected method" is not reasonably reflective of the dumping margins of the fifty-one non-examined producers.

Nothing in the CAFC's decision in *Albemarle Corp.* requires a different result. To the contrary, the court in that case emphasized that "accuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters." *Albemarle Corp.*, 821 F.3d at 1354 (citation omitted). Based on the facts of that case, the court found Commerce's assumption that the actually calculated dumping margins for the largest producers examined were not representative of non-selected producers was not reasonable:

> It was unreasonable in this case for Commerce to choose to limit its review to the two largest volume exporters, refuse to collect additional data from Huahui, and then draw inferences adverse to Huahui based on the lack of data available in the record.

*Id.* at 1358. To do as Cambria advocates in the instant case would stand the reasoning of the CAFC in *Albemarle Corp.* on its head. According to Cambria, Commerce should have assigned to cooperative, non-examined exporters a weighted average of the Pokarna dumping margin and the 323.12 percent AFA dumping rate assigned to Antique. As discussed further below, this would, in effect, be taking the adverse inference drawn for Antique and applying it to cooperating non-selected respondents. Cambria complains that "Commerce ignored the probative value of Antique's AFA rate," Cambria Br. at 21-22. But that AFA rate is simply not comparable to the actual dumping margins before the court in *Albemarle Corp.* As the CAFC instructed in *Bestpak*, while the Act may permit a simple average, "{f}orm should be disregarded for substance" when the evidence shows that a simple average does not "reflect{} economic reality." 716 F.3d at 1378 (citing *Thai Pineapple*, 273 F.3d at 1085 and *United States v. Eurodif S.A.*, 555 U.S. 305, 317-18 (2009)). Here, it was within Commerce's discretion to weigh Antique's AFA rate, determine that it was not probative of the economic reality of non-selected

companies' potential dumping, and use a rate from the investigation that more accurately reflected that economic reality.

Here, where there are only two mandatory respondents, the inclusion of an AFA dumping margin of more than 300 percent in the calculation of the non-selected dumping margin unavoidably skews the results in a way that distorts economic reality and leads to arbitrary results. In this case, if Pokarna had sold quartz products in the United States during the review period at the same 2.67 percent dumping margin as in the original investigation, then in view of Antique's AFA dumping margin of 323.12 percent, the non-selected respondents would have been assigned that same 2.67 percent dumping margin. However, because Pokarna's dumping margin was *de minimis*, thereby providing contemporaneous evidence that one of the two largest producers was not dumping at all, the use of the "expected method" would now result in assigning a 161.56 percent dumping margin to all non-selected exporters. Commerce reasonably and appropriately determined that in view of the history of dumping margins determined in this proceeding, such a result was not reflective of potential dumping by non-selected exporters.

Finally, Commerce's methodology is reasonable because, although it departed from the "expected method," it used a methodology that is consistent with the statutory instruction to avoid including in the non-selected company rate dumping margins determined solely on the basis of AFA. *See Final Results IDM* (P.R. 346) at 55. Indeed, both this Court and the CAFC have held that a simple average of a *de minimis* or zero rate with an AFA rate to establish a non-selected company rate—the exact calculation Cambria is requesting—was an unreasonable methodology as applied in particular instances. *See, e.g.*, *Bestpak*, 716 F.3d at 1379-80; *Navneet*,

999 F. Supp. 2d at 1362-65.[3]  Thus, Commerce's method of pulling forward the investigation

rate was not only reasonable; it was the most reasonable approach given the alternative, and in

light of the Act, the SAA, and prior case law.

### B.   Commerce's Decision To "Pull Forward" The Investigation Rate Based On Consideration Of Historical Rates Was Supported By Substantial Evidence And In Accordance With Law.

The use of historical rates as substantial evidence of a reasonable contemporary rate is

consistent with case law and Commerce's prior practice, and Commerce's use of historical rates

in this instance is therefore reasonable.  As discussed above, nothing in the history of the

proceeding supports a finding that Antique's AFA rate was a reasonable reflection of the non-

selected companies' potential dumping given that the rates in the investigation were far lower.

