Slip Op. 24-62

## UNITED STATES COURT OF INTERNATIONAL TRADE

CAMBRIA COMPANY LLC,
     Plaintiff,

     and

ANTIQUE MARBONITE PRIVATE LIMITED;
PRISM JOHNSON LIMITED; SHIVAM
ENTERPRISES; ARIZONA TILE, LLC; M S
INTERNATIONAL, INC.; AND PNS
CLEARANCE LLC,
     Consolidated-Plaintiffs,

     v.

UNITED STATES,
     Defendant,

     and

APB TRADING, LLC; ARIZONA TILE LLC;
COSMOS GRANITE (SOUTH EAST) LLC;
COSMOS GRANITE (SOUTH WEST) LLC;
COSMOS GRANITE (WEST) LLC; CURAVA
CORPORATION; DIVYASHAKTI GRANITES
LIMITED; DIVYASHAKTI LIMITED;
FEDERATION OF INDIAN QUARTZ
SURFACE INDUSTRY; M S
INTERNATIONAL, INC.; MARUDHAR
ROCKS INTERNATIONAL PVT LTD.;
OVERSEAS MANUFACTURING AND
SUPPLY INC.; QUARTZKRAFT LLP; AND
STRATUS SURFACES LLC,
     Defendant-Intervenors.

Before: Mark A. Barnett, Chief Judge
Consol. Court No. 23-00007

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's final results in the 2019–2021
administrative review of the antidumping duty order on certain quartz surface products
from India.]

Consol. Court No. 23-00007                                                      Page 2

Dated: May 28, 2024

Luke A. Meisner, Schagrin Associates, of Washington DC, argued for Plaintiff Cambria Company LLC.  Also on the brief was Roger B. Schagrin.

Jonathan T. Stoel and Jared Wessel, Hogan Lovells US LLP, of Washington, DC, argued for Consolidated Plaintiffs Arizona Title, LLC, M S International, Inc., and PNS Clearance LLC.  Also on the brief were Nicholas R. Sparks and Cayla D. Ebert.

Sezi Erdin, Trade Pacific PLLC, of Washington, DC, argued for Consolidated Plaintiffs Antique Marbonite Private Limited, Prism Johnson Limited, and Shivam Enterprises. Also on the brief were Robert G. Gosselink and Aqmar Rahman.

Collin T. Mathias, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States.  Also on the brief were Joshua E. Kurland, Senior Trial Counsel, Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Franklin E. White, Jr., Assistant Director.  Of counsel on the brief were Vania Wang, Senior Attorney, and Joseph Grossman, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

R. Will Planert, Julie C. Mendoza, Donald B. Cameron, Brady W. Mills, Mary S. Hodgins, Eugene Degnan, Jordan L. Fleischer, Nicholas C. Duffey, and Ryan R. Migeed, Morris Manning & Martin LLP, of Washington, DC, for Defendant-Intervenor Federation of Indian Quartz Surface Industry.

David John Craven, Craven Trade Law LLC, of Chicago, IL, for Defendant-Intervenor APB Trading, LLC, *et al.*

      Barnett, Chief Judge:  This consolidated action is before the court following the filing of motions for judgment on the agency record pursuant to U.S. Court of International Trade Rule 56.2 challenging the final results of the U.S. Department of Commerce's ("Commerce" or "the agency") first administrative review of the antidumping duty order covering quartz surface products from India for the period of review ("POR") December 13, 2019, through May 31, 2021.  *See Certain Quartz Surface Prods. From India*, 88 Fed. Reg. 1,188 (Dep't Commerce Jan. 9, 2023) (final

results of antidumping duty admin. rev.; 2019–2021) ("*Final Results*"), ECF No. 41-4,

and accompanying Issues and Decision Mem., A-533-889 (Dec. 30, 2022) ("I&D

Mem."), ECF No. 41-5.[1]

      Parties present three sets of challenges to the *Final Results*, listed in the order in

which they are addressed.  First, Consolidated Plaintiffs Antique Marbonite Private

Limited, Prism Johnson Limited, and Shivam Enterprises (collectively, "Antique Group"),

foreign producers and exporters of subject merchandise and mandatory respondents in

the administrative proceeding, challenge Commerce's rejection of its second

supplemental questionnaire response and denial of subsequent requests for permission

to refile that response.  *See* Mem. in Supp of the Mot. of [Antique Grp.] for J. on the

Agency R. ("Antique Grp.'s Mem."), ECF No. 52; Reply Br. of [Antique Grp.], ECF No.

83.  Second, Consolidated Plaintiffs Arizona Tile, LLC, M S International, Inc., and PNS

Clearance LLC (collectively, "Arizona Tile"), U.S. importers of subject merchandise,

challenge Commerce's rejection of Antique Group's second supplemental questionnaire

response, the agency's application of total adverse facts available ("AFA") to Antique

Group and the resulting antidumping duty rate, and Commerce's decision not to apply

an export subsidy offset to the rate assigned to Indian exporters not selected for

individual review.  *See* Confid. Mem. of P. & A. in Supp. of Rule 56.2 Mot. for J. on the

---

[1] The amended administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 47-3, and a Confidential Administrative Record ("CR"), ECF No. 47-2.  Parties submitted joint appendices containing record documents cited in their briefs. *See* Confid. J.A. ("CJA"), ECF No. 88; Public J.A., ECF No. 89.  The court references the confidential version of the relevant record documents, unless otherwise specified.