While Cambria argues against the use of historical rates as evidence of parties' "potential

dumping," Cambria Br. at 18-20, the Court itself has looked to historical rates in previous

reviews for "evidence supporting a lower all-others rate."  *Navneet*, 999 F. Supp. 2d at 1364-65.

The Court should do so again, and uphold Commerce's determination that a separate rate of

161.56 percent would not be representative of the non-selected companies' potential dumping

based on the far lower historical rates calculated for respondents in the history of this

administrative proceeding.

This Court has specifically instructed Commerce to consider historical rates in

calculating the non-selected companies' rate.  In *Bosun Tools Co. v. United States*, an instructive

case, the Court held that Commerce erred in <u>not</u> considering the "history of low calculated

---

[3] Although these cases were decided before the enactment of the Trade Preferences Extension Act of 2015, Pub. L. 114-27, 129 Stat. 383 (June 29, 2015), which removed the <u>requirement</u> that Commerce consider "commercial reality" in assigning an AFA rate, they remain applicable to Commerce's <u>discretion</u> to weigh the commercial reality of non-selected companies' potential dumping based on the evidence of historical rates on the record.

dumping margins" in that review and "summarily rejecting that evidence." 463 F. Supp. 3d 1309, 1318 (Ct. Int'l Trade 2020). Even when Commerce hewed to the expected method on remand, defending its decision to calculate the separate rate by averaging a 0.00 percent rate and a high AFA rate, it did so on the basis that the resulting average was "reflective of a general market trend of increasing rates." 493 F.Supp.3d 1351, 1355 (Ct. Int'l Trade 2021). Thus, this Court required that Commerce base such a determination on evidence of prior rates calculated for the selected and non-selected respondents when that evidence was presented to the agency.

In setting the non-selected companies' rate, Commerce must consider evidence on the record of historical rates irrespective of whether Commerce sets a higher rate, as in *Bosun*, or a lower rate, as here. Here, there is no such upward trend in rates. As the Defendant noted, Antique's 323.12 percent rate is the only AFA rate in the history of this proceeding. Def. Br. at 45. And other than that AFA rate, dumping margins are—and have been—trending downward. In the most recent *Final Results*, covering the subsequent POR of June 1, 2021 through May 31, 2022, all mandatory respondents and non-selected companies received a 0.00 percent weighted average dumping margin. *See Certain Quartz Surface Products From India: Final Results of Antidumping Duty Administrative Review, and Final Determination of No Shipments; 2021– 2022*, 88 Fed. Reg. 80,689 (Dep't Commerce Nov. 20, 2023). By the same "market trend" analysis endorsed in *Bosun*, the "economic reality" of the non-selected companies' "potential dumping" during the POR is inconsistent with such a high dumping margin as the 161.56 percent rate for which Cambria advocates.

Finally, Commerce's decision was not inconsistent with its prior practice, as Cambria asserts. *See* Cambria Br. at 28-29. Commerce has long held that "a 'reasonable method' to use when the margins of selected mandatory respondents are zero or *de minimis* is to assign non-

selected respondents the average of the most recently determined margins that are not zero, *de minimis*, or based entirely on facts available (*which may be from a prior review or a new shipper review or the investigation*)."[4]  *Certain Lined Paper Products IDM* at 14 (emphasis added).

For instance, in *Steel Nails from Oman*, a closely analogous case, Commerce pulled forward the all-others rate from the investigation.  There, like here, Commerce found that, because a 154.33 percent rate for the review's sole mandatory respondent was "based entirely on facts available with an adverse inference, and because all of the individually calculated rates and the all-others rate from the several recently preceding administrative reviews in this proceeding {were} significantly lower than 154.33 percent, . . . applying this rate to the companies not individually examined would not be reasonably reflective of {their} potential dumping margins during the POR."  *Certain Steel Nails From the Sultanate of Oman: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020–2021*, 87 Fed. Reg. 43,240 (Dep't Commerce July 20, 2022) and accompanying Preliminary Decision Memorandum at 13 (unchanged in *Final Results*).