Agency R. of Consol. Pls. [Arizona Tile] ("Arizona Tile's Mem."), ECF No. 53; Confid.

Reply of Consol. Pls. [Arizona Tile], ECF No. 86.  Third, Plaintiff Cambria Company LLC

("Cambria"), a domestic producer of subject merchandise, challenges Commerce's

decision to assign the all-others rate from the original investigation to the non-selected

respondents in the administrative review.  *See* Confid. Pl.'s Mem. in Supp. of its Mot. for

J. on the Agency R. ("Cambria's Mem."), ECF No. 55; Confid. Pl.'s Reply Br. in Supp. of

its Mot. for J. on the Agency R., ECF No. 84.

Defendant United States ("the Government") defends the *Final Results*.  *See*

Confid. Def.'s Resp. to Pls.' Mots. for J. upon the Agency R. ("Def.'s Resp."), ECF No.

67.  Cambria, appearing as a defendant-intervenor in the member actions, filed a

response to both Antique Group and Arizona Tile's motions.  *See* Cambria Co.'s Resp.

to Consol. Pls.' Mot. for J. on the Agency R. ("Cambria's Resp."), ECF No. 73.  In their

respective positions as defendant-intervenors in the lead case, Arizona Tile and the

Federation of Indian Quartz Surface Industry ("Federation"), an association of Indian

producers and exporters of subject merchandise, each filed a response to Cambria's

motion.  *See* Confid. Def.-Ints.' [Arizona Tile's] Resp. to Pl.'s Mot. for J. upon the

Agency R. ("Arizona Tile's Resp."), ECF No. 74; Def.-Int.'s Resp. to Pl.'s Mot. for J. on

the Agency R. ("Federation's Resp."), ECF No. 72.[2]

---

[2] ABP Trading, LLC, *et al.*, appeared as a defendant-intervenor in the lead action but
did not file substantive briefs.

Consol. Court No. 23-00007                                                      Page 5

In June 2020, Commerce issued an order imposing antidumping duties on

certain quartz surface products from India.  *See Certain Quartz Surface Prods. From*

*India and Turkey*, 85 Fed. Reg. 37,422 (Dep't Commerce June 22, 2020) (antidumping

duty orders) ("*Order*").  In August 2021, Commerce initiated the first administrative

review of that order.  *Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 86

Fed. Reg. 41,821, 41,823 (Dep't Commerce Aug. 3, 2021), PR 22, CJA Tab 3.

Commerce initially selected Antique Group[3] and Pokarna Engineered Stone Limited

("Pokarna") as mandatory respondents.  *See* Resp't Selection (Sept. 28, 2021) ("Resp't

Selection Mem.") at 1, PR 53, CR 13, CJA Tab 8.  Antique Group timely responded to

Commerce's initial and first supplemental questionnaires.  *See* Submission of Section-A

Initial Questionnaire Resp. (Nov. 3, 2021), PR 79–87, CR 21–35, CJA Tab 13;

Submission of Section-B Initial Questionnaire Resp. (Dec. 9, 2021), PR 95, CR 36–41,

CJA Tab 14; Submission of Section-C Initial Questionnaire Resp. (Dec. 9, 2021), PR

96, CR 42–54, CJA Tab 15[4]; Submission of Section-D Initial Questionnaire Resp. (Dec.

9, 2021), PR 97, CR 55–62, CJA Tab 17; Submission of Resp. to First Suppl.

Questionnaire (Section A and B) (Apr. 15, 2022), PR 189–92, CR 206–15, CJA Tab 23.

On April 20, 2022, Commerce issued Antique Group a second supplemental

---

[3] As stated above, Antique Group consists of three parties, but Commerce found those
three parties constituted a single entity.  I&D Mem. at 1 n.2.
[4] This document was later refiled, within the provided timelines, for business proprietary
treatment.  *See* Filing of Corrected Version of Submission of Section-C Initial
Questionnaire Resp. (Dec. 23, 2021), CR 180–92, CJA Tab 16.

questionnaire.  Second Suppl. Questionnaire (Apr. 20, 2022), PR 197, CR 216, CJA

Tab 24.

On April 30, 2022, Antique Group requested an extension of time to file its

second supplemental questionnaire response; Commerce granted that extension in

part, setting a deadline of May 11, 2022, at 5 p.m.  *See* Extension Req. to Submit Resp.

to Second Suppl. Questionnaire (Section A, C and D) (Apr. 30, 2022), PR 198, CJA Tab

25; First Extension of Time for Antique Grp.'s Second Suppl. Questionnaire Resp. (May

2, 2022), PR 199, CJA Tab 26.  On May 7, 2022, Antique Group requested a second

extension of time, which Commerce granted in part, setting a deadline of May 16, 2022,

this time at 10 a.m.  *See* 2nd Extension Req. to Submit Resp. to Second Suppl.