While Commerce may have "declined to depart from the expected method" in "numerous prior cases," Cambria Br. at 28, this does not mean that circumstances do not require a departure in this instance, as determined by Commerce's reasonable discretion.  As the cases described above demonstrate, Commerce regularly departs from the expected method when it determines that averaging *de minimis* or AFA rates would render the non-selected companies' rate inaccurate and when it has information on the record showing that a rate for cooperative respondents in a prior review would be more "reflective of the range of commercial behavior

---

[4] The CAFC has affirmed that the statutory methods for determining the non-selected companies' rate apply equally to administrative reviews and investigations.  *See Albemarle Corp.*, 821 F.3d at 1352-53.

demonstrated by exporters of the subject merchandise during a very recent period." *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 73 Fed. Reg. 52,273 (Dep't Commerce Sept. 9, 2008) and accompanying Issues and Decision Memorandum at 19.

### C. A Simple Average Including Antique's AFA Rate Would Be Inequitable By Applying An Adverse Inference to Cooperative Parties.

The use of AFA rates is governed by the dual principles of calculating accurate rates and fostering respondents' cooperation. As the CAFC explained in *Rhone Poulenc, Inc. v. United States*, "the basic purpose" of the AFA statute is to determine dumping margins "as accurately as possible," and to "induce{} importers to comply with agency questionnaires." 899 F.2d 1185, 1191 (Fed. Cir. 1990). Thus, the AFA statute does not permit punitive rates as a matter of course. *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F. 3d 1027, 1032 (Fed. Cir. 2000) ("{T}he purpose of the {AFA statute} is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."). Penalizing non-selected producers for the alleged failures of selected respondents does not advance that objective.

In this case, using Antique's AFA rate in calculating the non-selected companies' rate would be unreasonable and inequitable. This Court has admonished that the AFA statute should not be used to "punish companies, but rather to calculate accurate rates." *Bio-Lab, Inc. v. United States*, 435 F. Supp. 3d 1361, 1374 (Ct. Int'l Trade 2020) (citing *F.lli De Cecco*, 216 F. 3d at 1032). A rate for non-selected companies that is derived in large part from the highest rate alleged in the petition is hardly accurate as applied to companies that were not individually examined. These non-selected companies should not be penalized with a rate that is inflated by Antique's alleged failure to cooperate in Commerce's administrative review.

The use of Antique's AFA rate in calculating the non-selected companies' rate would be particularly inequitable to the non-selected companies given the circumstances in which that rate was assigned.  Commerce only assigned Antique an AFA rate because Antique, an otherwise cooperative, *pro se* respondent,[5] was a mere five hours late in submitting its supplemental questionnaire response to Commerce's deficiency questionnaire.  *See* P.R. 346 at 33.  Commerce itself acknowledged that the 10:00 a.m. deadline it set for Antique's response was "unanticipated" and "not the routine deadline time," given that Commerce rarely deviates from its standard 5:00 p.m. filing deadline.  *See* C.R. 250 at 4.

---

[5] Antique notes in its June 30, 2023 Motion for Judgement on the Agency Record, ECF No. 52 ("Antique Br.") that, at the time of filing its responses to Commerce, it was not represented by a U.S. law firm and "was an inexperienced *pro se* respondent."

VI.     **CONCLUSION AND RELIEF REQUESTED**

For the foregoing reasons, the Federation respectfully requests that this Court reject

Cambria's baseless arguments and find that the *Final Results* are based on substantial evidence

and otherwise in accordance with law.

Respectfully submitted,

**MORRIS MANNING & MARTIN LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4819

*/s/* Julie C. Mendoza
Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Ryan R. Migeed

Dated: December 11, 2023                    *Counsel to Federation of Indian*
                                            *Quartz Surface Industry*

19

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 5,127 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

/s/ Julie C. Mendoza

Julie C. Mendoza

Dated:  December 11, 2023