Questionnaire (Section A, C and D) (May 7, 2022), PR 200, CJA Tab 27; Second

Extension of Time for Antique Grp.'s Second Suppl. Questionnaire Resp. (May 9, 2022),

PR 201, CJA Tab 28.  On the due date, May 16, 2022, Antique Group submitted its

second supplemental questionnaire response between 2:55 p.m. and 3:45 p.m.  *See*

Antique Grp.'s Resp. to Commerce's Second Suppl. Questionnaire (May 16, 2022)

(Rejected Filing), PR 202, CR 217, CJA Tab 29; Rejection of Second Suppl.

Questionnaire Resp. (May 18, 2022) ("Rejection of Second Suppl. Resp.") at 1, PR 203,

CJA Tab 30.  Two days later, on May 18, 2022, Commerce rejected Antique Group's

submission as untimely pursuant to 19 C.F.R. § 351.302(d).  *See* Rejection of Second

Suppl. Resp. at 1–2.

Antique Group filed three letters with Commerce requesting the opportunity to

refile its second supplemental questionnaire response, citing both its participation in the

proceeding and the unusual nature of a 10 a.m. deadline.  *See* Req. for Opportunity to

Refile Resp. to Second Suppl. Questionnaire (Section A, C and D) (May 19, 2022)

("Req. to Refile Secs. ACD"), PR 205, CJA Tab 32; Req. for Acceptance of 2nd Suppl.

Questionnaire Resp. (Sec-ACD) Post Deadline (May 24, 2022), PR 208, CR 218, CJA

Tab 35; Req. for Recons. and Req. for Extension to File Out of Time (June 10, 2022),

PR 225, CJA Tab 43.  Commerce rejected Antique Group's requests, noting that

Antique Group did not demonstrate the extraordinary circumstances necessary to grant

an untimely extension request.  *See* Rejection of Second Suppl. Questionnaire Resp.

(May 20, 2022) ("First Denial of Req. to Resubmit"), PR 207, CJA Tab 34; Denial of

Second Req. to Resubmit Second Suppl. Questionnaire Resp. (June 3, 2022) ("Second

Denial of Req. to Resubmit"), PR 216, CJA Tab 40.

      Approximately forty-five days after Antique Group filed its second supplemental

questionnaire response (and Commerce's subsequent rejection of that response),

Commerce published its preliminary results.  *Certain Quartz Surface Prods. From India*,

87 Fed. Reg. 40,786 (Dep't Commerce July 8, 2022) (prelim. results of antidumping

duty admin. rev. and partial rescission of antidumping duty admin. rev.; 2019–2021)

("*Prelim. Results*"), PR 248, CJA Tab 48; *see also* Prelim. Decision Mem., A-533-889

(June 30, 2022) ("Prelim. Mem.), PR 243, CJA Tab 46.  Therein, Commerce calculated

a weighted-average dumping margin of zero percent for Pokarna and preliminarily

assigned Antique Group a dumping margin of 323.12 percent based on total AFA.[5]

*Prelim. Results*, 87 Fed. Reg. at 40,787.  The AFA rate assigned to Antique Group was

the dumping margin alleged in the petition underlying the original investigation.  Prelim.

Mem. at 10–11.  Commerce also preliminarily established a rate of 161.56 percent for

the fifty-one companies not selected for individual examination by averaging the

margins of Pokarna and Antique Group.  *Prelim. Results*, 87 Fed. Reg. at 40,786;

Calculation of the Rate for Resp'ts Not Selected for Individual Examination (June 30,

2022) ("Prelim. Non-Selected Calc. Mem.) at 2, PR 244, CR 229, CJA Tab 47.

      Commerce published the *Final Results* on January 9, 2023, 88 Fed. Reg. at

1,188, and made no change to the total AFA rate assigned to Antique Group, I&D Mem.

at 40.  In a change from the *Preliminary Results*, Commerce assigned a rate of 3.19

percent to the non-selected companies based on the non-selected respondent rate from

the investigation.  *Id.* at 55.  Commerce explained that, upon review of "the history of

rates for this *Order*," the agency concluded that the non-selected respondent rate

assigned in the *Preliminary Results* was "not reasonably reflective of the non-selected

companies' potential dumping margins during the POR."  *Id.* at 54.

---

[5] "The phrase 'total adverse [facts available]' or 'total AFA' encompasses a series of steps that Commerce takes to reach the conclusion that all of a party's reported information is unreliable or unusable and that as a result of a party's failure to cooperate to the best of its ability, it must use an adverse inference in selecting among the facts otherwise available."  *Deacero S.A.P.I. de C.V. v. United States*, 42 CIT __, __, 353 F. Supp. 3d 1303, 1305 n.2 (2018).

Consol. Court No. 23-00007                                                              Page 9

This appeal followed.  The court consolidated various challenges to the *Final Results* into this lead case.  *See* Order (Mar. 17, 2023), ECF No. 40.  The court heard oral argument on March 19, 2024.[6]  *See* Docket Entry, ECF No. 98.

### JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[7] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence on the record and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is defined as "more than a mere scintilla," as well as evidence that "a reasonable mind might accept as adequate to support a conclusion."  *See Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

### DISCUSSION

**I.    Commerce's Rejection of Antique Group's Second Supplemental Questionnaire**

**A.  Legal Framework**

Commerce's regulations establish a default standard for the time of day by which a submission must be received on the due date, noting, "[i]n general," that "[a]n electronically filed document must be received successfully in its entirety . . . by 5 p.m.

---

[6] Subsequent citations to the oral argument include the time stamp from the recording, which is available at https://www.cit.uscourts.gov/sites/cit/files/20240319-23-00007-MAB.mp3.
[7] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless otherwise specified.

Eastern Time on the due date." 19 C.F.R. § 351.303(b)(1).[8]  Commerce's regulations

permit the agency to extend any deadline upon a showing of good cause. *Id.*

§ 351.302(b).

  Parties may file untimely extension requests, which Commerce may grant

provided the moving "party demonstrates that an extraordinary circumstance exists." *Id.*

§ 351.302(c).  An extraordinary circumstance is defined as "an unexpected event" that

"[c]ould not have been prevented if reasonable measures had been taken, and . . .

[p]recludes a party or its representative from timely filing an extension request through

all reasonable means." *Id*. § 351.302(c)(2)(i)–(ii).  These standards notwithstanding, a

deadline-setting regulation that "is not required by statute may, in appropriate

circumstances, be waived and must be waived where failure to do so would amount to

an abuse of discretion." *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207 (Fed.

Cir. 1995).

## B. Discussion

  Antique Group and Arizona Tile argue that Commerce abused its discretion and

acted in an arbitrary and capricious manner in rejecting Antique Group's second

supplemental questionnaire response.  *See* Antique Grp.'s Mem. at 13–27; Arizona

---

[8] A review of the history of section 351.303(b) shows that Commerce first promulgated the default standard of 5 p.m. in July 2011.  *See Antidumping and Countervailing Duty Proceedings*, 76 Fed. Reg. 39,263, 39,275 (Dep't Commerce July 6, 2011) (electronic filing procedures; admin. protective order procedures).  Commerce established this standard to create an equivalence between when its records room closed for receiving paper submissions and when electronic filings would be due. *Id.* at 39,264–65.  As indicated by the regulation currently in effect, Commerce has not changed the default standard.  *See* 19 C.F.R. § 351.303(b) (2023).

Tile's Mem. at 16–34.  The Government and Cambria respond that Commerce properly

exercised its discretion in setting a 10 a.m. deadline, and Antique Group did not

demonstrate the extraordinary circumstances necessary for Commerce to accept its

submission out of time.  *See* Def.'s Resp. at 13–30; Cambria's Resp. at 11–20.

Commerce is "free to fashion [its] own rules of procedure and to pursue methods

of inquiry capable of permitting [it] to discharge [its] multitudinous duties."  *Vt. Yankee*

*Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (citation

omitted).  To that end, "Commerce has broad discretion to establish its own rules

governing administrative procedures, including the establishment and enforcement of

time limits."  *Yantai Timken Co. v. United States*, 31 CIT 1741, 1755, 521 F. Supp. 2d

1356, 1370 (2007) (citation omitted).  As relevant here, this means that Commerce has

discretion to depart from its regulation establishing a default deadline of 5 p.m. to

instead set a 10 a.m. deadline.

Commerce, however, must have a reasonable basis for such a departure,

particularly when, as here, Commerce's decision to advance the deadline to 10 a.m.

resulted in the rejection of Antique Group's submission that, if not for the departure from

the 5 p.m. deadline, would have been timely.  Therefore, the court considers

Commerce's departure in assessing whether its rejection of the submission was

reasonable.  Upon review of the record, Commerce's decision to reject Antique Group's

submission was unreasonable and unsupported by substantial evidence, constituting an

abuse of discretion.

Regardless of whether the departure from the 5 p.m. deadline is an extraordinary circumstance of Commerce's own making,[9] Commerce "must" waive its extraordinary circumstance standard when "failure to do so would amount to an abuse of discretion." *NTN Bearing*, 74 F.3d at 1207.  "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors."  *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citation omitted).  In this case, Commerce abused its discretion.

As discussed above, Antique Group submitted its response five hours after the changed deadline, approximately two hours *before* the standard deadline, and forty-five days before the *Preliminary Results*.  No party questions that this untimely submission was inadvertent.  *See, e.g.,* Def.'s Resp. at 13 (noting Commerce's finding that an oversight is not an extraordinary circumstance).  In declining to accept this late submission, Commerce explained generally that "untimely extension requests hinder the efficient and timely conduct of [the agency's] proceedings," First Denial of Req. to Resubmit at 2, but failed to engage with the specific facts of *this* case, which involved an atypical deadline and a five-hour delay, but otherwise resulted in the submission being received within business hours on the date upon which it was due.[10]  Commerce

---

[9] Commerce admits the lack of uniformity present here, by noting that departures from the 5 p.m. deadline are "not utilized regularly," I&D Mem. at 17, and that "10 a.m. is not the routine deadline time," Second Denial of Req. to Resubmit at 3.

[10] The Government and Cambria reference *Bebitz Flanges Works Private Ltd. v. United States*, 44 CIT __, 433 F. Supp. 3d 1297 (2020), as an example of this court affirming

failed to weigh the relevant facts, resulting in a decision that is unreasonable and unsupported by the evidence.  *See Consol. Bearings Co.*, 412 F.3d at 1269.

The Government's arguments to the contrary are unpersuasive.  At oral argument, the Government averred only that Commerce is free to set its own deadlines pursuant to section 351.302, Commerce's regulation regarding the extension of time limits.  Oral Arg. 6:30–8:00.  The Government argues that section 351.302 operates independently of section 351.303(b) and provides no limitations on Commerce's ability to set deadlines in granting extension requests.  *Id.* 8:00–10:05.  These arguments are misplaced.

Section 351.302(b) and section 351.303(b) can, and should, be read together. Section 351.302(b) states that "the Secretary may, for good cause, extend any time limit established by this part," but it does not affect the time of day that submission must be received.  Section 351.303(b) provides 5 p.m. as the default time of day even when the agency has extended the due date for a submission.  In fact, at oral argument, the Government conceded that when Commerce extends a deadline and fails to provide a specific time of day in its extension, the default time that a party must provide its submission is 5 p.m., as provided by section 351.303(b).  Oral Arg. 10:05–10:50.  Thus, the Government has failed to justify its position that section 351.302(b) supersedes the

---

Commerce's rejection of a response made less than two hours after the deadline.  *See* Def.'s Resp. at 27; Cambria's Resp. at 16.  *Bebitz Flanges Works* is easily distinguishable because the respondent there demonstrated a pattern of non-cooperation, evidenced by the filing of four extension requests and multiple warnings from Commerce.  *See id*. at 1302.

Consol. Court No. 23-00007                                                    Page 14

default time deadline in section 351.303(b) such that Commerce's departure from the

5 p.m. deadline here was supported by substantial evidence solely by reason of the

extension.

The Government also avers that "Commerce has set a 10 a.m. deadline more

than ten times . . . in the first five months of 2022 across various Enforcement and

Compliance offices."  Def.'s Resp. at 15.  However, a mere factual statement by the

Government of the number of times Commerce departed from its regulation is

insufficient explanation to support Commerce's departure in this case.[11]  While

Commerce has discretion to depart from its default deadline, the agency failed to

explain why it was necessary to depart in this case such that its corresponding rejection

of Antique Group's submission was reasonable.[12]

In reaching this conclusion, the court declines to consider the parties' contentions

regarding *Oman Fasteners, LLC v. United States*, Slip Op. 23-17, 2023 WL 2233642

(CIT Feb. 15, 2023), and Commerce's alleged practice of permitting untimely

submissions discussed therein.  That case is currently on appeal and is not dispositive

---

[11] The Government's reference to multiple 10 a.m. deadlines set across Commerce's
trade enforcement offices also is not persuasive.  Based on the number of orders it
administers, Commerce likely sets hundreds or even thousands of deadlines each year,
the vast majority of which adhere to the 5 p.m. deadline prescribed in section
351.303(b).  Thus, the limited use of a 10 a.m. deadline is insufficient to justify such a
deadline here.

[12] In fact, the Government offered no reason for Commerce to have adopted a 10 a.m.
deadline in this instance.  Commerce might well be within its discretion to enforce
strictly a 10 a.m. deadline if, for example, it established that agency officials needed the
requested information for verification and were expecting to depart later that day to
commence the verification.

as to whether Commerce reasonably rejected Antique Group's submission in this case.[13]

In sum, Commerce abused its discretion by rejecting Antique Group's second supplemental questionnaire response. On remand, Commerce must accept and consider the information contained within that submission.

## II.    Commerce's Application of AFA to Antique Group

The court's conclusion that Commerce abused its discretion in rejecting Antique Group's submission necessarily impugns the agency's basis for finding that Antique Group failed to act to the best of its ability and thus its decision to rely on the application of total adverse facts available. Even if the court had sustained Commerce's rejection of the submission, the court would—and does—nevertheless find that Commerce's determination that Antique Group failed to act to the best of its ability lacks substantial evidence.

### A.  Legal Background

When "necessary information is not available on the record," or an interested party "withholds information" requested by Commerce, "fails to provide" requested

---

[13] The Government and Cambria also rely upon *Dongtai Peak Honey Industry Co. v. United States*, 777 F.3d 1343 (Fed. Cir. 2015), to support the notion that agencies should be free to fashion their own rules of procedure. *See* Def.'s Resp. at 23; Cambria's Resp. at 12. Therein, a respondent received warnings from Commerce in response to extension requests filed six minutes before the submission deadline. *See Dongtai Peak*, 777 F.3d at 1346–47. Rather than heed Commerce's warnings, later in that proceeding the respondent failed to submit a supplemental questionnaire response within Commerce's stated deadline, and instead filed an untimely extension request two days after the deadline. *Id.* at 1347. The facts of this case distinguish it from *Dongtai Peak*.

information by the submission deadline, "significantly impedes a proceeding," or

provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i),

Commerce "shall . . . use the facts otherwise available."  19 U.S.C. § 1677e(a).  Once

Commerce determines that the use of facts otherwise available is warranted, if

Commerce also "finds that an interested party has failed to cooperate by not acting to

the best of its ability to comply with a request for information," Commerce "may use an

inference that is adverse to the interests of that party in selecting from among the facts

otherwise available."  *Id.* § 1677e(b).  "Compliance with the 'best of its ability' standard

is determined by assessing whether respondent has put forth its maximum effort to

provide Commerce with full and complete answers to all inquiries in an investigation."

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

### B.  Discussion

Antique Group argues that Commerce construed "best of its ability" to mean

perfection, as evidenced by the application of total AFA in response to what Antique

Group characterizes as an inadvertent calendaring error.  Antique Grp.'s Mem. at 28–

30.  In response, the Government argues that the application of AFA is justified because

Antique Group did not act to the best of its ability in timely responding to Commerce's

second supplemental questionnaire, which the agency needed to calculate an accurate

dumping margin.  Def.'s Resp. at 32–34.

Commerce's determination that Antique Group failed to act to the best of its

ability is unsupported by substantial evidence.  First, Antique Group had complied with

all prior deadlines throughout the course of Commerce's review.  Second, as noted

above, no party argues that Antique Group's failure to meet the 10 a.m. deadline was anything more than a calendaring error and, but for Commerce's arbitrary setting of the 10 a.m. deadline, Antique Group's response would have been timely.  Third, Antique Group explained to Commerce that it had established remedial measures to prevent future late filings including: instructing its paralegal team to adopt new practices relating to calendaring and internal communication, and retaining U.S.-based counsel to monitor deadlines and assist with future submissions.  *See* Req. to Refile Secs. ACD at 3.  This evidence, without more, does not support a finding that Antique Group failed to act to the best of its ability.  A single late response is not determinative that a respondent has not acted to the "best of its ability" to cooperate because "mistakes sometimes occur." *Nippon Steel Corp*., 337 F.3d at 1382.

In light of the court's finding that Commerce unreasonably rejected Antique Group's second supplemental questionnaire response, and because Commerce otherwise failed to support its decision to apply total AFA, that decision must be remanded for reconsideration by Commerce, consistent with the agency's statute, regulations, and practices.

III.    **Commerce's Corroboration of the AFA Rate Applied to Antique Group**

In the interest of judicial economy, the court addresses the merits of Commerce's corroboration of the AFA rate applied to Antique Group in case, upon analysis of Antique Group's second supplemental questionnaire response, Commerce continues to find the use of total AFA warranted on some other basis.

## A. Legal Framework

Commerce is statutorily obligated to corroborate the AFA rate pursuant to 19 U.S.C. § 1677e(c).  When using an adverse inference to select from among the facts otherwise available, Commerce may rely "on information derived from—(A) the petition, (B) a final determination in the investigation . . . , (C) any previous [administrative] review . . . , or (D) any other information placed on the record."  19 U.S.C. §1677e(b)(2).  "When Commerce 'relies on secondary information rather than on information obtained in the course of an investigation or review,' it 'shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal.'"  *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1299 (Fed. Cir. 2021) (alteration in original) (quoting 19 U.S.C. § 1677e(c).

Corroboration does not require Commerce to estimate what Antique Group's dumping margin would have been if Commerce had considered Antique Group to have cooperated or demonstrate that the dumping margin used by the agency reflects the alleged commercial reality of Antique Group.  *See* 19 U.S.C. § 1677e(d)(3).  Instead, "corroborating information means determining that [the information] 'has probative value.'"  *Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1380 (Fed. Cir. 2016) (quoting the Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 870 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040,

4199 ("SAA")).[14]  Commerce evaluates the probative value of information by "demonstrating the rate is both reliable and relevant."  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1354 (Fed. Cir. 2015).

**B.  Discussion**

In selecting an AFA rate for Antique Group, Commerce selected the highest dumping margin alleged in the petition, 323.12 percent.  I&D Mem. at 41–42.  Commerce explained that it corroborated the petition rate using certain transaction-specific margins from Pokarna's margin calculation.  *Id.* at 42.  Arizona Tile argues that Commerce failed to corroborate properly the AFA rate because it compared that rate to the dumping margins for certain of Pokarna's transactions, when, according to Arizona Tile, those transactions were of a distinct nature[15] that was not representative of Antique Group's sales.  Arizona Tile's Mem. at 36–38.  The Government and Cambria argue that Commerce corroborated the AFA rate by comparing the dumping margin of 323.12 percent alleged in the petition to individual dumping margins preliminarily calculated for Pokarna and found the rate to be within range of those individual dumping margins.  Def.'s Resp. at 35–36; Cambria's Resp. at 22–24.

---

[14] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements."  19 U.S.C. § 3512(d).

[15] At oral argument, the Government agreed with Arizona Tile's description of the distinct nature of the sales relied upon by Commerce (without conceding that the distinct nature rendered them inappropriate for purposes of corroboration).  Oral Arg. 1:41:15–1:41:45.  The distinct nature is business proprietary information, so the court does not further address the nature of the sales.

The record establishes that Commerce's decision to corroborate the petition margin using transaction-specific margins, when those transactions all shared a distinct feature, is not supported by substantial evidence. Transaction-specific margins may have probative value when the rate selected as AFA falls within a range of those transaction-specific margins. *See Deacero*, 996 F.3d at 1300 (sustaining Commerce's determination that the highest rate alleged in the petition was relevant when it was in the range of transaction-specific margins calculated in the immediately preceding administrative review); *Papierfabrik*, 843 F.3d at 1381 (sustaining Commerce's determination that the selected rate "fell within the range of transaction-specific margins calculated in [the second administrative review]" (alteration in original) (citation omitted)). Here, however, the Pokarna transactions Commerce used to corroborate Antique Group's AFA rate were not demonstrably relevant. Commerce used Pokarna sales with the certain sales characteristic that distinguished them from Pokarna's normal sales transactions. While Commerce is under no obligation to ensure that the corroborating sales, or the rate being corroborated, reflect Antique Group's commercial reality, the distinct characteristic of these sales indicates that they are not relevant for purposes of corroboration.

Because the court finds that Commerce failed to properly corroborate the petition rate, the court need not reach Arizona Tile's arguments that the selected petition rate was unduly punitive. If, upon remand, Commerce finds that the use of total AFA remains appropriate for Antique Group, it must select and, if necessary, corroborate any such rate consistent with this opinion and the statute.

IV.    **Commerce's Departure from the Expected Method in Calculating the Non-Selected Company Rate**

A.  **Legal Background**

In determining the rate for companies not selected for individual examination in an administrative review, Commerce looks to 19 U.S.C. § 1673d(c)(5) for guidance. *See, e.g.*, *Albemarle Corp. v. United States*, 821 F.3d 1345, 1351–52 (Fed. Cir. 2016). Section 1673d(c)(5)(A) provides that the non-selected company rate is the "weighted average of the estimated weighted average dumping margins" determined for individually examined companies, "excluding any zero and *de minimis* margins, and any margins determined entirely" on the basis of the facts available.  19 U.S.C. § 1673d(c)(5)(A).

When the dumping margins assigned to all individually examined companies are zero, *de minimis*, or based on facts available, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated."  *Id.* § 1673d(c)(5)(B).  The SAA provides that the "expected method" to determine the non-selected company rate in these situations "will be to weight-average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available."  SAA at 873*, as reprinted in* 1994 U.S.C.C.A.N. at 4201.  The SAA further provides that "if this [expected] method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods."  *Id.*  The expected method is the default method, and

the burden of proof lies with the party seeking to depart from the expected method.  *See*

*Albemarle*, 821 F.3d at 1353.  Put another way, when Commerce seeks to depart from

the expected method, as it did here, "Commerce must find based on substantial

evidence that there is a reasonable basis for concluding that the separate respondents'

dumping is different."  *Id*.

   In *Albemarle*, where respondents were both found to have *de minimis* margins,

instead of weight-averaging those results (as "expected"), Commerce decided to "carry

forward" the results of the prior administrative review to determine the rate for non-

selected respondents.  *Id.*  In reviewing that determination, the Federal Circuit outlined

"at least two circumstances" in which Commerce may depart from the expected method

to carry forward a rate from a prior period.  *Id.* at 1357.  As relevant here, departure may

be reasonable if Commerce establishes that the market and margins relevant to the

subject merchandise has not changed.  *Id.*  "There is no basis to simply assume that the

underlying facts or calculated dumping margins remain the same from period to period."

*Id*. at 1356.

   **B. Factual Background**

   For the *Preliminary Results*, Commerce applied the expected method by

averaging the margins of Pokarna and Antique Group, and the agency assigned a

preliminary rate of 161.56 percent to the non-selected companies.[16]  *Prelim. Results*, 87

---

[16] Although Commerce stated that it weight-averaged the two dumping margins, *Prelim. Results*, 87 Fed. Reg. at 40,787, Commerce elsewhere explained that it used a simple average, rather than a weighted average, Prelim. Non-Selected Calc. Mem. at 1.

Fed. Reg. at 40,787; *see also* Prelim. Non-Selected Calc. Mem.at 2.  For the *Final Results*, Commerce departed from the expected method by carrying forward the 3.19 percent non-selected companies' rate from the original investigation for the non-selected companies in this review.  I&D Mem. at 54–55.  Commerce stated that, "based on the history of rates for this *Order*, . . . the [rate from the *Preliminary Results*] is not reasonably reflective of the non-selected companies' potential dumping margins during the POR."  *Id.* at 54.

### C.  Discussion

Cambria argues that Commerce's review of the history of rates under the *Order* did not justify its departure from the expected method.[17]  *See* Cambria's Mem. at 13–20. The Government, Federation, and Arizona Tile each respond that Commerce's review of the history of the rates supports its determination that 161.56 percent was not reasonably reflective of the non-selected companies' potential dumping margins during

---

Commerce could not weight-average the two dumping margins because to do so would reveal, at least between the two respondents, their proprietary import quantities.  *Id.* Therefore, Commerce followed its practice of using the simple average, which it considered a "proxy" for the weighted average.  *Id.* at 1, 3.

[17] Cambria also argues that Commerce ignored evidence that the average unit values of the respondents supported the preliminary non-selected respondents' rate and that Commerce erred by not considering alternative methods to calculate that rate.  *See* Cambria's Mem. at 24–25, 34–36.  The Government counters that Cambria's additional arguments either fail on the merits or were not exhausted.  *See* Def.'s Resp. at 43–44, 46–48.  Because the court agrees with Cambria that Commerce has not supported with substantial evidence its departure from the expected method, the court does not reach these additional arguments.  On remand, parties will have the opportunity to fully raise these issues to the extent they remain relevant, and Commerce will have the opportunity to respond as appropriate.

the POR.  Def.'s Resp. at 40–41; Federation's Resp. at 14–17; Arizona Tile's Resp. at 18–20.

Here, Commerce failed to support its departure from the expected method and use of a prior margin.  Commerce asserted that while its "preference continues to be that [it] will use contemporaneous information where possible, in this instance, the expected method is not reasonably reflective of the potential dumping margins of the non-selected companies."  I&D Mem. at 55.  However, in merely referring to "the history of rates,"[18] Commerce "simply assume[d] that the underlying facts or calculated dumping margins remain[ed] the same from period to period," *Albemarle*, 821 F.3d at 1356, such that the expected method was not reasonably reflective of the dumping margin.  But that assumption does not amount to substantial evidence.  *See OSI Pharm., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("'Mere speculation' is not substantial evidence." (citation omitted)).

Commerce fails to identify substantial evidence to establish that any one segment is more representative than a single other segment.  This litigation involves the *first* administrative review of this order, so the "history" Commerce relies upon is merely one segment—the original investigation conducted in 2020.  Commerce failed to explain

---

[18] Counsel for Arizona Tile averred at oral argument that Commerce also looked at data from the second administrative review in an attempt to strengthen the position that Commerce reviewed contemporaneous data.  Oral Arg. 1:57:00–1:57:50.  This subsequent data is not referenced anywhere in Commerce's explanation.  The court may not accept counsel's *post hoc* rationalizations for agency action; an agency's decision must be upheld, if at all, on the basis articulated by the agency itself.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

why the investigation is more probative than the first administrative review.  Commerce

even acknowledged the lack of history when it rejected a request by Cambria to review

the historical rates to justify the use of sampling exporters of varying sizes in this review.

Commerce replied, "[a]t this time, there is *limited evidence* to provide Commerce with a

reasonable basis to believe or suspect that the . . . dumping margins for the largest

exporters differ from those of smaller exporters."  Resp't Selection Mem. at 6 (emphasis

added).  In other words, Commerce recognized that the history of dumping margins was

insufficient to show that the margins calculated for the largest exporters were not

representative of the non-selected companies.

     Commerce's departure from the expected method in calculating the non-selected

company rate is not supported by substantial evidence.[19]  On remand, Commerce must

reconsider or further explain any decision to depart from the expected method.

## V.   Commerce's Determination Not to Apply an Export Subsidy Offset to the Non-Selected Company Rate

     Arizona Tile also challenges Commerce's decision not to apply an export subsidy

offset to adjust the non-selected company rate, arguing that Commerce's decision

constitutes a ministerial error.  Arizona Tile's Mem. at 40–44.  In response, the

---

[19] Commerce's departure here is striking considering its disinclination to depart from the expected method in other proceedings involving one or more AFA rates for the mandatory respondents.  *See PrimeSource Building Prods., Inc. v. United States*, 46 CIT __, __, 581 F. Supp. 3d 1331, 1341–43 (2022), *appeal docketed*, No. 2022-2128 (Fed. Cir. Aug. 17, 2022); *Pro-Team Coil Nail Enter., Inc. v. United States*, 46 CIT __, __, 587 F. Supp. 3d 1364, 1372–74 (2022), *appeal docketed*, No. 2022-2241 (Fed. Cir. Sept. 22, 2022); *see also Bosun Tools Co. v. United States*, No. 2021-1929, 2022 WL 94172 at *4–6 (Fed. Cir. Jan. 10, 2022) (sustaining Commerce's averaging of zero and AFA rates to determine the rate for the non-selected respondents).

Government avers that Commerce's decision was not ministerial but rather methodological in nature and that Arizona Tile failed to exhaust its administrative remedies with respect to the adjustment.  Def.'s Resp. at 49–51.

In light of the need for Commerce to analyze Antique Group's second supplemental questionnaire response and, if appropriate, further corroborate any AFA rate and reconsider or better explain any decision to depart from the expected method, the court declines to reach the issue of the export subsidy offset.  Parties may address this issue before the agency, as appropriate, in the course of the remand proceeding.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby:

**ORDERED** that Commerce's *Final Results* are remanded to the agency for further action consistent with this opinion; and it is further

**ORDERED** that, the Parties must consult and, no later than June 27, 2024, provide the court with a joint status report proposing a reasonable date by which the remand proceeding will be completed; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.

/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: May 28, 2024
       New York, New York